1  MARSHA JONES MOUTRIE (SBN 69711)
   City Attorney
2  JOSEPH LAWRENCE (SBN 99039)
   Assistant City Attorney
3  LANCE S. GAMS (SBN 125487)
   Deputy City Attorney
4  MARTIN T. TACHIKI (SBN 83044)
5  Deputy City Attorney
6  1685 Main Street, Third Floor
7  Santa Monica, California 90401-3295
   Telephone: (310) 458-8336
8  Facsimile:  (310) 393-6727
9  Marty.Tachiki@smogov.net

10 Attorneys for Defendant,
   CITY OF SANTA MONICA
11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15 UNITED STATES OF AMERICA, and  )   CASE NO.: CV08-02695 CW(Ex)
   MARY E. PETERS, United States  )
16 Secretary of Transportation,    )   DATE:        April 28, 2008
                                    )   Time:        2:30 p.m.
17              Plaintiffs,         )   CourtRoom: 10
                                    )
18         v.                       )
                                    )
19 CITY OF SANTA MONICA,            )
                                    )
20              Defendants.         )
                                    )
21 _____)

22      OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO

23      PLAINTIFFS' APPLICATION FOR TRO; MEMORANDUM OF

24      POINTS AND AUTHORITIES IN SUPPORT THEREOF;

25      DELCARATIONS OF ROBERT TRIMBORN AND

26      JAMES E. HALL; EXHIBITS

27

28

1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY.......................................1

ARGUMENT...........................................................................4

I    The Secretary's Arugment That This
Court Has, In Effect, A Ministerial Duty
To Rubber Stamp The FAA's Interim Order
And Grant Injunctive Relief Should Be Rejected
Out Of Hand.........................................................................4

II.    The FAA's Self-Styled Cease and Desist Order Is Legally Invalid

And Unenforceable..............................................................5

    A.    The Court Has the Jurisdiction to Evaluate the Legality of the

        Cease and Desist Order.........................................6

        1.    The Court May Independently Determine Whether the

            Cease and Desist Order is Legal..........................6

        2.    The Court Must Evaluate the Likelihood that the

            Secretary Will Ultimate Succeed On Her Claim That the

            Order Is Valid...................................................8

    B.    The Order Is Invalid And Unenforceable Under Controlling

        Statutes And Regulations......................................10

    C    The Need to Critically Assess the Validity of the Order

        is Essential To Avoid A Serious 10th Amendment Violation......14

III.    THE SECRETARY'S EVIDENCE AND ARGUMENT ARE UTTERLY

    INSUFFICIENT TO JUSTIFY ISSUANCE OF

    AN ORDER PROHIBITNG, EVEN TEMPORARILY, THE

    ENFORCEMENT OF A LAW DULY ADOPTED TO

PROTECT PUBLIC SAFETY.................................................19

A.   The Physical Realities Combined With Increasing

C&D Aircraft Operations Create A Safety Risk According

to the FAA's Own Standards.....................................19

B.   As Proprietor and Operator of the Santa Monica Airport,

The City Is Legally Responsible For Its Safe Operation And Is

Legally Empowered to Fulfill That Responsibility...............20

C.   Unlike the FAA's Interim Cease and Desist Order,

the Ordinance Was Duly Adopted And Is Fully Consistent With

Federal Requirements ................................................21

IV.   SAFETY CONSIDERATIONS TIP THE BALANCE WHICH

THIS COURT SHOULD STRIKE IN FAVOR OF THE CITY........21

CONCLUSION.................................................................22

Declaration of Robert Trimborn.............................................23

Declaration of James E. Hall................................................24

Exhibits 1 through 21.................................................31-176

**TABLE OF AUTHORITIES**

<u>**Cases**</u>:                                                                Page

*Air Transport Ass'n of America v. Crotti*, (N.D. Cal. 1975)

    389F.Supp. 58 ……………………………..…………………….20

*Federal Maritime Comm'n v. South Carolina Ports Auth*, (2002)

    535 U.S. 743, 762 ……………………………………………..…7

*Gordon v Havasu Palms*, (2001)

    93 Cal.App.4th 244, 249 ……………………….…………….…18

*GTE South, Inc. v. Morrison*,

    199 F.3d 733, 744 4th Cir. 1999)……………………………..…8

*International Ass'n of Machinists and Aerospace Workers. v. Eastern Air Lines, Inc.*,

    826 F.2d 1141, 1144 (2d Cir. 1987)……………………………10

*Lineback v. Surlino Materials,* LLC, (S.D. Ind. 2007)

    Case No. 07-cv-0599, 2007 WL 3334786 at *1................................

*New York v. United States*, (1992)

    505 U.S. 144, 157 …………………………………………….15

*New York v. United States*,

    505 U.S. at 162…………………………………………………16

*NLRB v. Electro-Voice, Inc.*,

    83 F.3d 1559, 1567-70 (7th Cir. 1996)………………………….9

*Northern Cheyenne* ……………………………….………………5

*Printz v. United States*, (1997)

    521 U.S. 898, 935…………………………………………….16

*Sammartano v. First JudicialSist. Ct.* (9th Cir. 2002)

    303 F.3d 959,974………………………………………………5

*Slapin v. Los Angeles International Airport*, (1976)

    65 Cal.App.3d 484, 135 Cal. Rptr. 296 …………………………..20

*Tribe v. Hodel* (9th Cir. 1988)

    851 F.2d 1152, 1157.................................................................

United States v. First Nat'l Bank, (1965)

    379 U.S. 383 ..................................................................21

*United States v. Ruzicka*, (1946)

    329 U.S. 287, 290-92 ...........................................................

*Western Air Lines, Inc. v. Port Authority of New York*, (S.D.N.Y. 1986)

    658 F.Supp. 952 ..............................................................20.

*Yakus v. United States*, (1944)

    321 U.S. 414..................................................................7

Statues and Regulations

CFR § 16.31(d)

CFR §§16.31 & 16.109.

CFR § 16.109(a)

CFR § 40103(e)

CFR 46101(a)(4)

CFR §. 47111(f)

Rules

14 C.F.R. Part 16

46 U.S.C.App. § 1713(c))

49 U.S.C. Section n 1305(b)(1)

49 U.S.C. 40103(e)

49 U.S.C. 46101(a)(4)

61 Fed. Reg. 53999 (October 16, 1996)

Other

Article XI, section 5(a)

California Constitution, Article 11, Section 5

1  MARSHA JONES MOUTRIE (SBN 69711)
   City Attorney
2  JOSEPH LAWRENCE (SBN 99039)
3  Assistant City Attorney
   LANCE S. GAMS (SBN 125487)
4  Deputy City Attorney
5  MARTIN T. TACHIKI (SBN 83044)
   Deputy City Attorney
6  1685 Main Street, Third Floor
7  Santa Monica, California 90401-3295
   Telephone: (310) 458-8336
8  Facsimile:  (310) 393-6727
9  Marty.Tachiki@smogov.net

10 Attorneys for Defendant,
   CITY OF SANTA MONICA
11

12         **UNITED STATES DISTRICT COURT**

13         **CENTRAL DISTRICT OF CALIFORNIA**

14

15 UNITED STATES OF AMERICA, and ) CASE NO.: CV08-02695 CW(Ex)
   MARY E. PETERS, United States    )
16 Secretary of Transportation,     ) **OPPOSITION BY DEFENDANT**
                                     ) **CITY OF SANTA MONICA TO**
17         Plaintiffs,               ) **PLAINTIFFS' APPLICATION FOR**
                                     ) **TRO; MEMORANDUM OF POINTS**
18      v.                           ) **AND AUTHORITIES IN SUPPORT**
                                     ) **THEREOF; DELCARATIONS OF**
19 CITY OF SANTA MONICA,             ) **ROBERT TRIMBORN AND JAMES**
                                     ) **E. HALL; EXHIBITS**
20         Defendants.               )
   _____  )
21

22         The City of Santa Monica hereby opposes the United States and Secretary's

23 application for a temporary restraining order.

24                **INTRODUCTION AND SUMMARY**

25

26         This lawsuit and the application for a temporary restraining order were filed to

27 stop the City of Santa Monica from enforcing a local law duly adopted by the Santa

28 Monica City Council to protect public safety by implementing the federal

                                      1

government's own safety standards and guidelines at the Santa Monica Airport ("Airport"). A description of the Airport and a summary of its history are provided in the accompanying Declaration of Airport Director Robert Trimborn. That declaration documents both the City's efforts to preserve safety despite increasing Airport usage by faster aircraft and the Federal Aviation Administration's opposition to those efforts.

The dispositive facts are few. The City is the proprietor and operator of the Airport, an older facility built before World War II and before the era of private jet aircraft. The Airport sits atop a plateau and is surrounded by dense residential neighborhoods. (*See* Exhibit 7 [aerial photographs of the Airport and runway ends]) Homes sit below the runway and within 300 feet of both of its ends. There are no runway safety areas to protect Airport neighbors and users from accidents resulting from runway overruns. The City, as proprietor, must prevent such accidents to preserve public safety and to shield itself from legal liability.

Disputes between the Federal Aviation Administration ("FAA") and the City about Airport operations began decades ago. In 1984, after protracted negotiations, the City and the FAA resolved those disputes by entering into a contract commonly known as the 1984 Agreement. (Exhibit 8) Through contractual references, it obligates the City to accommodate Category A and B aircraft at the Airport through the year 2015. (Exhibits 8 – 11) It does not obligate the City to accommodate Category C&D aircraft, which, according to the FAA's own safety standards, require

2

a longer runway than the Airport's. (Decl. of Robert Trimborn, ¶ 5)

Six years ago, faced with mounting risks, the City formulated a program to conform Airport usage to Airport facilities according to federal standards and consistent with the 1984 Agreement.  But, despite the existence of the Agreement and despite the fact that the conformance program would implement federal safety standards and guidelines, the FAA opposed the program and halted its implementation by commencing the underlying administrative proceeding in October 2002.  Although that proceeding has been pending ever since, the FAA has not issued even a first level decision.  Meanwhile, C&D traffic at the Airport has increased.  And, the FAA itself has undertaken a national campaign to promote runway safety by requiring runway safety areas at airports nationwide.  (*See* Exhibit 13)  But, not in Santa Monica.  As to Santa Monica, the FAA contends that the City may not conform usage to the Airport's specifications and may not install adequate runway safety areas.

Ultimately, faced with mounting safety risks, the City moved forward with the Conformance Program by adopting an Ordinance banning Category C&D Aircraft. (Exhibit 15)  By this application, the Secretary seeks to protect the convenience of a relatively few airport users by obtaining rubber stamp approval of an unlawful FAA order,  issued without due process, for the sole purpose of prohibiting enforcement of the ordinance.  The Court should decline to supply that approval and allow the enforcement which will protect the safety of many.

3

## ARGUMENT

## I.  THE SECRETARY'S ARGUMENT THAT THIS COURT HAS, IN EFFECT, A MINISTERIAL DUTY TO RUBBER STAMP THE FAA'S INTERIM ORDER AND GRANT INJUNCTIVE RELIF SHOULD BE REJECTED OUT OF HAND.

The Secretary's application demonstrates a fundamental and fatal misapprehension of the authority and role of this court.  In essence, the application asserts that simply because the FAA has issued an Interim Order, the court must effectuate it and may not consider either the order's legality or the City's opposing arguments.

Facts which would warrant such a circumscription of this court's powers are conceivable.  For example, if engines on a commercial airline carrier's aircraft came loose and threatened to fall off their planes, if the FAA properly ascertained those facts and issued a cease and desist order grounding the planes; and if the carrier refused to comply, then perhaps the court would be constrained to do the Secretary's bidding upon her application for injunctive relief.

But, that is not this case.  The Secretary does not claim that the FAA duly issued an order to avert an immediate risk to public safety.  The Secretary's claim is merely that the FAA issued an order and the order must be effectuated, simply because it was issued.  There is absolutely no evidence that the FAA ascertained the existence of a safety emergency or acted to promote safety.  The only evidence the

4

1   Secretary has given this court is evidence that the FAA issued an interim order and

2   that Santa Monica intends to enforce its own ordinance which is designed to protect

3
4   the public safety.  Thus, the only evidence before this court relating to safety is that

5   the City -- not the FAA --has acted to protect safety and that the Secretary is in court,

6   on behalf of the FAA, to thwart the City's legitimate actions to do so.

7
8        Based on the evidence, the Court should conclude that the context of this

9   application does not warrant an abandonment of the Court's authority to exercise its

10  discretion by balancing the hardships and considering the public interest.  See

11
12  Northern Cheyenne See Tribe v. Hodel, 851 F.2d 1152, 1157 (9th Cir. 1988);

13  Sammartano v. First Judicial Dist. Ct. (9th Cir. 2002) 303 F.3d 959, 974 [both

14
15  explaining proper considerations in granting injunctive relief].

16

17  **II.    The FAA's Self-Styled Cease and Desist Order Is Legally Invalid**
18  **And Unenforceable.**

19       The Secretary does not and cannot point to any authority to support her position

20
21  that FAA can issue an immediately effective compliance order, prior to *any* agency

22  determination that any law has been violated, prior to the completion of the FAA's

23
24  ongoing investigation and prior to Santa Monica being afforded notice and a hearing.

25  As detailed below, the FAA's own regulations the controlling statutes, squarely

26  prohibit such attempts to by-pass procedures designed to ensure fundamental fairness

27  and due process.

28

A. **The Court Has the Jurisdiction to Evaluate the Legality of the Cease and Desist Order.**

1. **The Court May Independently Determine Whether the Cease and Desist Order is Legal.**

The Secretary's position that this Court lacks the jurisdiction to consider the legality of the order rests on her overly simplistic reading of 49 U.S.C. § 46110(c) -- that jurisdiction over the validity of FAA orders is vested in the courts of appeal, thereby depriving this Court of jurisdiction to consider the validity of the very orders it is being asked to enforce. (Memorandum in Support of Application for Temporary Restraining Order ["Memorandum"] at 10-11). However, Section 46110(c) only vests exclusive jurisdiction in the courts of appeal *after* (1) an aggrieved party exercises its option to seek review of an FAA order [§ 46110(a)], and (2) the clerk of the court transmits the petition for review to the Secretary [§ 46110(b)]. Neither of these events has occurred in this case. Accordingly, at this time, no court of appeals has taken any jurisdiction over any part of the FAA's order.

Moreover, nothing in the other statutes cited by the Secretary limits in any way this Court's jurisdiction with respect to the order. The Court is free to consider the legality of the order, just as it would consider the underlying jurisdictional basis for any claim brought before it and legal authority of any plaintiff to seek extraordinary relief from this court. Indeed, the Secretary herself puts the validity of the Interim Order at issue by assertions that "the City is placing itself squarely in violation of a valid and effective order of the FAA" (Memorandum at 8; *see also, id.* at 10).

6

1    Moreover, the Secretary's position is not supported by the cases she cites.  The

2  Secretary cites *Yakus v. United States*, 321 U.S. 414 (1944) for the proposition that

3
4  "under statute vesting exclusive jurisdiction [*sic*] in court of appeals, district court

5  lacked authority to hear challenge to validity of order in an enforcement action."  But

6  in *Yakus*, the Supreme Court found that provisions of a statute conferring on an

7
8  Emergency Court of Appeals "'exclusive jurisdiction to determine the validity of any

9  regulation or order', coupled with the provision that 'no court, Federal, State, or

10  Territorial, shall have jurisdiction or power to consider the validity of any such

11
12  regulation are broad enough in terms to deprive the district court of power to consider

13  the validity of the Administrator's regulation or order as a defense to a criminal

14
15  prosecution for its violation."  *Id.* at 43.  As discussed above, the statutory scheme

16  governing appellate court jurisdiction to review FAA orders does not make exclusive

17  jurisdiction automatic; rather, exclusive jurisdiction is triggered only when a petition

18
19  for review has been filed *and* the Court sends the petition to the Secretary [§46110(a)-

20  (c)], none of which has occurred here.  Moreover, none of the statutes the FAA relies

21  on contain a provision removing this Court's power to *consider* the validity of the

22  regulation or order before issuing injunctive relief.

23
24    The other cases cited by the Secretary are similarly distinguishable  In *Federal*

25  *Maritime Comm'n v. South Carolina Ports Auth*, 535 U.S. 743, 762 (2002), the

26  enforcement statute expressly limited the district court's authority to review the

27
28  agency's order to "whether the relevant order 'was properly made and duly issued.'"

7

*Id.* [*quoting* 46 U.S.C.App. § 1713(c)]. Again, there is no corresponding statutory limitation on the Court's authority in statutes cited by the Secretary in this case. Moreover, the Supreme Court did not hold that the sanctioned party could never contest the merits of the agency's action, but only that its failure to do so before the agency would compromise its ability to do so later. *Id.* Here, the FAA's action in issuing the Interim Order on the evening of April 23rd without providing the City the opportunity for a hearing, and then immediately seeking a TRO the next morning, has, in violation of applicable law, deprived Santa Monica of the ability to contest the Order before the agency prior to the proceeding in this Court.[1] The governing statutes and regulations preclude the government from dragging the City into a Kafkaesque process by seeking immediate enforcement by this court and preventing Santa Monica from defending itself by challenging the legality of FAA's order.

**2.    The Court Must Evaluate the Likelihood that the Secretary Will Ultimate Succeed On Her Claim That the Order Is Valid.**

Even if the Court were to accept the Secretary's argument that this Court cannot adjudicate the legality of the Order the Secretary seeks to enforce, the Court can, and indeed must, consider the legality of the Order in the context of assessing the

---

[1] The other cases cited by the Government are similarly inapposite. *GTE South, Inc. v. Morrison*, 199 F.3d 733, 744 4th Cir. 1999) (different statutory scheme in which appeals challenging validity of rules were already pending); *United States v. Ruzicka*, 329 U.S. 287, 290-92 (1946) (statute expressly barred sanctioned party from contesting validity of order in enforcement proceeding, while also providing a separate administrative process for such claims).

likelihood of success on the merits.  There is no question that this Court must determine whether the Secretary is likely to succeed on the merits of this case, as even the Secretary concedes.  Memorandum at 9.

As noted above, the Secretary's position is that she is entitled to equitable relief to enforce the Interim Order.  But, if that order is invalid, there is no basis on which this Court can issue the injunction or TRO the Secretary demands.  As discussed in detail below, the Secretary asserts irreparable harm if the City is not enjoined from enforcing the ordinance.  Memorandum at 9, 11-12.  The Secretary also asserts that she is likely to succeed on the merits.  Id. at 9-11.  Accordingly, it is incumbent on this Court to make an assessment of the likelihood that the Secretary  will prevail on her assertion that the order is valid and enforceable, even if that argument will ultimately be decided by the Court of Appeals.

In cases where an injunction is sought in one forum but the merits of the case are vested in the jurisdiction of another forum, courts have reviewed the underlying merits in the context of evaluating the likelihood of success on the merits.  *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1567-70 (7th Cir. 1996) (careful analysis of petitioner's likelihood of success in proceeding before NLRB where court had no jurisdiction to adjudicate the merits of those proceedings).  As the Second Circuit stated in reversing a district court for refusing to consider likelihood of success on the merits in an injunction case in which the merits were in the exclusive jurisdiction of arbitrators: "The court most decidedly had jurisdiction to entertain whether there was

9

a probability of success *on the injunction.*"  *International Ass'n of Machinists and Aerospace Workers. v. Eastern Air Lines, Inc.*, 826 F.2d 1141, 1144 (2d Cir. 1987) (emphasis in the original)[ultimately finding no likelihood of success due to lack of jurisdiction].

Having come into this Court relying on the legality of the FAA's purported Cease and Desist Order, the Secretary cannot avoid all scrutiny of the legality of the Order.  At a minimum, the Court must consider the likelihood that the Secretary will successfully defend the legality of the order before the Court of Appeals.  As set forth above, there are significant reasons the Secretary will not succeed in doing so.  Therefore, the Court should not issue the requested TRO or injunction.

Thus, while the Secretary boldly asserts that she is "certain" to succeed on the merits, there is in fact, considerable doubt that she would do so, and under the applicable standards for injunctive relief (see discussion, *supra*), the Court must inquire into that issue.

**B.     The Order Is Invalid And Unenforceable Under Controlling Statutes And Regulations.**

The Secretary's position is incorrect because, quite simply, the FAA followed neither its governing statutes nor its own regulations in issuing the Order.  The Order was issued by the Acting Director of Airport Safety and Standards ("Director") as part of a proceeding under 14 C.F.R. Part 16.  Under Part 16, the Director's Determination acts as a *proposed* set of findings and remedial actions.  As the Secretary concedes, the next step in this case, if the Director's Determination is adverse to the City, would

10

be a hearing before a hearing officer.  If the Hearing Officer's proposed decision is adverse to the City, it can appeal to the Associate Administrator for Airports, who issues a Final Decision.

Here, placing the cart far ahead of the horse, the Director has purported to issue a Cease and Desist Order prior to the issuance of a Director's Determination.  Order at 1, 2.  Part 16, however, does not authorize the Director to issue a binding Cease and Desist order.  Section 16.31(d) only authorizes the Director, at the time he renders his Determination, to *propose* the issuance of a Cease and Desist order.  This is in keeping with the fact that the Director's Determination is not a final agency order, but merely a proposed order. [2]  14 C.F.R. §16.3 (defining ""Director's determination" as "the initial determination made by the Director following an investigation, which is a non-final agency decision").  *See also id.* at §§16.31 & 16.109.

---

[2] The Discussion of Comments contained in Preamble to the final Part 16 Regulations similarly recognizes that a compliance order may only be proposed, not made effective, at the time of a Director's Determination. With regard to a right to a hearing the FAA notes that "Section 16.31(d) provides the respondent with the opportunity for a hearing if the initial determination finds the respondent in noncompliance and *proposes* the issuance of a compliance order and an opportunity for a hearing required by statute. (*emphasis added.*) 61 Fed. Reg. 53999 (October 16, 1996).  FAA also states that, "Under Sec. 16.31(d), a case proceeds to a hearing only after the FAA has found against the respondent in an initial determination that *proposes* the issuance of a compliance order. (emphasis added.)" *Id.*

11

Similarly, Section 16.109(a) provides that "the agency will provide the opportunity for a hearing if, in the Director's Determination, the agency proposes to issue ... a cease and desist order . . . or any other compliance order issued by the Administrator to carry out the provisions of the acts, and required to be issued after notice and opportunity for a hearing."

Thus, under the FAA's own regulations, even if the Director had issued his initial Determination, he could not have issued a binding Cease and Desist Order.  In this case, however, the Director has not yet issued an initial Determination.  And the FAA has not provided the City with an opportunity for a hearing, but, the Secretary concedes, it will do so if the Acting Director concludes that the Ordinance does not comply with federal law.  (Memorandum at 7)  Thus, the FAA has no authority at this point to issue a binding Cease and Desist Order and has not presented this Court with a valid order that can be enforced.

With respect to an alleged violation of 49 U.S.C. 40103(e) (prohibition against granting exclusive rights to any person to use aeronautical facilities)[3], an order to

_____

[3] In any event, FAA would be hard pressed to demonstrate that the City has violated Sec. 40103(e), which says that "no person" shall be granted an exclusive right.  The Ordinance does not exclude any person from the use of airport facilities. Any person who had access prior to implementation of the Ordinance can have access after the Ordinance is enforced, as long as they operate a compliant aircraft.  Category C and D operators are not an immutable.  As set forth below, the majority of operations of C and D aircraft at SMO were conducted by operators utilize multiple

compel compliance is governed by 49 U.S.C. 46101(a)(4). That section provides that "*After notice and an opportunity for hearing*, the Secretary shall issue a notice to compel compliance with this part [49 U.S.C. Part A]] if the Secretary . . . finds in an investigation under this subsection that a person is violating this part." (emphasis added.)   Thus, the FAA may not issue an order to compel compliance with Section 40103(e) unless and until the FAA complies with the notice and hearing requirements of Section 46101(a)(4) and Part 16 *and* the Associate Administrator issues the order. The existence of other, general provisions, cited by the Secretary concerning FAA's authority to issue orders does not allow FAA to escape the directly applicable requirements of Sec. 46101(a)(4) that the City must be provided an opportunity for hearing before FAA may issue and seek to enforce a compliance order.

Moreover, it is clear that Congress deliberately chose not to allow the FAA to bypass the notice and hearing requirements in any but true emergency cases involving safety. The only statutory provision that allows for the issuance of a compliance order without providing the opportunity for a hearing is Section 46105(c). It which provides limited authority in the event of "an emergency related to safety in air commerce [that] requires immediate action." In this case, the Secretary has not

---

aircraft, both compliant and non-compliant.   Moreover, the distinction between Category C and D aircraft and Category A and B aircraft is reasonable and rationale because the Airport lacks the Runway Safety Areas specified by FAA's own published guidance for runways serving Category C and D aircraft

**OPPOSITON BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR TRO**

asserted, nor can she plausibly assert, that the implementation of the Ordinance creates an emergency related to safety in air commerce.

Given the fact that the FAA's order was not properly issued in accordance with applicable statutory and regulatory authority, the order is not "valid and binding," as asserted by the Secretary.  Memorandum at 10.  Therefore, there is no basis for seeking an injunction or TRO to compel compliance with the Order.[4]

**C.**      **The Need to Critically Assess the Validity of the Order is Essential To Avoid A Serious 10th Amendment Violation.**

Duly enacted Ordinances of the City of Santa Monica that are designed to protect public health and safety are entitled to a presumption of validity. This is particularly true here, because the Ordinance was enacted only after great deliberation.

As a result, there is a presumption against enjoining duly enacted public health and safety measures of a subdivision of the sovereign State of California.  The presumption counterbalances the FAA's claimed presumption in favor of enforcement

---

[4] If despite the arguments contained in the Memorandum that rely on the Order as the sole basis for seeking the TRO, the Secretary were to reverse course and now claim that it is seeking to enjoin the enforcement of the Ordinance in order to prevent a violation of the City's substantive federal obligations, pursuant to Sec. 47111(f), then the Court would be entitled to evaluate the likelihood of the FAA proving its substantive allegations that the Ordinance violates the City's federal obligations.  The City would welcome the opportunity to present evidence to the Court that the City has

of an order it issued.  Because of these competing presumptions, the normal tests for

the issuance of the preliminary injunction must be met, which the FAA has failed to

do.  The Court should carefully weigh the equities and claims of both sovereign

interests.

The existence of significant Tenth Amendment concerns reinforces the

necessity of addressing the important state interests in preserving the ability of a local

government to enforce its health and safety protections.  This is true as part of the

TRO and preliminary injunction analysis and as part of the assessment of the FAA's

attempt to contort the provisions of federal law to give it the power to stop

enforcement of local safety regulations without a hearing and without making any

final findings of fact or conclusions of law.  When considering the FAA's

unprecedented arguments, the standard rule of statutory construction that statutes

should be interpreted to avoid creating constitutional violations must be applied.

The Tenth Amendment ensures the viability of our system of dual sovereignty

by confirming "that the power of the Federal Government is subject to limits that may,

in a given instances, reserve power to the States." New York v. United States, 505

U.S. 144, 157 (1992).   And, the California Constitution gives cities, particularly

charter cities like Santa Monica, extremely broad police powers to ensure that the

local public health, safety and welfare will be protected.  California Constitution,

Article 11, Section 5.

not violated its federal obligations.

15

Moreover, the federal government may not conscript state and local

governments to regulate on its behalf.  While Congress has the authority to encourage

states to regulate according to federal preferences, "the Constitution does not confer

upon Congress the ability simply to compel the States to do so." New York v. United

States, Id. at 149. See Printz v. United States, 521 U.S. 898, 935(1997)["The Federal

Government may neither issue directives requiring the State to address particular

problems, nor command the States' officers … to administer or enforce a federal

regulatory program."] "While Congress has substantial powers to govern the Nation

directly, including in areas of intimate concern to the States, the Constitution has

never been understood to confer upon Congress the ability to require the States to

govern according to Congress' instructions." New York v. United States, 505 U.S. at

162.  The law is abundantly clear: federal coercion is proscribed.

Here, by the Interim Cease and Desist Order, the FAA is attempting to compel

the City to use its municipal resources and exercise its proprietary authority, as an

airport operator, to  achieve the FAA's goal of allowing aircraft for which the airport

was not designed to utilize Santa Monica Airport.  As attested to by Mr. Hall, a past

Chairman of the National Transportation Safety Board for six years, "in the absence of

meeting the federal standards for RSAs [Runway Safety Areas] at Santa Monica

Airport, Category C and D aircraft should not be permitted to operate due to the

serious risk of injuries and deaths to occupants of the aircraft and members of the

community resulting from aircraft operating on the margins of safety with no

16

provision for the possibility of mechanical failure or pilot error." (Decl. James E. Hall at ¶ 16)

Significantly, the City's grant assurances with the federal government preserve its proprietary rights, as airport operator. Grant Assurance 22(i) provides that "[t]he sponsor [Santa Monica] may prohibit or limit any given type, kind of class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public." Grant Assurance 22(i). (Exhibit 10) Moreover, the 1984 Settlement Agreement provides that the City is only required to accommodate Category A and B aircraft, through its reference to an Advisory Circular setting forth design standards for airports that only accommodate A and B aircraft. (Exhibit 8 at Section 8) Now, the FAA, at a preliminary stage of an administrative proceeding, before an initial determination, before a hearing and before a final agency determination, attempts to ignore the City's rights and strip the City of its authority and property by forcing the City to use its resources to accommodate faster Category C and D aircraft for which the airport was never designed and for which the airport lacks Runway Safety Areas (RSAs), which provide a margin of safety in the event of mechanical failure or pilot error.

This coercion is both unlawful under the Tenth Amendment and patently unreasonable. The Airport's runway lacks the RSAs that the FAA, itself, has determined are necessary and appropriate for C and D aircraft. The City, as proprietor and responsible party, has determined that it would be infeasible to provide such

17

RSAs while maintaining the current usable runway length, because the topography (steep drops offs at each end of the runway) and the immediate proximity of long-standing residential neighborhoods make installation of 1,000 foot flat RSAs impracticable. The FAA has rejected City proposals for adequate RSAs and EMAS that would involve shortening the runway. Thus, the only way for the City to provide the margin of safety intended by the FAA design standards is to ban operations by C and D aircraft.

If successful, the FAA's attempt, by its Interim Cease and Desist Order, to prevent enforcement of the City's Ordinance and force the City to accommodate Category C and D aircraft would commandeer the resources of the City to implement the FAA's regulatory approach of requiring an airport proprietor to accept operations of aircraft far faster than those for which the proprietor designed, built and agreed to operate its airport. In the event of an overrun, the FAA's demand, if successful, would not only force the City to expend emergency resources but also, more importantly, shoulder the liability risks associated with allowing operations of aircraft without safety measures specified by the FAA's own standards. See, e.g. Gordon v Havasu Palms, 93 Cal.App.4th 244, 249 (2001). There is no mechanism by which FAA could or would assume the risks associated with accommodating faster aircraft at the Airport.

Thus, the Secretary's position is that pursuant to the FAA's Interim Cease and Desist Order the City has no choice but to accept and shoulder the risks attendant

18

upon accommodating faster aircraft without the safety measures the FAA has

designated as appropriate for those aircraft. The Tenth Amendment precludes the FAA

from forcing this obligation upon the City.

### III.   THE SECRETARY'S EVIDENCE AND ARGUMENT ARE UTTERLY INSUFFICIENT TO JUSTIFY ISSUANCE OF AN ORDER PROHIBITNG, EVEN TEMPORARILY, THE ENFORCEMENT OF A LAW DULY ADOPTED TO PROTECT PUBLIC SAFETY.

#### A.  The Physical Realities Combined With Increasing C&D Aircraft Operations Create A Safety Risk According to the FAA's Own Standards.

The Declarations of Bob Trimborn and Jim Hall attest to and explain the safety

risks at the Santa Monica Airport.  In short, there are no runway safety areas.  The

residents living within 300 feet of the runway ends are thus at risk in the event of an

overrun resulting from pilot error or equipment failure.  And, the risk is heightened by

increased usage of the Airport by C&D aircraft, which travel faster and therefore

require longer runways.  The risk is also increased by the Airport's topography. The

Airport sits on a plateau above the surrounding residential neighborhoods.  Thus,

landing at the Airport has been likened to landing on the deck of a aircraft carrier.

There is no margin for error.

And errors occur.  As Mr. Hall attest, and everyone knows, humans make

mistakes and equipment fails.  Overruns occurring in Santa Monica and elsewhere

illustrate this universal truth.  (Exhibit 12)  That is why the FAA has trumpeted the

importance of runway safety and embarked upon a nationwide program of requiring

runway safety areas.  (Exhibit 13)  Given the unusual proximity of homes to the

runway ends in Santa Monica, an overrun like the ones which have occurred relatively

recently at other airports would be catastrophic. (*See* Exhibit 12)

**B. <u>As Proprietor and Operator of the Santa Monica Airport, The City Is
Legally Responsible For Its Safe Operation And Is Legally Empowered to
Fulfill That Responsibility.</u>**

Contrary to the federal government's assertions, federal and state law both
empower and require the City to address these risks. The federal courts have
recognized that a government entity which owns and airport is legally responsible for
that airport's safety. <u>See</u>, <u>e.g.</u>, <u>Air Transport Ass'n of America v. Crotti</u>, 389F.Supp.
58 (N.D. Cal. 1975)[explaining that an airport proprietor is responsible for the
consequences attendant upon its operation of that airport]. Likewise, under state law,
a city which owns an airport is liable for dangerous conditions at that airport,
notwithstanding the governmental immunities afforded by state statute. <u>Slapin v. Los
Angeles International Airport</u>, 65 Cal.App.3d 484, 135 Cal. Rptr. 296 (1976).

And, federal and state law empower the City to fulfill this responsibility.
Federal law recognizes the proprietary powers and rights of airport owners. 49 U.S.C.
Section n 1305(b)(1) establishes the proprietary exception to federal supremacy by
stating that the federal power to control aviation shall not "be construed to limit the
authority of any State or political subdivision thereof ... as the owner or operator of an
airport .. to exercise its proprietary powers and rights." See <u>Wester Air Lines, Inc. v.
Port Authority of New York</u>, 658 F.Supp. 952 (S.D.N.Y. 1986)[discussing the
exception]. The proprietor's exception is reflected in federal grant assurance
conditions and regulations which allow airport owner/grantees to ensure safety.
(Exhibit 10)

Likewise, state law empowers Santa Monica to protect airport safety. The State
Constitution gives all California cities broad police powers to protect the public,
safety, health and welfare through local legislation. Article XI, Section 7. Those
powers are even broader for charter cities like Santa Monica, which are granted
additional "home rule" powers by Article XI, section 5(a).

Thus, Santa Monica has both the responsibility to keep its airport safe, and the

1  authority to do so.

2  **C.  Unlike the FAA's Interim Cease and Desist Order, the Ordinance Was**

3  **Duly Adopted And Is Fully Consistent With Federal Requirements.**

4  The Ordinance, which is the subject of this dispute, was not only adopted

5  pursuant to the City's authority and responsibility to keep the Airport safe.  It was

6  adopted only after an extensive public process.  As Mr. Trimborn's declaration attests,

7  there were several public hearings over the course of months.   The City Council's

8  findings, which are the foundation of the ordinance, demonstrate that the Council gave

9  the most careful consideration to the record, to the community's concerns, and to the

10  City's responsibilities.  Even after the ordinance was approved on first reading, the

11  second reading was delayed, to address any remaining possibility of a settlement

12  which would both address the FAA's concerns and protect public safety.  In short, this

13  was not impetuous rush to judgment. It was local government working hard to address

14  competing interests fulfill its most basic responsibility, the protection of public safety.

15  And, the City's legislative solution to the problem of Airport safety is fully

16  consistent with applicable federal standards.  As explained in Mr. Trimborns

17  Declaration, the C&D ban comports with the Airport's reference code, with the City's

18  obligations under the 1984 Agreement, with federal standards as to runway length and

19  safety requirements.

20  **IV. SAFETY CONSIDERATIONS TIP THE BALANCE OF**

21  **HARDSHIPS FAR IN FAVOR OF THE CITY.**

22  In ruling on this application, the Court should consider the public interest.  See

23  United States v. First Nat'l Bank, 379 U.S. 383 (1965).  That interest means that

24  public safety must outweigh the federal governments concerns about the convenience

25  of a relatively small number of Airport users.  They have other options.  As the

26  evidence shows, they can use other aircraft.  Fractional share operators advertise the

27  ease of changing aircraft.  (Exhibits 16 – 18)  All that is at stake for them is their

28  convenience.

OPPOSITON BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR TRO

In contrast, to the residents living below the runway ends, this is a matter of safety, not mere inconvenience. Runway overruns happen, and an overrun by a C or D aircraft at Santa Monica would threaten their lives. (*See* Exhibit 12) And, the City would bear legal responsibility for that catastrophe. Doubtless, its responsibility would be assessed by applying the FAA's own guidelines and standards -- the very guidelines and standards that the City seeks to apply in enforcing the Ordinance and implementing the Aircraft Conformance Program.

This court should protect the public interest by protecting public safety, decline to issue and temporary restraining order, and thereby allow the City to enforce the Ordinance pending a full hearing on the merits of the parties' claims.

## **CONCLUSION**

For the forgoing reasons, the City of Santa Monica respectfully requests that this court reject the Secretary's application for a temporary restraining order.

DATED: April 25, 2008

OFFICE OF THE CITY ATTORNEY
SANTA MONICA, CALIFORNIA

MARSHA JONES MOUTRIE
City Attorney

MARTIN T. TACHIKI
Deputy City Attorney

Attorneys for Defendant
CITY OF SANTA MONICA

22

# DECLARATION OF ROBERT TRIMBORN IN SUPPORT OF THE CITY OF SANTA MONICA'S OPPOSITION TO THE APPLICATION FOR A TEMPORARY RESTRAINING ORDER

I, Robert Trimborn, declare that the following is true and correct based upon my person knowledge and that, if called upon to testify as a witness in any legal proceeding, I could and would competently testify as set forth in this declaration.

1.     I am the Acting Airport Director of the Santa Monica Municipal Airport ("Airport"), and I have served as Airport Manager or Acting Airport Director continuously since August of 1996. During the last twelve years I have been involved in all aspects of the Airport's management, and I am familiar with all aspects of its history and operation.

2.     The City of Santa Monica ("City") owns the Airport and is legally responsible for its safe operation. Physical constraints greatly increase the challenges of ensuring the Airport's safe operation. The Airport sits on a plateau 40 feet above the surrounding residential neighborhoods. Homes in those neighborhoods are less than 300 feet from both ends of the runway. Overhead photographs of the Airport showing the proximity of surrounding neighborhoods are attached hereto as Exhibit 1. The Airport has no runway safety areas ("RSAs") to safeguard residential neighbors and Airport users in the event of an overrun. And, the topography limits the options for enhancing the safety of the Airport. Thus, there is no margin for pilot error or equipment failure at the Airport.

3.     The Airport is an older facility. The City has owned and operated it since at least 1917. I have reviewed the City records relating to use of the Airport prior to, during and immediately after World War II. The records show that the City leased the Airport to the federal government for the duration of the war. After the war, the federal government returned the Airport to the City. And, the City has operated it continuously since then.

1    Copies of the documents relating to the City's lease of the Airport to the federal government

2    are attached as Exhibits 2 through 7. In the 1960's, jet aircraft began using the Airport and

3    that usage created conflicts with airport neighbors. Litigation followed.

4

5        4.      In 1984, those conflicts were resolved through the Santa Monica Airport

6    Agreement, a settlement agreement between the FAA and the City, commonly known as the

7    1984 Agreement. A copy of that Agreement is attached as Exhibit 8.

8

9        5.      The 1984 Agreement sets forth the respective responsibilities that the City and

10   federal government have to each other regarding facility layout and the operation and

11   maintenance of the Airport. By reference to the Group II Design Standards set forth in FAA

12   Advisory Circular 150/5300.4B dated February 24, 1983, pertinent portions of which are

13   attached as Exhibit 9, the 1984 Agreement establishes that the City must operate the Airport

14   to accommodate Category A and B aircraft through 2015. The 1984 Agreement does not

15   obligate the City to accept Category C and D aircraft at the Airport nor did the FAA accept

16   responsibility or liability for the safe operation of the Airport. However, in the years after

17   adoption of the Agreement, Category C & D aircraft began using the Airport; and, over time,

18   the operations of those aircraft substantially grew in numbers creating operational

19   incompatibilities with the physical layout of the Airport.

20

21       6.      In connection with receiving federal aid for the Airport in 1994, the City

22   entered into a Grant Assurance agreement with the FAA. Grant Assurance 22(i) provides

23   that "[t]he sponsor [Santa Monica] may prohibit or limit any given type, kind or class of

24   aeronautical use of the airport if such action is necessary for the safe operation of the airport

25   or necessary to serve the civil aviation needs of the public." A true and correct copy of the

26   Grant Agreement (Contract No. DTFA08-94-C-20857) is attached hereto as Exhibit 10.

27

28       7.      Use of the Airport by increasing numbers of C & D aircraft created safety risks

1   which are further exacerbated by the physical circumstances I have already described – the

2   proximity of homes to the runway ends, the topography and the lack of runway safety areas.

3   The 1984 Agreement's designation of the Airport as a facility for category A and B aircraft

4   is reflected in the 1991 approval by the FAA of the Airport's current Airport Layout Plan

5   designating the Airport as an ARC B-II facility designed for category A and B aircraft.  A

6   copy of the 1991 Airport Layout Plan is attached here to as Exhibit 11.

7

8        8.      In 2002, to address these risks, the City developed the Aircraft Conformance

9   Program which would conform Airport usage to its Airport Reference Code and facilities,

10   based upon FAA guidelines for the layout of airports and runway safety.  The FAA opposed

11   the Aircraft Conformance Program and filed a complaint against the City, challenging its

12   legality, even before the City Council adopted the Program. That complaint started the

13   underlying administrative proceeding six years ago.  The City answered the complaint on

14   November 7, 2002, explaining its safety concerns regarding the ever increasing number of

15   incompatible category C & D aircraft, defending the legality of the Conformance Program,

16   and expressing its willingness to discuss safety alternatives with the FAA.

17

18        9.      Those discussions dragged on for the next six years.  During that time, the

19   number of C & D aircraft using the Airport continued to grow further increasing the risk of

20   an overrun or undershoot on the runway.  A fatal runway overrun has occurred in Santa

21   Monica.  And, overruns occurred elsewhere, including at Teterboro Airport in New Jersey.

22   Had that same overrun occurred in Santa Monica, the results would have been devastating.

23   Exhibit 12, attached to this declaration, shows how far that overrun would have extended

24   into the residential neighborhood at the end of Santa Monica's runway.  The FAA has

25   ignored the evidence that pilot error or mechanical failure of an aircraft are inevitable.

26

27        10.     Ironically, and partly as a consequence of such overruns, the FAA increased its

28   efforts to promote and ensure runway safety nationwide.  Exhibit 13 attached to this

DECLARATION OF ROBERT TRIMBORN

25

1    declaration, provides the statement of the last FAA Administrator about the need for runway

2    safety areas. Thus, as the City continued to negotiate with the FAA, the risks to the City

3    increased and so did FAA's efforts on runway safety area compliance at airports nationwide.

4    The City wanted to meet the runway safety area standards, but which the FAA claimed Santa

5    Monica was not legally allowed to implement those standards.

6

7        11.    In 2007, faced with growing concerns expressed by residents living near the

8    runway ends and growing legal risks, the City Council determined that it must press forward

9    with the Conformance Program in order to protect Airport neighbors and users against

10   overrun accidents and in order to protect the City from liability risks. The FAA strenuously

11   opposed the Program and Kirk Shaffer, Airport Administrator for the FAA, wrote to the City

12   Council stating that the ordinance banning C&D aircraft was "flatly illegal". A true and

13   correct copy of Mr. Shaffer's November 26, 2007 letter to Mayor Richard Bloom is attached

14   hereto as Exhibit 14. Nonetheless, after multiple public hearings and careful consideration

15   of the FAA's arguments, on November 27, 2007, the City approved on first reading the

16   ordinance which is the subject of the Cease and Desist Order. Still hoping for a cooperative

17   resolution, the Council delayed the second reading for one last attempt at settlement

18   facilitated by members of Congress. After that effort proved unavailing, the Council adopted

19   the Ordinance on second reading on March 25, 2008. Pursuant to state and local law, it went

20   into effect thirty days later. A true and correct copy of Ordinance No. 2251 (CCS) is

21   attached hereto as Exhibit 15.

22

23       12.    The day after the Ordinance was adopted, I received a copy of an Order to

24   Show Cause from the FAA. It stated that the FAA was attempting to revive the Part 16

25   administrative proceeding that it had commenced in 2002. The Order gave the City just ten

26   days to respond and submit any and all information it wanted the FAA to consider. The City

27   asked for additional time, which was denied by the FAA. The City filed its reply on April

28   7th.

13.     The FAA's opposition to the Ordinance has, from the very start of this controversy, been based largely on concerns about inconvenience to Airport users. However, on average only about 12 to 13 C & D aircraft use the Airport every day. Moreover, the people who fly on those planes can use other types of compatible aircraft. Most are charter aircraft users or owners of fractional share aircraft that are operated by companies that make it easy for their customers to use other aircraft that are compatible with the Airport. Attached hereto as Exhibits 16, 17 and 18 are copies of internet pages from fractional share companies regarding the right to trade to a compliant aircraft.   We have explained to the FAA that the ban will not stop any person from using the Airport, but those arguments have fallen on deaf ears.

14.     On April 21st, I received a letter from Kelvin Solco, Acting Director of the FAA's Office of Airport Safety and Standards. His letter, similar to the one from Mr. Shaffer, concludes that the ordinance is unlawful. It also gave the City 24 hours to provide assurances that the Ordinance would not be enforced. The City responded, timely, explaining the importance of enforcing the ordinance to protect safety. The next day, even though there had been no hearing and no decision by the FAA, Mr. Solco issued an Interim Cease and Desist Order, giving the City 10 days to respond but asserting that the Order was effective upon issuance.

I declare under penalty of perjury that the foregoing is true and correct and is executed this 25th day of April 2008 under the laws of the United States of America and the State of California in the City of Santa Monica, California.

ROBERT TRIMBORN

### DECLARATION OF JAMES E. HALL IN SUPPORT OF THE
### CITY OF SANTA MONICA'S OPPOSITION TO APPLICATION FOR
### TEMPORARY RESTRAINING ORDER

I, James E. Hall, declare that the following is true and correct based upon my personal knowledge and review of relevant documents and that, if called upon to testify as a witness in any legal proceeding, I could and would competently testify as set forth in this declaration.

1.     I am making this declaration to provide information in this proceeding before the United States District Court, Case No. Civ. Action No. CV 02695 GW(Ex).

2.     I served as Chairman of the National Transportation Safety Board (NTSB) from June, 1994 to January, 2001. As such, I am intimately familiar with issues relating to aviation safety.

3.     During my tenure at the NTSB, I oversaw the investigation of thousands of aircraft accidents.

4.     In the overwhelming majority of cases, the cause of the accident was human error or the failure of an aircraft system to perform as designed.

5.     As a result of NTSB accident investigations, I personally, and the NTSB as an institution, have become convinced of the need to provide adequate margins of safety to avoid disasters when pilot error or mechanical failure occur.

6.     The NTSB has, for almost 32 years, urged the Federal Aviation Administration (FAA) to ensure the implementation of adequate runway safety areas at airports. See attached NTSB Safety Recommendation A-77-16 of April 20, 1977.

7.     Safety enhancements such as Runway Safety Areas (RSAs) are designed to

1    provide protection when something goes wrong.

2        8.    Because of the very real possibility of human error or mechanical failure, the

3    fact that FAA's flight standards office has issued standards or specifications stating that a

4

5    particular aircraft, operating at a particular weight, can safely land or take off on a specified

6    runway length in no way guarantees that an actual operation on such a runway by such an

7    aircraft will be accomplished safely.

8        9.    For a safe aviation system it is imperative that airport design standards and

9

10   flight operations standards work together to provide protection to persons on board aircraft

11   and persons on the ground.

12       10.   For aviation safety it is very important that aircraft only operate at airports that

13   meet the design criteria for those aircraft.

14

15       11.   Due to either mechanical failure or human error aircraft periodically

16   undershoot runways or overrun the ends of runways, sometimes resulting in serious injuries

17   and death to both occupants of the aircraft and others.

18       12.   During my time at the NTSB, I oversaw and served as the NTSB Board

19

20   member on-site for the investigation of an air accident at Sikorsky Memorial Airport in

21   Stratford, CT in which a Piper PA-31-350 aircraft overshot the runway and crashed into a

22   blast fence. The resultant destruction and fire killed eight of nine occupants and was directly

23   caused by the collision with the nonfrangible blast fence. The NTSB declared in its attendant

24   Safety Recommendation of January 5, 1995 to the FAA that "the absence of safety areas

25

26   creates conditions that are demonstrably unsafe." (See attached NTSB Safety

27   Recommendation A 94 211)

28       13.   RSAs which meet the federal standards for aircraft operating at a particular

1  airport are critically important in helping to prevent serious injuries and deaths resulting

2  from undershoots and over runs of runways. The importance of RSAs was reiterated by the

3  NTSB on May 6, 2003 in attached Safety Recommendation A-03-11 to the FAA.

4

5       14.    RSAs which meet the federal standards for aircraft operating at Santa Monica

6  Airport (SMO) are especially important to safety at its airport due to its unique topography

7  and close proximity to residential housing. I have examined an aerial photograph of SMO

8  and it is apparent that residential neighborhoods are extremely close to the runway ends.

9

10      15.    The RSA federal standards for airports used by Category C and D aircraft

11  provide for a 1,000 foot RSA or an equivalent amount of Engineered Material Arresting

12  System (EMAS).

13

14      16.    In my opinion, in the absence of meeting the federal standards for RSAs at

15  Santa Monica Airport, Category C and D aircraft should not be permitted to operate due to

16  the serious risk of injuries and deaths to occupants of the aircraft and members of the

17  community resulting from aircraft operating on the margins of safety with no provision for

18  the possibility of mechanical failure or pilot error.

19

20

21      I declare under penalty of perjury under the laws of the United States of America that

22  the foregoing is true and correct and that this declaration was executed this 25th day of April,

23  2008 in Chattanooga, TN,

24

25                                          _____
                                            James E. Hall

26

27

28

30