MARSHA JONES MOUTRIE (SBN 69711)
City Attorney
JOSEPH LAWRENCE (SBN 99039)
Assistant City Attorney
LANCE S. GAMS (SBN 125487)
MARTIN T. TACHIKI (SBN 83044)
Deputy City Attorneys
1685 Main Street, Third Floor
Santa Monica, California 90401-3295
Telephone: (310) 458-8336
Facsimile:  (310) 395-6727
marty.tachiki@smgov.net

Attorneys for Defendant,
CITY OF SANTA MONICA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and MARY E. PETERS, United States Secretary of Transportation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF SANTA MONICA,<br><br>                    Defendants. | CASE NO.: CV08-02695 CW(Ex)<br><br>DATE:           May 15, 2008<br>TIME:           8:30 AM<br>COURTROOM:   10 |

## DEFENDANT CITY OF SANTA MONICA'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; SUPPLEMENTAL DECLARATION OF ROBERT TRIMBORN; AND EXHIBITS

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY.................................................................... 1

ARGUMENT...................................................................................................... 3

I.   THE COURT SHOULD DECLINE TO ISSUE A PRELIMINARY INJUNCTION BECAUSE THE INTERIM CEASE AND DESIST ORDER IS UNLAWFUL ON ITS FACE AND THIS COURT LACKS JURISDICTION TO ENFORCE IT ................................................. 3

    A.   The Cease and Desist Order is Unlawful Under Federal Statutes............................................................................................ 4

    B.   The Law Does Not Preclude This Court From Assessing the Validity of the Interim Cease and Desist Order It is Asked To Enforce................................................................................. 6

    C.   Interpreting The Law To Preclude This Court From Ascertaining The Legality Of the Interim Order Would Frustrate The Congressional Requirement That Due Process May Only Be Circumscribed To Protect Safety ...................... 9

    D.   The Notion That This Court May Not Assess The Interim Order's Validity Should Also Be Carefully Reassessed Because the Order's Deficiencies May Implicate This Court's Jurisdiction ..................................................................... 10

II   AN INJUNCTION SHOULD NOT ISSUE BECAUSE THE FAA IS UNLIKELY TO SUCCEED ON THE MERITS OF THIS CASE ......................................................................................... 11

    A.   The Ordinance Validly Expresses The City's Proprietary Rights.......................................................................................... 12

    B.   The FAA's Claims That The Ordinance Violates Federal Law Are Arbitrary and Capricious......................................... 13

        1.   Contrary to the FAA's Unsubstantiated Assertions, the Ordinance Does Not Unreasonably Discriminate Between Categories Of Aircraft ................................. 13

        2.   Nor Does The Ordinance Grant Any Exclusive Right.............. 14

i

# TABLE OF CONTENTS

**Page**

      3.    The Ordinance Is Fully Consistent With Both the Documents Which Transferred the Airport Back to Its Long-time Owner, the City At the End of World War II And With the 1984 Settlement Agreement Which Resolved the Rights And Responsibilities Of the City and FAA With Respect to The Airport Through the Year 2015 ............... 15

    C.    The Court Should Also Conclude That The City Is Likely To Succeed On The Merits Because The Tenth Amendment Protects the City Against the FAA's Demand That The City Accept C&D Aircraft At Its Airport, Even Though Doing So Violates The FAA's Own Safety Standards .......................................... 16

III.    INJUNCTIVE RELIEF SHOULD ALSO BE DENIED BECAUSE THE BALANCE OF HARDSHIPS TIPS MARKEDLY IN THE CITY'S FAVOR AND DENIAL WILL SERVE THE PUBLIC INTEREST BY FAVORING PUBLIC SAFETY OVER INDIVIDUAL CONVENIENCE ................................................................ 19

CONCLUSION ........................................................................................ 22

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Air California v. U.S. Department of Transportation,*
654 F.2d 616, 620 (9th Cir. 1981) ................................................................4

*Air One Helicopters, Inc. v. FAA,*
86 F.3d 880 (9th Cir. 1996) ........................................................................8

*Air Transport Ass'n of America v. Crotti,*
389 F. Supp. 58 (N.D. Cal. 1975) .............................................................13

*Clark v. Busey,*
959 F.2d 808, 811 (9th Cir. 1992) ..............................................................4

*Federal Land Bank of Jackson in Receivership v. Federal Intermediate Credit Bank,*
727 F. Supp. 1055, 1058-1059 (S.D.Miss. 1989) .......................................8

*Federal Maritime Comm'n v. South Carolina Ports Auth.,*
535 U.S. 743, 762 (2002) ............................................................................7

*Gordon v Havasu Palms,*
93 Cal.App.4th 244, 249 (2001) ...............................................................19

*GTE South, Inc. v. Morrison,*
99 F.3d 733, 744 (4th Cir. 1999) ................................................................8

*Millard Refrigerated Services, Inc., v. FAA,*
98 F.3d 1361 (D.C. Cir. 1996) ..................................................................13

*Nader v. FAA,*
440 F.2d 292 (CADC 1971) ........................................................................6

*National Business Aviation Ass'n. v. City of Naples Airport Authority,*
162 F. Supp.2d 1343 (M.D.Fla. 2001) ......................................................13

*National Helicopter Corp. of America v. City of New York,*
137 F.3d 81 (C.A.2 N.Y. – 1998) .............................................................13

*New York v. United States,*
505 U.S. 144, 157 (1992) ..........................................................................17

*Printz v. United States,*
521 U.S. 898, 935(1997) ...........................................................................17

*Slapin v. Los Angeles Internat'l Airport,*
65 Cal.App.3d 484 (1976) .........................................................................13

*United States v. First Nat'l Bank,*
379 U.S. 383 (1965) ...................................................................................22

iii

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

# <u>TABLE OF AUTHORITIES</u>

**Page**

*Western Air Lines, Inc. v. Port Authority of New York,*
  658 F.Supp. 952 (S.D.N.Y. 1986) .................................................................13

*Yakus v. United States,*
  321 U.S. 414 (1944) ...........................................................................................7


**Statutes**

28 USC § 1331 ........................................................................................................8

28 USC § 1345 ........................................................................................................8

49 U.S.C. § 40103(e) ...........................................................................................15

49 U.S.C. § 40113(a) .............................................................................................4

49 U.S.C. § 40133 .................................................................................................4

49 U.S.C. § 41713 ...............................................................................................12

49 U.S.C. § 46101(a)(4) ...................................................................................4, 11

49 U.S.C. § 46105(c) ........................................................................................4, 5

49 U.S.C. § 46106 ...............................................................................................11

49 U.S.C. § 46107 ...............................................................................................11

49 U.S.C. § 46110(a) .............................................................................................7

49 U.S.C. § 46110(b) .............................................................................................7

49 U.S.C. § 46110(c) .............................................................................................6

49 U.S.C. § 47107(a)(1) .......................................................................................14

49 U.S.C. § 47107(a)(4) .......................................................................................15

49 U.S.C. § 47111(f) .............................................................................................11

49 U.S.C. § 47121 ..................................................................................................4

California Government Code § 830(a) ..................................................................19

California Government Code § 830.6 ...................................................................19

California Government Code § 835 .......................................................................19

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF AUTHORITIES**

**Page**

**Regulations**

14 C.F.R. § 16.1 .................................................................................................5

14 C.F.R. § 16.109(a) .........................................................................................5

14 C.F.R. § 16.11 ...............................................................................................4

14 C.F.R. § 16.229(a) .........................................................................................9

14 C.F.R. § 16.3. ................................................................................................6

14 C.F.R. § 16.31(d) ..........................................................................................5

**Constitutional Provisions**

California Constitution, Article XI, § 5(a). ......................................................14

California Constitution, Article XI, § 7 ............................................................14

## INTRODUCTION AND SUMMARY

The City opposes the issuance of a preliminary injunction prohibiting enforcement of its ordinance ("the Ordinance")(Exhibit 15)[1], duly enacted to protect the public and the City by implementing federal safety standards which define the Santa Monica Airport facilities as inadequate for the C&D category aircraft that are using the Airport in growing numbers. The Federal Aviation Administration ("FAA") unlawfully issued a so-called "interim cease and desist order" ("Interim Order") to block enforcement of the Ordinance and filed this action to effectuate its Interim Order. But, the Interim Order is facially invalid. It was issued in a six year old administrative proceeding under 14 C.F.R., Part 16 ("Part 16") that, by the FAA's own admission, remains at its earliest, pre-hearing phase. The federal government's action is an unprecedented and unlawful procedural maneuver. The statutory scheme adopted by Congress simply does not allow such an order absent a hearing or a clear safety emergency. There has been no administrative hearing; and, it is the City, not the FAA, which has acted to protect safety. Thus, under these circumstances, the FAA has no authority to issue, and this Court has no jurisdiction to confirm, a premature order prohibiting enforcement of the Ordinance.

The legality of the Interim Order is squarely before this Court, and that order is entitled to no deference. Rather, if the federal government believes that its unauthorized Interim Order (rather than the City's duly adopted safety ordinance), should be enforced, then the federal government must meet the normal standards for extraordinary relief. However, it cannot; neither the law nor the facts support the preliminary injunction request

The FAA claims that the Ordinance must give way merely because it would inconvenience a comparatively small number of persons who fly on C&D aircraft. However,

---

[1]        References to Exhibits 1 through 21 are to those exhibits attached to Defendant City of Santa Monica's Opposition to Plaintiffs' Application for a Temporary Restraining Order filed on April 25, 2008. References to Exhibits 22 through 34 are attached hereto and submitted with this Opposition to Plaintiff's Application for a Preliminary Injunction.

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1  those flyers have, within their own power, the choice and ability to simply fly in and out of

2  Santa Monica Airport on compliant aircraft or use another local airport.  Unlike the flyers,

3  the City and its residents have no ready alternatives.  Residents live in family homes within

4  300 feet of, and below, the runway ends.  (Trimborn I, ¶2; Trimborn II, ¶3 and Exhibit 1) [2]

5  No runway safety areas protect them against an overrun.  They cannot simply trade for a

6  safer home as flyers may trade aircraft.  And, the City is responsible for the safety of its

7  Airport.  The City cannot simply hand its legal responsibility off to the federal government

8  even though that government will not let the City conform the Airport to federal safety

9  standards.

10      Nonetheless, the FAA proclaims that the City must cease and desist from enforcing its

11  safety Ordinance, that this Court must enforce the FAA's Interim Order, and that the City

12  may not challenge the legality of that Interim Order in this Court.   Such is not the law.

13  Having voluntarily invoked the jurisdiction of this Court, the federal government cannot then

14  proclaim that the Court must do its bidding despite the circumstances and the law.  Congress

15  certainly did not cede authority to the FAA to turn a federal court into its rubber stamp, and

16  most certainly not do so in the this factual and legal context

17      To the contrary, Congress requires the FAA to protect safety first.  This

18  Congressional directive reflects one inescapable reality: accidents happen.  Equipment fails

19  and people make mistakes.  Accidents happen to novices and to professionals alike.  (*See*

20  Trimborn II, ¶¶7 and 8). One need not look beyond the daily newspaper or weekly magazine

21  to be reminded that experienced professionals operating all types of craft, including

22  automobiles, ships and airplanes have accidents.  Even professional licensure and years of

23

24

25      [2]      The Declaration of Robert Trimborn In Support of the City of Santa Monica's
Opposition to the Application for a Temporary Restraining Order was filed on April 25, 2008 and is
26  hereinafter referred to as "Trimborn I".  The Declaration of Robert Trimborn in Support of the City's
Santa Monica's Opposition to the Application for a Preliminary Injunction is attached hereto and is
27  hereinafter referred to as "Trimborn II".  The Declaration of James Hall was filed on April 25, 2008
in Opposition to the Application for a Temporary Restraining Order and is hereinafter referred to as
28  "Hall".

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1    unblemished experience do not avert the danger.  Thus, the FAA has adopted safety

2    standards to safeguard the public against the inevitability of error and failure.

3              As a prudent and responsible government and airport owner, the City of Santa Monica

4    has acted to implement those standards.  The City studied the safety options, conducted

5    numerous public hearings, engaged in years of negotiations with the FAA, evaluated

6    alternative proposals, and ultimately reached the legislative conclusion that Airport safety

7    was best enhanced by conforming runway usage to the category A and B aircraft that the

8    FAA has approved the Airport to service because they are able to safely operate at the

9    Airport.  The Ordinance is measured and targeted.  It offers the least intrusive infringement

10   on Airport usage while protecting residents of the City, neighboring communities, businesses

11   and visitors.  Yet, the FAA claims that none of this matters.  Again, such is not the law.  The

12   potential benefit of enforcing the Ordinance greatly outweighs any alleged harm of its taking

13   affect.  Like the law, the balance of hardships tips precipitously in the City's favor.  And,

14   considerations of public safety and welfare dictate that, while this legal dispute remains

15   pending, public safety should be protected through enforcement of the ordinance.

16

17                                            **ARGUMENT**

18

19   **I.     THE COURT SHOULD DECLINE TO ISSUE A PRELIMINARY**

20           **INJUNCTION BECAUSE THE INTERIM CEASE AND DESIST ORDER IS**

21           **UNLAWFUL ON ITS FACE AND THIS COURT LACKS JURISDICTION TO**

22           **ENFORCE IT.**

23

24             In response to the federal government's application for a Temporary Restraining

25   Order, the City has already argued that the FAA had no authority to issue the cease and

26   desist order, and that this Court has jurisdiction to assess the Interim Order's validity.  And,

27   the Court has preliminarily concluded that it may not assess the Interim Order's validity and

28

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1    must effectuate it.  The Court's preliminary conclusion that the FAA's order must be

2    enforced through injunctive relief warrants careful reconsideration because the illegality of

3    the Interim Order does not simply impact its enforceability, it also raises jurisdictional

4    questions.

5            To the extent that there is jurisdiction to review a final order of the FAA, that

6    jurisdiction lies exclusively within the United States Courts of Appeals. *See Clark v. Busey,*

7    959 F.2d 808, 811 (9th Cir. 1992).  However, as the courts of appeals have not acted, nor

8    even been asked to act, this Court too lacks jurisdiction to enforce the FAA purported

9    "order".  There is no proper or valid order to enforce.  *See e.g., Air California v. U.S.*

10   *Department of Transportation,* 654 F.2d 616, 620 (9th Cir. 1981).  There exists no subject

11   matter jurisdiction for this court to proceed.

12

13   **A.     The Cease and Desist Order is Unlawful Under Federal Statutes.**

14           The Court has preliminarily concluded that 49 U.S.C. §§ 40113(a), 46105(c) and 14

15   C.F.R. § 16.11 authorizes the FAA's issuance of the Interim Order.  This issue warrants

16   more attention.  While those statutes and regulation mention orders, their language and the

17   statutory scheme reveal that they do not authorize the action taken by the FAA in this case.

18           The FAA's own regulation, 14 C.F.R. § 16.11 authorizes the FAA to issue orders on

19   Part 16 proceedings, but only pursuant to 49 U.S.C. §§ 40133 and 47121.  Neither of those

20   statutes expressly authorizes the extraordinary relief of a cease and desist order in a Part 16

21   proceeding.

22           Nor should they be construed to authorize such extraordinary agency action.  Section

23   47121 deals with record keeping and audits, not airport operations.   Section 40113(a) refers

24   to the issuance of orders in general.  But, a more specific federal statute governs the cease

25   and desist order in this case: 49 U.S.C. § 46101(a)(4).  It provides:  "*After notice and an*

26   *opportunity for hearing*, the Secretary shall issue a notice to compel compliance with this

27   part [49 U.S.C. Part A]] if the Secretary . . . finds in an investigation under this subsection

28

---

4

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1   that a person is violating this part." (Emphasis added.).  Thus, the most specific and

2   therefore applicable federal statute requires a hearing before the issuance of a compliance

3   order.  And, the parties do not dispute that no such administrative hearing has occurred in

4   this case.

5         The federal statutory requirement of a hearing before issuance of a compliance order

6   is reflected in the FAA's own regulations.  14 C.F.R. § 16.109(a) provides that "the agency

7   will provide the opportunity for a hearing if, in the Director's Determination, the agency

8   proposes to issue ... a cease and desist order . . . or any other compliance order issued by the

9   Administrator to carry out the provisions of the acts, and required to be issued after notice

10  and opportunity for a hearing."   Thus, in advance of a hearing, the Director may only

11  "propose" issuance of a compliance order.  The order itself may only be issued after a

12  hearing.

13        Indeed, the statutory scheme enacted by Congress authorizes the FAA Director to act

14  before a hearing in only one situation, a safety emergency.  49 U.S.C. § 46105(c) states that:

15  "When the Administrator is of the opinion that an emergency exists related to safety in air

16  commerce and requires immediate action, the Administrator ... may ... issue orders without

17  regard to this subpart ... ."   Thus, Congress simply has not allowed the FAA to issue a cease

18  and desist order without first conducting a hearing, except in the case of safety emergencies.

19        That section does not authorize interim orders in Part 16 proceedings, which relate to

20  such issues as whether federal grantees are operating their airports in compliance with

21  statutory mandates prohibiting unreasonable discrimination and exclusive rights. *See* 14

22  C.F.R. § 16.1 [listing Congressional statutes authorizing Part 16 actions, but not listed

23  among the provisions in 14 C.F.R. § 16.1 is 49 U.S.C. § 46105(c).]

24        Here, placing the cart far ahead of the horse, the Director has purported to issue an

25  "interim cease and desist order" prior to the issuing a determination.  (Interim Order at 1, 2).

26  Part 16, however, does not authorize the Director to issue a binding cease and desist order.

27  Under Part 16, § 16.31(d) only authorizes the Director, at the time he renders his

28

5

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

determination, to *propose* the issuance of a Cease and Desist order. Thus, under the FAA's own regulations, even if the Director had issued his initial determination -- which he has not -- he could not have issued a binding cease and desist order. The regulations provide that the Director's Determination is the "initial determination made by the Director following an investigation, [and] is a non-final agency decision"). 14 C.F.R. § 16.3. Moreover, under Part 16, the Director's Determination, if and when issued, will function as a *proposed* set of findings and remedial actions. If the Director's Determination is adverse to the City, the next step will be a hearing before a hearing officer and then an appeal to the Associate Administrator for Airports, who may make a Final Decision. (14 C.F.R., Part 16, Subparts D and G).

Thus, under the federal regulations it is undisputable that, after six years, the underlying agency process is still in its earliest phases of the Part 16 proceedings; and because the Director has not yet issued an initial Determination, has not issued a proposed Cease and Desist Order, and has not afforded the City a hearing, the FAA has no authority under its own regulations to issue a binding Cease and Desist Order and has not presented this Court with a valid order that can be enforced.

Thus, the federal laws that define and limit the FAA's authority do not allow it to issue an interim cease and desist order in a Part 16 proceeding. The agency's emergency powers are limited to averting immediate safety risks. *See, Nader v. FAA*, 440 F.2d 292, 293 (CADC 1971) [ill effects of smoking did not justify FAA's exercise of emergency power to ban smoking on commercial aircraft since the FAA only has that power in a clear safety emergency].

### B. The Law Does Not Preclude This Court From Assessing the Validity of the Interim Cease and Desist Order It Is Asked To Enforce.

The Court's initial decision that it lacks the jurisdiction to consider the legality of the cease and desist order rests on 49 U.S.C. § 46110(c). However, that statute only vests

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

exclusive jurisdiction in the courts of appeal *after* (1) an aggrieved party exercises its option to seek review of an FAA order [§ 46110(a)], and (2) the clerk of the court transmits the petition for review to the Secretary [§ 46110(b)].  Neither of these events has occurred in this case.  Accordingly, at this time, no court of appeals has taken any jurisdiction over any part of the FAA's order; and this Court's jurisdiction and ability to act are called into doubt. Indeed, plaintiff herself puts the validity of the Interim Order at issue by assertions that "the City is placing itself squarely in violation of a valid and effective order of the FAA" (Plaintiff's Memorandum at 8; *see also*, *id.* at 10).

Nor is plaintiffs' position supported by the cases she has cited.  In *Yakus v. United States*, 321 U.S. 414 (1944), the Supreme Court found that provisions of a statute conferring on an Emergency Court of Appeals "'exclusive jurisdiction to determine the validity of any regulation or order', coupled with the provision that 'no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation are broad enough in terms to deprive the district court of power to consider the validity of the Administrator's regulation or order as a defense to a criminal prosecution for its violation." *Id.* at 429.  As discussed above, the statutory scheme governing appellate court jurisdiction to review FAA orders does not make exclusive jurisdiction automatic; rather, exclusive jurisdiction is triggered only when a petition for review has been filed *and* the Court sends the petition to the Secretary [49 U.S.C. § 46110(a)-(c)], none of which has occurred here. Moreover, none of the statutes the FAA relies on contain a provision removing this Court's power to *consider* the validity of the regulation or order before issuing injunctive relief.

Likewise in *Federal Maritime Comm'n v. South Carolina Ports Auth.*, 535 U.S. 743, 762 (2002), the enforcement statute expressly limited the district court's authority to review "whether the relevant order 'was properly made and duly issued.'" *Id.* [*quoting* 46 U.S.C.App. § 1713(c)].  Again, there is no corresponding statutory limitation on the Court's authority in statutes cited by the Secretary in this case. Moreover, the Supreme Court did not hold that the sanctioned party could never contest the merits of the agency's action, but only

7

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1   that its failure to do so before the agency would compromise its ability to do so later. *Id.*

2     Here, the FAA has voluntarily invoked this Court's limited jurisdiction by claiming

3   that certain laws compel this Court to enforce the FAA's "valid and effective" action. But

4   those laws do no such thing particularly in a situation where the FAA's "valid and effective"

5   action so plainly has jumped the gun. The Court's already limited jurisdiction is squarely

6   therefore in doubt. And since the FAA asserts that it has not yet made any decision, it is

7   difficult to see what other jurisdiction exists.[3]

8     By issuing the Interim Order, and then immediately seeking a TRO, the FAA has

9   facially violated the very laws it says applies. The FAA, in contravention of applicable law,

10   has deprived Santa Monica of the ability to contest the Interim Order before the agency prior

11   to any proceeding in this or any other Court.[4]  The governing statutes and regulations

12   preclude such high-handed action. The law the FAA invokes bars it from dragging the City

13   before this Court. No legal principle prevents Santa Monica from defending itself by

14   challenging the legality of FAA's order and this Court's jurisdiction. Nor should this Court

15   allow such unfairness by the FAA. *Cf. Air One Helicopters, Inc. v. FAA*, 86 F.3d 880, 881

16   (9th Cir. 1996)[Ninth Circuit grants review despite FAA's claim that the court lacked

17   jurisdiction to review an FAA opinion to end "bureaucratic gridlock" and thereby ensure

18       ——————————

19

20     [3] In addition to these specific statutes, the federal government has also cited two general jurisdictional statutes in its complaint: 28 USC § 1331, which confers broad jurisdiction over cases presenting federal questions under the Constitution, laws and treaties of the United States; and 28 USC § 1345, which authorizes the federal government to sue in federal court. Despite these statutes' breadth, issues of their application can be subtle. *See, e.g., Federal Land Bank of Jackson in Receivership v. Federal Intermediate Credit Bank* 727 F. Supp. 1055, 1058-1059 (S.D.Miss. 1989) [noting the difficulty of determining the existence of federal question jurisdiction in a case involving federal agencies and explaining that the requirement of "arising under" is technical one that must be assessed by the courts].

21

22

23

24

25     [4] The other cases cited by the Government are similarly inapposite. *GTE South, Inc. v. Morrison*, 199 F.3d 733, 744 (4th Cir. 1999) (different statutory scheme in which appeals challenging validity of rules were already pending); *United States v. Ruzicka*, 329 U.S. 287, 290-92 (1946) (statute expressly barred sanctioned party from contesting validity of order in enforcement proceeding, while also providing a separate administrative process for such claims).

26

27

28

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

fairness].[5]

In short, it is one thing for Congress to provide that a party aggrieved by an administrative decision may only seek judicial review of that decision in a federal appellate court. It is quite another thing for this Court to conclude that a city aggrieved by an unlawfully issued Interim Order is not entitled to contest the invocation of this Court's limited jurisdiction or otherwise defend itself and its ability to protect safety if dragged into the United States District Court by the FAA.

**C.     Interpreting The Law To Preclude This Court From Ascertaining The Legality Of the Interim Order Would Frustrate The Congressional Requirement That Due Process May Only Be Circumscribed To Protect Safety.**

As explained in subsection A above, the federal statutory scheme requires a hearing in advance of an FAA cease and desist order; the only exception being when a safety emergency exists. Here, the FAA is attempting to jump this requirement, but the Court should not allow a regulatory agency to disregard requirements ensuring fairness. Congress has struck a balance between fairness to the regulated entity and public safety. When safety is at imminent risk, Congress has established that the process guarantee must yield to that necessity. Otherwise, those guarantees must be honored. The balance Congress struck must be respected.

Moreover, if countenanced by this Court, the procedural maneuver which the FAA has undertaken to defer its duties will also violate federal requirements of fairness in another important way. In the hearing which the FAA has so far avoided, the burden of proof will be on the FAA. 14 C.F.R. § 16.229(a) is unambiguous on this point. It provides "The

---

[5] Of course, given the repeated pronouncements by FAA officials that the City's actions are illegal, any proceeding before the FAA likely is futile as the FAA has already predetermined the outcome, further eroding notions of due process.

9

1     burden of proof of noncompliance with an Act or any regulation, order, agreement or

2     document of conveyance issued under the authority of an Act is on the agency." By the

3     unlawful expedient of leapfrogging over the hearing requirement, the FAA has avoided its

4     burden of proof – a burden imposed by its own regulation and which it likely cannot meet on

5     the facts of this case. Federal law should not be interpreted to allow the FAA to avoid its

6     burden of proof.

7

8           **D.**     **The Notion That This Court May Not Assess The Interim Order's Validity**

9                **Should Also Be Carefully Reassessed Because the Order's Deficiencies**

10              **May Implicate This Court's Jurisdiction.**

11          The unprecedented process followed by the federal government in this case raises

12     serious issues of jurisdiction in other ways as well. The three federal statutes, which are

13     cited in the complaint for purposes of demonstrating jurisdiction, require an administrative

14     hearing before the Secretary is authorized to file suit. *See* 49 U.S.C. §§ 46106, 46107 and

15     47111(f). Section 46106 empowers the Secretary to file suit to "enforce this part or a

16     requirement or regulation prescribed, or an order or any term of a certificate or permit issued,

17     under this part." Thus, to invoke jurisdiction under 49 U.S.C. § 46106, the Secretary must,

18     in this case, establish that issuance of the Interim Cease and Desist Order was consistent with

19     the federal statutes. That requirement cannot be met in this case. As explained in subsection

20     A, above, the federal statutory scheme limits the FAA's authority to issue orders to those

21     situations in which it has first given notice and conducted a hearing. *See* 49 U.S.C. §

22     46101(a)(4)["After notice and an opportunity for a hearing …the Secretary of

23     Transportation, Under Secretary, or Administrator shall issue an order to compel compliance

24     with this part if [he or she] finds in an investigation under this sub that a person is violating

25     this part."] Likewise, 49 U.S.C. § 46107 makes the existence of an order a prerequisite to

26     suit.[6] Similarly, 49 U.S.C. § 47111(f) allows this Court to effectuate enforcement of grant

27

28         [6]  Moreover, both specific provisions of the United States Code expressly state that court

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1   conditions, but it too requires an administrative hearing before the Secretary may initiate

2   judicial proceedings.  *See* 49 U.S.C. § 47111(e).

3           Moreover, these statutes do not excuse the federal government from meeting other

4   prerequisites to filing suit such as an actual case or controversy, standing and ripeness.  Here,

5   it is not clear, for instance, that the matter is ripe because the FAA has not conducted the

6   hearing required by federal law as a prerequisite to proposing and issuing a cease and desist

7   order and as a prerequisite to invoking the jurisdiction and the enforcement powers of this

8   Court.

9           Thus, for all the reasons explained in this section, the Court should reconsider its

10  initial decision that it cannot assess the legality of the Interim Order.  The Court's limited

11  jurisdiction has not been properly invoked.

12

13  **II.     AN INJUNCTION SHOULD NOT ISSUE BECAUSE THE FAA IS UNLIKELY**

14  **        TO SUCCEED ON THE MERITS OF THIS CASE.**

15

16          Commencing with its administrative complaint against the City under Part 16 in

17  October 2002 and followed by its administrative order to show cause and its cease and desist

18  order in the Part 16 proceeding and most recently in plaintiffs' complaint filed herein, the

19  FAA has asserted a number of claims, which the City has steadfastly refuted with both

20  argument and evidence for almost six years.  Even a cursory review of those claims and the

21  City's evidence shows that the FAA's actions in this dispute have been arbitrary and

22  capricious and that the Interim Order should therefore not be effectuated by this Court.

23  Instead, the Court should recognize and protect the rights of the City as an airport proprietor

24  to keep its Airport safe and thereby protect the public against aircraft accidents and the City

25

26  _____

27  proceedings may be initiated "with respect to safety duties and powers designated to be carried out
    by the Administrator".  In this case there is no lawful order, and the Administrator or his designee is
28  not acting to discharge safety duties.  Only the City is acting to promote safety.

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1   against liability for those accidents.  Neither the law nor the balance of hardships favor the

2   FAA.

3

4   **A.      The Ordinance Validly Expresses The City's Proprietary Rights.**

5         Congress has affirmed the judicial recognition of the "proprietor's exception" to

6   federal preemption of aviation regulation.  49 U.S.C. § 41713.  *See also, National Helicopter*

7   *Corp. of America v. City of New York,* 137 F.3d 81, 89 (2nd Cir. 1998)  It allows the City to

8   make its Airport safe and protects the City from the unfairness which will result if the FAA

9   is allowed to prevent the City from making the Airport safe by federal standards.  The

10  exception thereby ensures that airport proprietors will not be placed in the extremely unfair

11  position of bearing liability for circumstances beyond their control.

12        The exception gives airport proprietors the right to take reasonable actions to protect

13  themselves against liability which would otherwise arise for unsafe conditions existing at

14  airports.  *See Air Transport Ass'n of America v. Crotti*, 389 F. Supp. 58, 63-64 (N.D. Cal.

15  1975)[explaining that an airport proprietor is responsible for the consequences attendant

16  upon its operation of a public airport];  *Slapin v. Los Angeles Internat'l Airport,* 65

17  Cal.App.3d 484, 488 (1976)[explaining that, notwithstanding statutory immunities,

18  California cities may be liable for dangerous conditions at their airport].

19        Thus, pursuant to the proprietor's exception, an airport proprietor may limit airport

20  operations to avoid liability for unsafe conditions. *See Western Air Lines, Inc. v. Port*

21  *Authority of New York*, 658 F.Supp. 952, 956 (S.D.N.Y. 1986)[discussing the exception].

22  The proprietor's exception is reflected in federal grant assurance conditions and regulations

23  which allow airport owner/grantees to ensure safety.  (Exhibit 10).  It allows an airport

24  proprietor and operator to, for example, impose a curfew to protect against nuisance claims

25  for unreasonable noise.  *National Helicopter Corp. of America v. City of New York,* 137 F.3d

26  81, 89-90 (2nd Cir. 1998).  Likewise a city owning an airport may ban particular classes of jet

27  aircraft to avoid liability for jet noise.  *National Business Aviation Ass'n. v. City of Naples*

28

12

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

*Airport Authority*, 162 F. Supp.2d 1343, 1352-54 (M.D.Fla. 2001). The FAA has contended in this dispute that the proprietor's exception is limited to taking steps to avert unreasonable noise. That is simply incorrect. Congress has not limited the proprietor's exception to noise restrictions, and the FAA itself recognizes that the exception gives airport proprietor's the right to establish weight limits which exclude larger aircraft. *See, Millard Refrigerated Services, Inc. v. Omaha Airport Authority*, FAA 13-93-19 (August 4, 1995), remanded on other grounds by *Millard Refrigerated Services, Inc., v. FAA*, 98 F.3d 1361 (D.C. Cir. 1996) (upholding weight based ban). Moreover, it simply makes no sense to interpret the Congressional mandate of the proprietor's exception as being limited to noise restrictions. If Congress meant only this, it certainly could have stated so easily enough.

Like federal law, state law empowers Santa Monica to protect airport safety. The California Constitution gives all California cities broad police powers to protect the public, safety, health and welfare through local legislation. California Constitution, Article XI, § 7. Those powers are even broader for charter cities like Santa Monica, which are granted additional "home rule" powers by Article XI, § 5(a).

### B.     The FAA's Claims That The Ordinance Violates Federal Law Are Arbitrary and Capricious.

> 1.     Contrary to the FAA's Unsubstantiated Assertions, the Ordinance Does Not Unreasonably Discriminate Between Categories Of Aircraft.

Federal law requires airport operators, which have received federal grants, to make their airports "available for public use on reasonable conditions and without unjust discrimination." 49 U.S.C. § 47107(a)(1). This requirement is echoed in Grant Assurance 22(a). (Exhibit 10) The FAA's Notice of Investigation against the City and its cease and desist order, both pursuant to Part 16, are based, in part, on the contention that the City has unjustly discriminated by banning Category C&D aircraft. As the record shows, this

---

13

contention is spurious and should be rejected out of hand.  The Aircraft Conformance Program merely implements federal safety standards.  The ban of Category C&D aircraft reflects the fact that the Airport's runway lacks runway safety areas for those faster aircraft. There are no margins for error because the runway ends are just feet from major streets and homes.

Even the FAA itself recognizes that safety may require imposing conditions on Airport usage.  Grant Assurance 22(h) states that the City "may establish such fair, equal and not unjustly discriminatory conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport."  (Exhibit 10)  The City has prohibited faster jets because, under the FAA's own standards, their use of the Airport is not safe given the lack of runway safety areas, topography, and proximity of homes.

2.     Nor Does The Ordinance Grant Any Exclusive Right.

Federal law also prohibits the City from giving any person an exclusive right for the use of airport facilities.  49 U.S.C. §§ 40103(e) and 47107(a)(4).  However, as is obvious on the face of the Ordinance, it does not exclude any person from the use of airport facilities. Any person who had access prior to implementation of the Ordinance can have access after the Ordinance is enforced, as long as they operate a compliant aircraft.  Category C&D operators are not an immutable class.  Many C&D aircraft operations at SMO were conducted by operators that utilize multiple aircraft, both compliant and non-compliant. (Trimborn II, ¶ 12.)  Moreover, the distinction between Category C&D aircraft and Category A&B aircraft is reasonable and rationale because the Airport is approved by the FAA for category A and B aircraft, but lacks the Runway Safety Areas specified by FAA's own published guidance for Category C&D aircraft.

14

3.    The Ordinance Is Fully Consistent With Both the Documents
Which Transferred the Airport Back to Its Long-time Owner, the
City At the End of World War II And With the 1984 Settlement
Agreement Which Resolved the Rights And Responsibilities Of
the City and FAA With Respect to The Airport Through the Year
2015.

The FAA contends that the Instrument of Transfer which transferred the Airport back to the City at the end of World War II somehow circumscribes the City's right, as proprietor, to operate the Airport safely. This is, likewise, simply and obviously wrong. Although the City leased the Airport to the federal government during the War, it retained its fee interest in the airport land. The conveyances made by the City to the federal government were merely leases. They expired, by their own terms 12 months after President Truman terminated the national state of emergency by Proclamation 2487 in 1952. (Exhibits 2 through 7). Thus, the federal government merely acquired possessory rights, temporarily and by leasehold, during the World War II, and the City's recovered its possessory rights after the War ended. As a mere tenant, the federal government can not dictate terms upon the landlord (the City) once its rights as a tenant were extinguished. And, even if the federal government could have imposed restrictions by this transfer, those restrictions would only have mandated compliance with the federal prohibitions against unjust discrimination and exclusive rights; they would not have added other substantive obligations.

Likewise, the Ordinance comports with the 1984 Settlement Agreement. (Exhibit 8) It requires the City to keep the Airport open until 2015 to a variety of aircraft. However, that requirement is circumscribed by the explicit language of the Agreement which states: "The airport will be capable of accommodating most kinds of general aviation aircraft, generally consistent with Group II Design Standards set forth in FAA advisory Circular 150/300-4B dated February 24, 1983." (Emphasis added.)(Exhibits 8) That circular, which provided technical guidance for the design of safe and efficient airports, provided: "[t]he standards,

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1  recommendations, and guidance material in this Advisory Circular (AC) define an airport

2  suitable for the less demanding Aircraft Approach Category A and B airplanes, i.e., airplanes

3  with approach speeds of less than 121 knots." (Emphasis added.)(Exhibit 9)  Thus, by its

4  plain language and the reference to an advisory circular from the FAA, the 1984 Agreement

5  only obligates Santa Monica to keep its Airport accessible to slower aircraft.  That is what

6  the City bargained for in the 1984 Agreement, and that is what the FAA agreed to when it

7  executed the agreement.  Additionally, the Runway Data Table on the Airport Layout Plan

8  for the Airport approved by the FAA in August 1991 specifies an Airport Reference Code of

9  B-II indicating the FAA's recognition that the Airport was designed for category A and B

10  aircraft. (Exhibit 11.)  This is further evidence that the 1984 Agreement only obligates the

11  City to keep the Airport accessible to a mix of smaller aircraft.  And, the City has fulfilled its

12  obligations under the 1984 Agreement.  In 2007, the Airport accommodated about 127,000

13  operations, but only about 9,000 operations involved aircraft larger than the B-II category

14  specified in the Agreement.  (*See* Trimborn II ¶ 11.)

15      The FAA has also asserted in its administrative complaint and its Order to Show

16  Cause that the Ordinance violates both the Instrument of Transfer assigning the lease of the

17  Airport back to the City at the end of World War II and the 1984 Settlement Agreement

18  between the FAA and the City.  Again, the evidence belies these claims.

19

20      **C.      The Court Should Also Conclude That The City Is Likely To Succeed On**

21              **The Merits Because The Tenth Amendment Protects the City Against The**

22              **FAA's Demand That The City Accept C&D Aircraft At Its Airport, Even**

23              **Though Doing So Violates The FAA's Own Safety Standards.**

24      The Tenth Amendment ensures the viability of our system of dual sovereignty by

25  confirming "that the power of the Federal Government is subject to limits that may, in a

26  given instances, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157

27  (1992).   While Congress has the authority to encourage states to regulate according to

28

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

federal preferences, "the Constitution does not confer upon Congress the ability simply to compel the States to do so." *New York v. United States, Id.* at 149. *See Printz v. United States*, 521 U.S. 898, 935(1997)["The Federal Government may neither issue directives requiring the State to address particular problems, nor command the States' officers ... to administer or enforce a federal regulatory program."] "While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. at 162. The law is abundantly clear: federal coercion is proscribed.

Thus, the central question of this case – whether the federal government may require Santa Monica to allow C&D aircraft at its Airport, notwithstanding the obvious dangers they pose under federal safety standards – is a question of constitutional dimension. Particular care must be taken to fully assess the City's rights and duties to ensure protection of its Tenth Amendment rights.

Here, by a six-year long course of conduct, beginning prior to its administrative complaint against the City and extending through the issuance of the Interim Cease and Desist Order, the FAA has attempted to compel the City to accommodate aircraft for which the Airport was not designed.   However, the evidence shows that is unsafe. Mr. James Hall, a past Chairman of the National Transportation Safety Board, stated in his declaration that "in the absence of meeting the federal standards for RSAs [Runway Safety Areas] at Santa Monica Airport, Category C&D aircraft should not be permitted to operate due to the serious risk of injuries and deaths to occupants of the aircraft and members of the community resulting from aircraft operating on the margins of safety with no provision for the possibility of mechanical failure or pilot error." (Hall, ¶ 16)

Significantly, the City's grant assurances with the federal government preserve its proprietary rights, as airport operator. Grant Assurance 22(i) provides that "[t]he sponsor [Santa Monica] may prohibit or limit any given type, kind of class of aeronautical use of the

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1   airport if such action is necessary for the safe operation of the airport or necessary to serve

2   the civil aviation needs of the public." Grant Assurance 22(i). (Exhibit 10) Moreover, the

3   1984 Settlement Agreement provides that the City is only required to accommodate Category

4   A&B aircraft, through its reference to an Advisory Circular setting forth design standards for

5   airports that only accommodate A&B aircraft. (Exhibits 8 and 9) Now, the FAA, at a

6   preliminary stage of an administrative proceeding, before an initial determination, before a

7   hearing and before a final agency determination, attempts to ignore the City's rights and strip

8   the City of its authority and property by forcing the City to use its resources to accommodate

9   faster Category C&D, even though the runway has no Runway Safety Areas to create

10  margins for error or mechanical failure and the runway ends are less than 300 feet from

11  family homes.

12      This coercion is both unlawful under the Tenth Amendment and patently

13  unreasonable. The FAA, itself, has determined that runway safety areas are necessary and

14  appropriate for C&D aircraft. The City, as proprietor and responsible party, has determined

15  that it would be infeasible to provide such RSAs while maintaining the current usable

16  runway length, because the topography (steep drops offs at each end of the runway) and the

17  immediate proximity of long-standing residential neighborhoods make installation of 1,000

18  foot flat RSAs impracticable. The FAA has rejected City proposals to protect safety through

19  adequate RSAs and EMAS. Thus, the only way for the City to provide the margin of safety

20  intended by the FAA design standards is to ban operations by C&D aircraft.

21      If successful, the FAA's attempt, by its Interim Cease and Desist Order, to prevent

22  enforcement of the City's Ordinance and force the City to accommodate Category C&D

23  aircraft would commandeer the resources of the City to implement the FAA's regulatory

24  approach of requiring an airport proprietor to accept operations of aircraft far faster than

25  those for which the proprietor designed, built and agreed to operate its airport. In the event

26  of an overrun, the FAA's demand, if successful, would not only force the City to expend

27  emergency resources but also, more importantly, shoulder the liability risks associated with

28

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

allowing operations of aircraft without safety measures specified by the FAA's own standards. *See, e.g. Gordon v Havasu Palms*, 93 Cal.App.4th 244, 249 (2001).

Moreover, other than implementing a safety plan that reflects the FAA's standards, there is no mechanism under state law by which the City can shield itself from liability. The California Government Code confers immunities from liability for dangerous conditions on public property but they are limited in scope and would only apply to the Airport if its runway safety measures were designed in conformity with federal runway standards. *See* California Government Code §§ 830(a), 830.6, and 835[establishing that cities are responsible and liable for dangerous conditions on public property but may obtain statutory immunity by designing and implementing safety protections]. Additionally, the FAA will not assume the risks associated with accommodating faster aircraft at the Airport.

Thus, the Secretary's position is that pursuant to the FAA's Interim Cease and Desist Order the City has no choice but to accept and shoulder the risks attendant upon accommodating faster aircraft without the safety measures the FAA has designated as appropriate for those aircraft. The Tenth Amendment precludes the FAA from forcing this obligation upon the City.

## III.   INJUNCTIVE RELIEF SHOULD ALSO BE DENIED BECAUSE THE BALANCE OF HARDSHIPS TIPS MARKEDLY IN THE CITY'S FAVOR AND DENIAL WILL SERVE THE PUBLIC INTEREST BY FAVORING PUBLIC SAFETY OVER INDIVIDUAL CONVENIENCE.

The Declarations of Robert Trimborn and James Hall attest to and explain the safety risks at the Santa Monica Airport. In short, there are no runway safety areas. The residents living within 300 feet of the runway ends are thus at risk in the event of an overrun resulting from pilot error or equipment failure. And, the risk is heightened by increased usage of the Airport by C&D aircraft, which travel faster and therefore require longer runway safety

19

1    areas. The risk is also increased by the Airport's location on a plateau above the surrounding

2    residential neighborhoods. Thus, landing at the Airport has been likened to landing on the

3    deck of an aircraft carrier in that there is no margin for error. But, the risks are different.

4    The Airport has no tail hook to stop planes. And, in the event an overrun, a faster aircraft

5    will not plummet into the open sea. It will crash into a dense residential neighborhood,

6    populated by families who depend upon the City for protection against overruns.

7         And it is undeniable that overruns occur. There have been two at Santa Monica

8    during the pendency of this dispute, one fatal. There was also an overrun at Santa Barbara

9    Airport last year, involving a plane which had landed at Santa Monica 13 times in the 7

10   months before the Santa Barbara accident. (Trimborn II, ¶8F.)

11        At the hearing on the Temporary Restraining Order, the Court considered and

12   appeared to accept plaintiff's assertion that faster C&D category aircraft do not pose a

13   significant risk at Santa Monica Airport because C&D operations are safer than the

14   operations of slower aircraft. This assumption should receive additional consideration.   All

15   humans make mistakes, and all equipment fails. While it is true that the overruns to date at

16   Santa Monica have involved Category B aircraft and while it is true that pilots of C&D

17   aircraft may have more training or experience, those two facts do not warrant dismissal of

18   the City's safety concerns.   The vast majority of operations at the Airport involve Category

19   A&B aircraft. Because those aircraft account for over 90% of the operations, it is not

20   surprising that they would be most likely to experience overruns. That likelihood does not

21   make the Airport safe for C&D operations. Though the likelihood of an overrun by a C or D

22   category aircraft may be smaller, the lower probability of a C or D aircraft overrun is

23   irrelevant to an airport like Santa Monica Airport which cannot afford even a single overrun

24   at either end of its runway.   (Trimborn II, ¶ 6). The Category B aircraft, which overran the

25   runway at the start of this dispute, stopped at the edge of the airport property and burned up,

26   killing the passenger and pilot. A Category C or D aircraft traveling much faster and

27   weighing ten times more would likely have crashed and burned in the residential

28

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO
PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1   neighborhood across the street.  And, as the evidence shows, C&D aircraft do overrun

2   runways.  The fatal overrun at Teterboro in 2005 involved Category C aircraft which had

3   previously landed at Santa Monica Airport.  (Trimborn II, ¶ 8C).   This undeniable risk is

4   why the FAA's runway safety requirements apply to all airports,  not just those that have

5   experienced overruns and certainly not just those which only accommodate Category A&B

6   aircraft.  The risk is common to all aircraft but the federal safety requirements are more

7   demanding for category C&D aircraft because faster aircraft require greater safety margins.

8          Against this risk – a risk of both injury and death to Airport users and neighbors and a

9   risk to the City of liability that the FAA will not let it avert – the Court must weigh the

10   convenience of Airport users who wish to travel in C&D aircraft against the risk of injury

11   and death to nearby residents who homes are just off the ends of the runway.  There are

12   about 25 operations per day involving C&D aircraft.  The passengers on those planes have

13   other choices. They may use other aircraft.  (Trimborn I, ¶¶ 13 and Trimborn II, ¶¶ 11 to 14.)

14   The evidence shows that fractional operators make it easy for their clients to change aircraft.

15   They may use other airports in the area.

16          In ruling on this application, the public interest should be dispositive. *See United*

17   *States v. First Nat'l Bank,* 379 U.S. 383 (1965).  This means that public safety must

18   outweigh the federal governments concerns about the convenience of a relatively small

19   number of Airport users.  To the residents living below the runway ends, this is a matter of

20   safety, not mere inconvenience.  Runway overruns happen, and an overrun by a C or D

21   aircraft at Santa Monica would threaten their lives.  (*See* Exhibit 12)  And, the City would

22   bear legal responsibility for that catastrophe.  This court should protect the public interest by

23   allowing the City to enforce its Ordinance.

24

25

26

27

28

**OPPOSITION BY DEFENDANT CITY OF SANTA MONICA TO**
**PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

1

## **CONCLUSION**

2

3     For the forgoing reasons, the City of Santa Monica respectfully requests that this court

4     decline to issue a preliminary injunction and allow the Ordinance to go into effect to protect

5     safety during the pendency of this dispute.

6

7     DATED: May 6, 2008                    OFFICE OF THE CITY ATTORNEY
                                            SANTA MONICA, CALIFORNIA
8

9

10                                          MARSHA JONES MOUTRIE
                                            City Attorney
11

12

13                                          MARTIN T. TACHIKI
                                            Deputy City Attorney
14

15                                          Attorneys for Defendant
                                            CITY OF SANTA MONICA
16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF ROBERT TRIMBORN IN SUPPORT OF**

**THE CITY OF SANTA MONICA'S OPPOSITION TO THE**

**APPLICATION FOR A PRELIMINARY INJUNCTION**

I, Robert Trimborn, declare that the following is true and correct based upon my personal knowledge and that, if called upon to testify as a witness in any legal proceeding, I could and would competently testify as set forth in this declaration.

1.     I am the Acting Airport Director of the Santa Monica Municipal Airport ("Airport"), and I have served as Airport Manager or Acting Airport Director continuously since August of 1996.  As I stated in my prior declaration in opposition to the issuance of the Temporary Restraining Order ("TRO"), I have been involved in all aspects of the Airport's management during the past twelve years, and I am familiar with all aspects of its history and operation.

2.     As part of my management duties in operating the Airport, I participate in several national and regional aviation organizations such as the Southwest Chapter of the American Association of Airport Executives, the American Association of Airport Executives, and the Aviation Technical Advisory Committee of the Southern California Association of Governments.  These organizations provide updated information regarding operational issues for airports like Santa Monica Municipal Airport.  I also monitor the aircraft that use the Airport to ensure that aircraft can safely operate within the physical constraints of the Airport.  Monitoring events at other airports is an important aspect of my management duties since aircraft operating at other airports often become users of Santa Monica's Airport.

3.     In my prior declaration, I noted that the Airport sits on a plateau 40 feet above the surrounding residential neighborhoods.  As the photographs attached as Exhibit 1 to the City's Opposition to the Application for a TRO show, homes in those neighborhoods are less

than 300 feet from both ends of the runway.  Since the Airport has no runway safety areas ("RSAs") to safeguard residential neighbors or aircraft operators using Santa Monica Airport, I have become particularly concerned about the probability of an aircraft overrun into the nearby residential neighborhoods and I have monitored the incidents of aircraft overruns at other airports to determine if there were precautionary measures that the City could institute to prevent a catastrophic loss of life and property from an accident in Santa Monica.  My concern was reinforced when James Hall, a former Chairperson of the National Transportation Safety Board concurred with my belief that the continued operation of category C and D aircraft without adequate runway safety areas should not be permitted.  See Declaration of James Hall submitted with the City's Opposition to the Application for a TRO.

4.      Aircraft overruns at Santa Monica Airport and other airports across the country are stark reminders that aircraft accidents can occur due to pilot error or mechanical problems with the aircraft.  The dramatic growth in category C and D aircraft operations at Santa Monica Airport is a further reminder that the probability of pilot error or mechanical problems with these aircraft are increasing.  Incidents involving pilot error and aircraft mechanical problems are not theoretical problems, but actual events that have occurred at Santa Monica and at other airports nationwide.

5.      At Santa Monica Airport, the most deadly accident occurred on November 13, 2001 when a twin engine Cessna 340A continued off the end of Runway 21, vaulted an embankment and came to rest on an airport service road during an aborted takeoff due to pilot error.  The details are set forth in paragraph 8B below.  More recently on January 13, 2008, a single engine four seat Jabiru aircraft went off the end of Runway 21, rolled down the west slope of the Airport and came to rest on the service road.  It was reported that the pilot experienced mechanical failure on landing.  The details are set forth in paragraph 8G below.

6.      While the FAA has focused on the lower probability of an aircraft in the

24

DECLARATION OF ROBERT TRIMBORN

categories with faster approach speeds overrunning the Airport's runway, my review of the
incidents that have occurred at the Santa Monica Airport have led me to be concerned about
the tremendous difference in the impact if a category C and D aircraft, as opposed to a
category A or B aircraft, were to overrun the ends of the runway into the residential
neighborhoods. Although the two aircraft accidents at the Airport were category A aircraft,
the slower speeds at which they operated resulted in the aircraft remaining within the Airport
boundaries. With the total absence of RSAs at the Santa Monica Airport, the category C and
D aircraft incidents described below at other airports demonstrate that similar category C and
D aircraft overruns in Santa Monica would go beyond the Airport's boundaries into the
residential areas just off the ends of the runway. Without RSAs that meet FAA standards for
the aircraft fleet mix that uses the Airport or other runway safety measures to mitigate the
impact of pilot error or aircraft mechanical failure, the lower probabilities of a category C
and D aircraft overrun is not particularly relevant for an airport that cannot afford even a
single category C or D aircraft overrun. See Exhibit 12 the City's Opposition to the
Application for a TRO.

       7.     There have also been dramatic jet aircraft runway overruns at the airports in
Santa Barbara, Teterboro, New Jersey and Palomar airport in Carlsbad, California – some of
which resulted in loss of life and substantial property damage and all of which were by the
same type of aircraft that use Santa Monica Airport. As the previously submitted Exhibit 12
illustrates, had the overruns at Teterboro and Santa Barbara occurred at the Santa Monica
Airport, the aircraft would have traveled a good distance into the residential neighborhoods
adjacent to the Airport. As the specifics of these accidents indicate, pilot error or mechanical
problems do occur regardless of the aircraft type or the caliber of the pilot operating the
aircraft.

       8.     Although a category C or D aircraft has not yet overrun the ends of the runway
at Santa Monica, my review of the National Transportation Safety Board's ("NTSB") reports
have revealed that several of the overrun accidents at other airports involved the same

DECLARATION OF ROBERT TRIMBORN

1   aircraft models that use the Santa Monica Airport.  Based on NTSB reports, overruns caused

2   by pilot error and mechanical problems occur at both air carrier and general aviation airports

3   and with both commercial and private pilots.  Some of the accidents that have occurred

4   recently are:

5           A.      Little Rock, Arkansas – A McDonnell Douglas MD-82 aircraft operated

6   by American Airlines overran the end of the runway on June 1, 1999 while landing during

7   severe thunderstorms.  The NTSB concluded that errors made by the flight crew contributed

8   to the overrun.  See Exhibit 22, a summary copy of NTSB report DCA99AM060.

9           B.      Santa Monica, California – On November 13, 2001, a Cessna 340A

10  overran the end of the runway during an aborted take-off resulting in the death of two

11  people.  The NTSB concluded that the pilot failed to remove the control gust lock prior to

12  take-off and further failed to abort the take-off with sufficient runway remaining to stop the

13  aircraft on the runway.  See Exhibit 23, a summary copy of NTSB report LAX02FA028.

14          C.      Teterboro, New Jersey – On February 2, 2005, a Challenger CL-600-

15  1A11 overran the end of the runway on departure.  The aircraft went through an airport

16  perimeter fence, across a six-lane highway where it struck a motor vehicle and passed

17  through a parking lot before impacting a building.  The NTSB concluded that the pilot failed

18  to ensure that the aircraft was loaded within proper weight and balance limits, but still

19  attempted to take-off from the airport.  See Exhibit 24, a summary copy of NTSB report

20  DCA05MA031.  The actual aircraft involved in this accident had operated previously at the

21  Santa Monica Airport on June 23, 2004.

22          D.      Midway Airport, Chicago, Illinois – On December 8, 2005, a Boeing

23  737-300 overran the end of the runway upon landing at Midway Airport.  The aircraft went

24  through both a blast fence and airport perimeter fence before entering an adjacent roadway

25  where it hit a motor vehicle and killed a child in the motor vehicle.  The NTSB cited several

26  factors related to the pilot's judgment and the absence of a runway safety area or other

27  aircraft arresting system to capture an aircraft overrunning the end of the runway.  See

28

DECLARATION OF ROBERT TRIMBORN

1   Exhibit 25, a summary copy of NTSB report DCA06MA009.

2       E.      McClellan-Palomar Airport, Carlsbad, California – On January 24,

3   2006, a Cessna 560 Citation overran the end of the runway on landing at the airport. The

4   NTSB found that the pilot's failure to attain a proper touchdown point during the landing and

5   approach speed contributed to the accident. Four people died in the accident. See Exhibit

6   26, a summary copy of NTSB report SEA06MA047.

7       F.      Santa Barbara, California – On June 10, 2007, a Falcon 900 overran the

8   end of the runway on departure from the airport. The airline transport rated captain of the

9   aircraft reported that the aircraft accelerated normally, but the aircraft did not respond as he

10  had expected. Although the captain decided to abort the take-off, he did not have sufficient

11  remaining runway and the aircraft overran the end of the runway. Fifteen people were

12  injured in the accident. See Exhibit 27, a summary copy of NTSB report SEA07LA152.

13  The actual aircraft involved in this accident has operated at the Santa Monica Airport thirteen

14  times between November 15, 2006 and May 5, 2007.

15      G.      Santa Monica, California - Several months ago on January 13, 2008, a

16  DeSousa Jabiru J400 aircraft overran the end of the runway while landing at the Santa

17  Monica Airport. The pilot reported landing approximately half way down the runway,

18  applying full brakes, but experienced brake failure three quarters of the way down the

19  runway. Three people were injured when the aircraft skidded down a 35 foot embankment.

20  See Exhibit 28, a summary copy of NTSB report SEA08LA060.

21      9.      Although the Santa Monica Airport has not had an overrun from a category C

22  or D aircraft, many of the aircraft noted above also operate at the Santa Monica Airport. As I

23  stated above, the Challenger CL-600-1A aircraft that overran the end of the runway at airport

24  in Teterboro, New Jersey on February 2, 2005 had previously been to the Santa Monica

25  Airport on June 23, 2004 and the Falcon 900 aircraft involved in the Santa Barbara incident

26  on June 10, 2007 operated at the Santa Monica Airport thirteen times between November 15,

27  2006 and May 5, 2007. Pilots of varying degrees of experience and aircraft of all types have

28

DECLARATION OF ROBERT TRIMBORN

1    been involved in accidents that have been caused by pilot error or mechanical problems.

2          10.    Runway safety is an important nationwide issue.  As the Federal Aviation

3    Administration ("FAA") noted in Advisory Circular No. 150/5200-22A, dated September 30,

4    2005. attached hereto as Exhibit 29, on the use of an engineered materials arresting system

5    ("EMAS") for aircraft overruns:

6                     Aircraft can and do overrun the ends of runways,

7                sometimes with devastating results.   An overrun occurs when an

8                aircraft passes beyond the end of a runway during an aborted

9                takeoff or while landing.  Data on aircraft overruns over a 12

10               year period (1975 to 1987) indicate that approximately 90% of

11               all overruns occur at exit speeds of 70 knots or less (Reference 7,

12               Appendix 4) and most come to rest between the extended runway

13               edges within 1000 feet of the runway end (Reference 6,

14               Appendix 4). AC No. 150/5220-22A, Paragraph 3.

15   At the Santa Monica Airport, an aircraft that went 1000 feet beyond the ends of the runway

16   would end up be approximately 700 feet into residential areas adjacent to the Airport.

17         11.    I am familiar with the number of take-offs and landings at the Airport.  Of the

18   total 127.036 aircraft operations in 2007, approximately 118,000 aircraft operations, or more

19   than 93%, were category A and B aircraft.  The remaining 9000 operations, about 7% of the

20   total aircraft operations, were the more demanding category C and D aircraft.  The Airport

21   has no RSAs on either end of the runway.  Accommodating the necessary runway safety

22   enhancements for those faster aircraft is much more challenging because category C and D

23   aircraft require 1000 foot RSAs as opposed to the 300 foot RSAs for category A and B

24   aircraft.  In recent years, the number of faster aircraft in the C and D categories using the

25   Airport has increased substantially.  When the Aircraft Conformance Program was initially

26   discussed by the City's Airport Commission in 2002, Coffman Associates, aviation

27   engineers hired by the City to assess the Airport facility, reported 6800 C and D aircraft

28

DECLARATION OF ROBERT TRIMBORN

operations for the one year period ending in June 2000. By calendar year 2007, the number of category C and D aircraft have grown to over 9000 operations, an increase of 32%.

12.     On average 174 aircraft use the Airport on a daily basis and of that number, only about 12 to 13 aircraft are either category C or D. Of the people who use the category C and D aircraft, many of them are users of charter or fractional share operations that permit the user to shift to other aircraft. Those charter and fractional share users are able to shift to aircraft with slower approach speeds that are compatible with the Airport's Airport Reference Code ("ARC") designation of B-II. See Exhibits 16, 17 and 18, which were attached to the City's Opposition to the Application for a TRO and are copies of relevant information from the internet pages of three fractional share companies regarding the right to trade to a compliant aircraft. In the month of April 2008, there were 641 total category C and D aircraft operations and 303 of those operations, or about 47.3%, were by fractional share companies. As I stated in my earlier declaration, the City's Ordinance will not stop any person from using the Airport.

13.     Although the FAA has argued that the City's Ordinance would interfere with the safe and efficient use of air space in the Los Angeles area by creating congestion and delay for air traffic, it provided no facts to substantiate that claim. First, as stated above, the individuals who use the 12 to 13 aircraft that could be affected by the Ordinance could switch to aircraft that are compliant to the Airport's current ARC of B-II. Second, airports in the region have operated at much higher levels in the past and the number of aircraft that could potentially be diverted from Santa Monica Airport by enforcement of the Ordinance could be readily accommodated by airports in the Los Angeles area. For example, in 2007, Los Angeles International Airport ("LAX") averaged about 933 aircraft per day and Van Nuys Airport averaged about 513 aircraft per day. True and correct copies of the statistics for LAX and Van Nuys airports from the Los Angeles World Airport's internet site are attached hereto as Exhibits 30 and 31. Third, the Hawthorne Airport requested the assistance of the City of Santa Monica in diverting category C and D aircraft to its airport since it is

DECLARATION OF ROBERT TRIMBORN

operating below its operational capacity.  In January 2008, I had a conversation with the operator of the Hawthorne Airport and he indicated their desire to increase the number of category C and D operations at the Hawthorne Airport.

14.    Some current users of Category C and D aircraft will undoubtedly convert to compliant aircraft, but even if none did, the 12 to 13 aircraft that could be affected by the City's Ordinance would not have a significant effect on the traffic at these two airports or air traffic in the Los Angeles area.  As the attached table from the internet site for Van Nuys Airport shows, as recently as 1999, total operations were 598,564 which is over 200,000 more operations then the 2007 total operations level of 394,915.  A true and correct copy of the operations figures shown the Van Nuys Airport internet site is attached hereto as Exhibit 32.  Similarly, in 1999, Los Angeles International Airport ("LAX") had total operations of 779,150, which is almost over 100,000 more then the 2007 total operations level of 680,954.  True and correct copies of the internet pages for the operations levels at Los Angeles International Airport are attached hereto as Exhibits 33 and 34.  In addition, other airports in the area include the facilities at Hawthorne, Torrance, Long Beach, Burbank and El Monte.  It is entirely baseless for the FAA to contend that 9000 operations per year or 25 operations per day would cause congestion and delay for air traffic in the Los Angeles area.

I declare under penalty of perjury that the foregoing is true and correct and is executed this 5th day of May 2008 under the laws of the United States of America and the State of California in the City of Santa Monica, California.


ROBERT TRIMBORN

DECLARATION OF ROBERT TRIMBORN

# EXHIBIT 22

NTSB Identification: **DCA99MA060**.

The docket is stored in the Docket Management System (DMS). Please contact Records
Management Division

Scheduled 14 CFR Part 121: Air Carrier AMERICAN AIRLINES INC
Accident occurred Tuesday, June 01, 1999 in LITTLE ROCK, AR
Probable Cause Approval Date: 5/28/2002
Aircraft: McDonnell Douglas MD-82, registration: N215AA
Injuries: 11 Fatal, 45 Serious, 65 Minor, 24 Uninjured.

The full report (NTSB/AAR-01-02) is available on the NTSB Web site. See
http://www.ntsb.gov/Publictn/publictn.htm for details.

On June 1, 1999, at 2350:44 central daylight time,1 American Airlines flight 1420, a McDonnell
Douglas DC-9-82 (MD-82), N215AA, crashed after it overran the end of runway 4R during
landing at Little Rock National Airport in Little Rock, Arkansas. Flight 1420 departed from
Dallas/Fort Worth International Airport, Texas, about 2240 with 2 flight crewmembers, 4 flight
attendants, and 139 passengers aboard and touched down in Little Rock at 2350:20. After
departing the end of the runway, the airplane struck several tubes extending outward from the
left edge of the instrument landing system (ILS) localizer array, located 411 feet beyond the end
of the runway; passed through a chain link security fence and over a rock embankment to a flood
plain, located approximately 15 feet below the runway elevation; and collided with the structure
supporting the runway 22L approach lighting system. The captain and 10 passengers were killed;
the first officer, the flight attendants, and 105 passengers received serious or minor injuries; and
24 passengers were not injured.2 The airplane was destroyed by impact forces and a postcrash
fire. Flight 1420 was operating under the provisions of 14 Code of Federal Regulations (CFR)
Part 121 on an instrument flight rules (IFR) flight plan.

The National Transportation Safety Board determines the probable cause(s) of this accident as
follows:

The flight crew's failure to discontinue the approach when severe thunderstorms and their
associated hazards to flight operations had moved into the airport area and the crew's failure to
ensure that the spoilers had extended after touchdown.

Contributing to the accident were the flight crew's (1) impaired performance resulting from
fatigue and the situational stress associated with the intent to land under the circumstances, (2)
continuation of the approach to a landing when the company's maximum crosswind component
was exceeded, and (3) use of reverse thrust greater than 1.3 engine pressure ratio after landing.

Full narrative available

Index for Jun1999 | Index of months

031

# EXHIBIT 23

NTSB Identification: **LAX02FA028**.

The docket is stored in the Docket Management System (DMS). Please contact Records Management Division

14 CFR Part 91: General Aviation

Accident occurred Tuesday, November 13, 2001 in Santa Monica, CA

Probable Cause Approval Date: 4/23/2003

Aircraft: Cessna 340A, registration: N2RR

Injuries: 2 Fatal.

During an aborted nighttime takeoff, the airplane continued off the end of the 4,987-foot-long runway, vaulted an embankment, and impacted a guardrail on an airport service road 30 feet below. According to the manufacturer's pilot operating handbook, the takeoff distance required for the ambient conditions was 1,620 feet and the accelerate-stop distance was 2,945 feet. Several witnesses reported observing the airplane traveling along the runway at an unusually high speed, with normal engine sound, and without becoming airborne; followed by an abrupt reduction in engine power and the sound of screeching tires. Skid marks were present on the last 1,000 feet of the runway. In the wreckage, the gust lock/control lock was found engaged in the pilot's control column.

The National Transportation Safety Board determines the probable cause(s) of this accident as follows:

The pilot's failure to remove the control gust lock prior to takeoff and his failure to abort the takeoff with sufficient runway remaining to stop the airplane on the runway.

Full narrative available

Index for Nov2001 | Index of months

032

# EXHIBIT 24

NTSB Identification: **DCA05MA031**.

The docket is stored in the Docket Management System (DMS). Please contact Records Management Division

Nonscheduled 14 CFR Part 135: Air Taxi & Commuter

Accident occurred Wednesday, February 02, 2005 in Teterboro, NJ

Probable Cause Approval Date: 2/1/2007

Aircraft: Bombardier CL-600-1A11, registration: N370V

Injuries: 4 Serious, 2 Minor, 7 Uninjured.

The Safety Board's full report is available at http://www.ntsb.gov/publictn/publictn.htm. The Aircraft Accident Report number is NTSB/AAR-06/04.

On February 2, 2005, about 0718 eastern standard time, a Bombardier Challenger CL-600-1A11, N370V, ran off the departure end of runway 6 at Teterboro Airport (TEB), Teterboro, New Jersey, at a ground speed of about 110 knots; through an airport perimeter fence; across a six-lane highway (where it struck a vehicle); and into a parking lot before impacting a building. The two pilots were seriously injured, as were two occupants in the vehicle. The cabin aide, eight passengers, and one person in the building received minor injuries. The airplane was destroyed by impact forces and postimpact fire. The accident flight was an on-demand passenger charter flight from TEB to Chicago Midway Airport, Chicago, Illinois. The flight was subject to the provisions of 14 Code of Federal Regulations (CFR) Part 135 and operated by Platinum Jet Management, LLC (PJM), Fort Lauderdale, Florida, under the auspices of a charter management agreement with Darby Aviation (Darby), Muscle Shoals, Alabama. Visual meteorological conditions prevailed for the flight, which operated on an instrument flight rules flight plan.

The National Transportation Safety Board determines the probable cause(s) of this accident as follows:

the pilots' failure to ensure the airplane was loaded within weight and balance limits and their attempt to takeoff with the center of gravity well forward of the forward takeoff limit, which prevented the airplane from rotating at the intended rotation speed.

Contributing to the accident were: 1) PJM's conduct of charter flights (using PJM pilots and airplanes) without proper Federal Aviation Administration (FAA) certification and its failure to ensure that all for-hire flights were conducted in accordance with 14 CFR Part 135 requirements; 2) Darby Aviation's failure to maintain operational control over 14 CFR Part 135 flights being conducted under its certificate by PJM, which resulted in an environment conducive to the development of systemic patterns of flight crew performance deficiencies like those observed in this accident; 3) the failure of the Birmingham, Alabama, FAA Flight Standards District Office to provide adequate surveillance and oversight of operations conducted under Darby's Part 135 certificate; and 4) the FAA's tacit approval of arrangements such as that between Darby and PJM.

Full narrative available

Index for Feb2005 | Index of months

033

# EXHIBIT 25

NTSB Identification: **DCA06MA009**.
The docket is stored in the Docket Management System (DMS). Please contact Records
Management Division
Scheduled 14 CFR Part 121: Air Carrier SOUTHWEST AIRLINES CO
Accident occurred Thursday, December 08, 2005 in Chicago, IL
Probable Cause Approval Date: 11/29/2007
Aircraft: Boeing 737-700, registration: N471WN
Injuries: 1 Fatal, 1 Serious, 21 Minor, 85 Uninjured.

The Safety Board's full report is available at http://www.ntsb.gov/publictn/publictn.htm. The
Aircraft Accident Brief number is NTSB/AAR-07/06.

On December 8, 2005, about 1914 central standard time, Southwest Airlines (SWA) flight 1248,
a Boeing 737-7H4, N471WN, ran off the departure end of runway 31 center (31C) after landing
at Chicago Midway Airport (MDW), Chicago, Illinois. The airplane rolled through a blast fence,
and airport perimeter fence, and onto an adjacent roadway, where it struck an automobile before
coming to a stop. A child in the automobile was killed, one automobile occupant received serious
injuries, and three other automobile occupants received minor injuries. Eighteen of the 103
airplane occupants (88 passengers, 3 flight attendants, and 2 pilots) received minor injuries, and
the airplane was substantially damaged. The airplane was being operated under the provisions of
14 Code of Federal Regulations (CFR) Part 121 and had departed from Baltimore/Washington
International Thurgood Marshall Airport (BWI), Baltimore, Maryland, about 1758 eastern
standard time. Instrument meteorological conditions prevailed at the time of the accident flight,
which operated on an instrument flight rules flight plan.

The National Transportation Safety Board determines the probable cause(s) of this accident as
follows:

The pilots' failure to use available reverse thrust in a timely manner to safely slow or stop the
airplane after landing, which resulted in a runway overrun. This failure occurred because the
pilots' first experience and lack of familiarity with the airplane's autobrake system distracted
them from thrust reverser usage during the challenging landing.

Contributing to the accident were Southwest Airline's 1) failure to provide its pilots with clear
and consistent guidance and training regarding company policies and procedures related to
arrival landing distance calculations; 2) programming and design of its onboard performance
computer, which did not present inherent assumptions in the program critical to pilot decision
making; 3) plan to implement new autobrake procedures without a familiarization period; and 4)
failure to include a margin of safety in the arrival assessment to account for operational
uncertainties. Also contributing to the accident was the pilots' failure to divert to another airport
given reports that included poor braking action and a tailwind component greater than 5 knots.
Contributing to the severity of the accident was the absence of an engineering materials arresting
system, which was needed because of the limited runway safety area beyond the departure end of
runway 31C.

Full narrative available

Index for Dec2005 | Index of months

034

# EXHIBIT 26

NTSB Identification: **SEA06MA047**.
The docket is stored in the Docket Management System (DMS). Please contact Records
Management Division
14 CFR Part 91: General Aviation
Accident occurred Tuesday, January 24, 2006 in Carlsbad, CA
Probable Cause Approval Date: 12/20/2007
Aircraft: Cessna 560, registration: N86CE
Injuries: 4 Fatal.

Air traffic control cleared the flightcrew for the instrument landing system (ILS) approach to
runway 24, which was 4,897 feet long. The flightcrew then reported that they had the runway in
sight, cancelled their instrument flight rules (IFR) clearance, and executed a visual flight rules
(VFR) approach in VFR conditions to the airport. The reported winds favored a landing toward
the east, onto the opposite runway (runway 6). During the approach, after a query from the first
officer, the captain indicated to the first officer that he was going to "...land to the east,"
consistent with the reported winds. However, the final approach and subsequent landing were
made to runway 24, which produced a six-knot tailwind. During the approach sequence the
captain maintained an airspeed that was approximately 30 knots higher than the correct airspeed
for the aircraft's weight, resulting in the aircraft touching down about 1,500 feet further down the
runway than normal, and much faster than normal. The captain then delayed the initiation of a
go-around until the first officer asked if they were going around. Although the aircraft lifted off
the runway surface prior to departing the paved overrun during the delayed go-around it
impacted a localizer antenna platform, whose highest non-frangible structure was located
approximately 304 feet past the end of the runway, and approximately two feet lower than the
terrain at the departure end of the runway. The aircraft continued airborne as it flew over
downsloping terrain for about 400 more feet before colliding with the terrain and a commercial
storage building that was located at an elevation approximately 80 feet lower than the terrain at
the end of the runway. The localizer antenna platform was located outside of the designated
runway safety area, and met all applicable FAA siting requirements. The captain had type 2
diabetes, for which he took oral medication and monitored blood sugar levels. He did not reveal
his history of diabetes to the FAA. The captain's post-accident toxicology testing was consistent
with an elevated average blood sugar level over the previous several months; however, no
medical records of the captain's treatment were available, and the investigation could not
determine if the captain's diabetes or treatment were potentially factors in the accident. The
captain of the accident flight was the sole owner of a corporation that was asked by the two
owners of the accident airplane to manage the airplane for them under a Part 91 business flight
operation. The two owners were not pilots and had no professional aviation experience, but they
desired to be flown to major domestic airports so that they could transfer and travel
internationally via commercial airlines. One of the two owners stated that the purpose of the
accident flight was to fly a businessman to a meeting, and to also transport one of the owner's
wives to visit family at the same destination. According to one of the owners, the businessman
was interested in being a third owner in the accident airplane, so the owner permitted the
businessman to fly. The owner also stated that the accident pilot told him that the passenger
would pay for expenses directly related to the operation of the airplane for the flight (permitted
under FAA Part 91 rules), and an "hourly fee" (prohibited under FAA Part 91 rules); however,
no documentation was found to corroborate this statement for the accident flight or previous
flights.

035

The National Transportation Safety Board determines the probable cause(s) of this accident as
follows:

The captain's delayed decision to execute a balked landing (go-around) during the landing roll.
Factors contributing to the accident include the captain's improper decision to land with a
tailwind, his excessive airspeed on final approach, and his failure to attain a proper touchdown
point during landing.

<u>Full narrative available</u>

<u>Index for Jan2006</u> | <u>Index of months</u>

036

# EXHIBIT 27

NTSB Identification: **SEA07LA152**
14 CFR Part 91: General Aviation
Accident occurred Sunday, June 10, 2007 in Santa Barbara, CA
Aircraft: Dassault-Breguet Mystere Falcon 900, registration: N914DD
Injuries: 15 Uninjured.

This is preliminary information, subject to change, and may contain errors. Any errors in this
report will be corrected when the final report has been completed.

On June 10, 2007, approximately 1412 Pacific daylight time, N914DD, registered as a Dassault-
Breguet Mystere Falcon 900, was substantially damaged when it overran the departure end of
Runway 25 on take-off roll at the Santa Barbara Municipal Airport, Santa Barbara, California.
The airplane was registered to Kerry Acquisitions LLC, of Concord, Massachusetts, and
operated by Trishan Air, of Santa Barbara. The airline transport rated captain, airline transport
rated pilot acting as first officer/co-pilot (FO), and 13 passengers were not injured. Visual
meteorological conditions prevailed for the 14 CFR Part 91 business flight, and an instrument
flight plan was filed. The flight was originating at the time of the accident.

In a telephone interview with the NTSB investigator-in-charge (IIC), the captain, who was acting
as the pilot-in-command, reported that during the take-off roll the airplane accelerated normally.
The captain stated that as the airplane accelerated the co-pilot, verbalized "V1" and shortly
thereafter "rotate." The captain further stated that immediately after "rotate" was verbalized he
applied back pressure on the control column, "...but the nose wouldn't come up. I continued to
pull back on the yoke until it was all the way back in my chest, but there was still no response.
The nose wouldn't come off the ground." The captain reported that he then rejected the takeoff
but was unable to stop the airplane on the remaining available runway, which resulted in the
aircraft overrunning the end of Runway 25, coming to rest slightly off the extended centerline
about 300 feet from the departure end. Company maintenance personnel, who examined the
airplane shortly after the occurrence, reported that the airplane had sustained substantial damage
to the forward section of the pressure vessel, just aft of where the nose landing gear is attached;
the nose landing gear had separated during the overrun.

At the request of the IIC, Federal Aviation Administration (FAA) inspectors from the Van Nuys
Flight Standards District Office, Van Nuys, California, will provide oversight supervision during
an examination of the airplane by representatives from Dassault-Breguet, in an effort to identify
the origin of the anomaly.

037

Index for Jun2007 | Index of months

038

# EXHIBIT 28

NTSB Identification: **SEA08LA060**
14 CFR Part 91: General Aviation
Accident occurred Sunday, January 13, 2008 in Santa Monica, CA
Aircraft: DeSousa Jabiru J400, registration: N522RJ
Injuries: 3 Uninjured.

This is preliminary information, subject to change, and may contain errors. Any errors in this
report will be corrected when the final report has been completed.

On January 13, 2008, at 1720 Pacific standard time, an experimental DeSousa Jabiru J400
airplane, N522RJ, overran runway 21 during landing at the Santa Monica Airport, Santa Monica,
California. The airplane sustained substantial damage and the pilot, the owner and operator of the
airplane, and the two passengers, were not injured. Visual meteorological conditions prevailed
for the cross-country flight conducted under the provisions of 14 CFR Part 91. The airplane
departed Catalina Island, California, approximately 35 minutes prior to the accident. Santa
Monica was the pilot's intended destination and no flight plan was filed.

During a telephone conversation with the National Transportation Safety Board investigator-in-
charge, the pilot reported the airplane touched down approximately halfway down the runway.
He reported that he applied full brakes, however, approximately three quarters the way down the
runway, the brakes failed and the airplane overran the runway. After exiting the runway, the
airplane collided with a concrete ditch and skidded down a 35-foot embankment.

Index for Jan2008 | Index of months

039

# EXHIBIT 29



U.S. Department
of Transportation

**Federal Aviation
Administration**

# Advisory Circular

| | |
|---|---|
| **Subject:** Engineered Materials Arresting Systems (EMAS) for Aircraft Overruns | **Date:** 9/30/2005   **AC No:** 150/5220-22A<br>**Initiated by:** AAS-100   **Change:** |

**1.   PURPOSE.** This advisory circular (AC) contains standards for the planning, design, installation, and maintenance of Engineered Materials Arresting Systems (EMAS) in runway safety areas (RSA). Engineered Materials means high energy absorbing materials of selected strength, which will reliably and predictably crush under the weight of an aircraft.

**2.   CANCELLATION.** This AC cancels AC 150/5220-22, *Engineered Materials Arresting Systems (EMAS) for Aircraft Overruns*, dated August 28, 1998.

**3.   BACKGROUND.** Aircraft can and do overrun the ends of runways, sometimes with devastating results. An overrun occurs when an aircraft passes beyond the end of a runway during an aborted takeoff or while landing. Data on aircraft overruns over a 12-year period (1975 to 1987) indicate that approximately 90% of all overruns occur at exit speeds of 70 knots or less (Reference 7, Appendix 4) and most come to rest between the extended runway edges within 1000 feet of the runway end (Reference 6, Appendix 4).

To minimize the hazards of overruns, the Federal Aviation Administration (FAA) incorporated the concept of a safety area beyond the runway end into airport design standards. To meet the standards, the safety area must be capable, under normal (dry) conditions, of supporting the occasional passage of aircraft that overrun the runway without causing structural damage to the aircraft or injury to its occupants. The safety area also provides greater accessibility for emergency equipment after an overrun incident. There are many runways, particularly those constructed prior to the adoption of the safety area standards, where natural obstacles, local development, and/or environmental constraints, make the construction of a standard safety area impracticable. There have been accidents at some of these airports where the ability to stop an overrunning aircraft within

the runway safety area would have prevented major damage to aircraft and/or injuries to passengers.

Recognizing the difficulties associated with achieving a standard safety area at all airports, the FAA undertook research programs on the use of various materials for arresting systems. These research programs, as well as, evaluation of actual aircraft overruns into an EMAS have demonstrated its effectiveness in arresting aircraft overruns.

**4.   APPLICATION.** Runway safety area standards cannot be modified or waived. The standards remain in effect regardless of the presence of natural or man-made objects or surface conditions that might create a hazard to aircraft that overrun the end of a runway. A continuous evaluation of all practicable alternatives for improving each sub-standard RSA is required. FAA Order 5200.8, *Runway Safety Area Program*, explains the evaluation process.

FAA Order 5200.9, *Financial Feasibility and Equivalency of Runway Safety Area Improvements and Engineered Material Arresting Systems*, is used in connection with FAA Order 5200.8 to determinet he best practicable and financially feasible alternative for an RSA improvement.

The FAA does not require an airport sponsor to reduce the length of a runway or declare its length to be less than the actual pavement length to meet runway safety area standards if there is an operational impact to the airport. An example of an operational impact would be an airport's inability to accommodate its current or planned aircraft fleet. Under these circumstances, installing an EMAS is another way of enhancing safety.

A standard EMAS provides a level of safety that is generally equivalent to a full RSA built to the dimensional standards in AC 150/5300-13, *Airport Design.* It also provides an acceptable level of safety for undershoots.

AC 150/5220-22A                                                                                9/30/2005

The FAA recommends the guidelines and standards in this AC for the design of EMAS. In general, this AC is not mandatory and does not constitute a regulation. It is issued for guidance purposes and to outline a method of compliance. However, use of these guidelines is mandatory for an airport sponsor installing an EMAS funded under Federal grant assistance programs or on an airport certificated under Title 14 Code of Federal Regulations (CFR) Part 139, *Certification of Airports*. Mandatory terms such as "shall" or "must" used herein apply only to those who seek to demonstrate compliance by use of the specific method described by this AC.

If an airport sponsor elects to follow an alternate method, the alternate method must have been determined by the FAA to be an acceptable means of complying with this AC, the runway safety area standards in AC 150/5300-13, and 14 CFR Part 139.

**5. RELATED READING MATERIAL.** Appendix 4, Related Reading Material, contains a list of documents with supplemental material relating to EMAS. These documents contain information on materials evaluated, as well as design, construction, and testing procedures utilized. Testing and data generated under these FAA studies may be used as input to an EMAS design without additional justification.

**6. PLANNING CHARTS.** The figures included in Appendix 2, Planning Charts, are for planning purposes only. They are intended as a preliminary screening tool and are not sufficient for final design. Final design must be customized for each installation. The figures illustrate estimated EMAS stopping distance capabilities for various aircraft types. The design used in each chart is optimized specifically for the aircraft noted on the chart. Charts are based on standard design conditions, i.e. 75-foot set-back, no reverse thrust, and poor braking (0.25 braking friction coefficient).

   **a. Example 1.** Assume a runway with a DC-9 (or similar) as the design aircraft. Figure A2-1 shows that an EMAS 400 feet in length (including a 75-foot set-back) is capable of stopping a DC-9 within the confines of the system at runway exit speeds of up to 75 knots.

   **b. Example 2.** Assume the same runway, but assume the design aircraft is a DC-10 (or similar). Figure A2-2 shows an EMAS of the same length, but designed for larger aircraft, can stop the DC-10 within the confines of the system at runway exit speeds of up to 62 knots.

**7. PRELIMINARY PLANNING.** Follow the guidance in FAA Orders 5200.8 and 5200.9 to determine practicable, financially feasible alternatives for RSA improvements. Additional cost and performance information for EMAS options to consider in the analysis can be obtained from the EMAS manufacturer.

**8. SYSTEM DESIGN REQUIREMENTS.** For purposes of design, the EMAS can be considered fixed by its function and frangible since it is designed to fail at a specified impact load. An aircraft arresting system such as EMAS is exempt from the requirements of 14 CFR Part 77, *Objects Affecting Navigable Airspace*. When EMAS is the selected option to upgrade a runway safety area, it is considered to meet the safety area requirements of 14 CFR Part 139. The following system design requirements must prevail for all EMAS installations:

   **a. Concept.** An EMAS is designed to stop an overrunning aircraft by exerting predictable deceleration forces on its landing gear as the EMAS material crushes. It must be designed to minimize the potential for structural damage to aircraft, since such damage could result in injuries to passengers and/or affect the predictability of deceleration forces. An EMAS should be design for a 20-year service life.

   **b. Location.** An EMAS is located beyond the end of the runway and centered on the extended runway centerline. It will usually begin at some setback distance from the end of the runway to avoid damage due to jet blast and undershoots (Figure A1-2, Appendix 1). This distance will vary depending on the available area and the EMAS materials. Where the area available is longer than required for installation of a standard EMAS designed to stop the design aircraft at an exit speed of 70 knots, the EMAS should be placed as far from the runway end as practicable. Such placement decreases the possibility of damage to the system from short overruns or undershoots and results in a more economical system by considering the deceleration capabilities of the existing runway safety area.

The resulting runway safety area must provide adequate protection for aircraft that touch down prior to the runway threshold (undershoot). Adequate protection is provided by either: (1) providing at least 600 feet (or the length of the standard runway safety area, whichever is less) between the runway threshold and the far end of the EMAS bed if the approach end of the runway has vertical guidance or (2) providing the full length standard runway safety area when no vertical guidance is provided.

An EMAS is not intended to meet the definition of a stopway as provided in AC 150/5300-13. The runway

2

9/30/2005                                                                 AC 150/5220-22A

safety area and runway object free area lengths begin at a runway end when a stopway is not provided. When a stopway is provided, these lengths begin at the stopway end (AC 150/5300-13).

The airport sponsor, EMAS manufacturer, and the appropriate FAA Regional Airports Division/Airport District Office (ADO) should consult regarding the EMAS location to determine the appropriate location beyond the end of the runway for the EMAS installation for a specific runway.

**c. Design Method.** An EMAS design must be supported by a validated design method that can predict the performance of the system. The design (or critical) aircraft is defined as that aircraft using the associated runway that imposes the greatest demand upon the EMAS. This is usually, but not always, the heaviest/largest aircraft that regularly uses the runway. EMAS performance is dependent not only on aircraft weight, but landing gear configuration and tire pressure. In general, use the maximum take-off weight (MTOW) for the design aircraft. However, there may be instances where less than the MTOW will require a longer EMAS. All configurations should be considered in optimizing the EMAS design. To the extent practicable, however, the EMAS design should consider both the aircraft that imposes the greatest demand upon the EMAS and the range of aircraft expected to operate on the runway. In some instances, this composite design aircraft may be preferable to optimizing the EMAS for a single design aircraft. Other factors unique to a particular airport, such as available RSA and air cargo operations, should also be considered in the final design. The airport sponsor, EMAS manufacturer, and the appropriate FAA Regional Airports Division/ADO should consult regarding the selection of the design aircraft that will optimize the EMAS for a specific airport.

The design method must be derived from field or laboratory tests. Testing may be based either on passage of an actual aircraft or an equivalent single wheel load through a test bed. The design must consider multiple aircraft parameters, including but not limited to allowable aircraft gear loads, gear configuration, tire contact pressure, aircraft center of gravity, and aircraft speed. The model must calculate imposed aircraft gear loads, g-forces on aircraft occupants, deceleration rates, and stopping distances within the arresting system. Any rebound of the crushed material that may lessen its effectiveness must also be considered.

**d. Operation.** The EMAS must be a passive system.

**e. Width.** The minimum width of the EMAS must be the width of the runway (plus any sloped area as necessary—see 8 (h) below).

**f. Base.** The EMAS must be constructed on a paved surface capable of supporting the occasional passage of the critical design aircraft using the runway and fully loaded Aircraft Rescue and Fire Fighting (ARFF) vehicles without deformation of the base surface or structural damage to the aircraft or vehicles. It must be designed to perform satisfactorily under all local weather, temperature, and soil conditions. It must provide sufficient support to facilitate removal of the aircraft from the EMAS. Full strength runway pavement is not required. Pavement suitable for shoulders and blast pads is suitable as an EMAS base. AC 150/5300-13 provides recommendations on pavement for shoulders and blast pads. State highway specifications may also be used.

**g. Entrance Speed.** To the maximum extent possible, the EMAS must be designed to decelerate the design aircraft expected to use the runway at exit speeds of 70 knots (approach category C and D aircraft) without imposing loads that exceed the aircraft's design limits, causing major structural damage to the aircraft or imposing excessive forces on its occupants. Contact the FAA's Airport Engineering Division (AAS-100) at 202-267-7669 for guidance when other than approach category C and D aircraft is proposed for the EMAS design. Standard design conditions are no reverse thrust and poor braking (0.25 braking friction coefficient).

Generally, when there is insufficient RSA available for a standard EMAS, the EMAS must be designed to achieve the maximum deceleration of the design aircraft within the available runway safety area. However, a 40-knot minimum exit speed should be used for the design of a non-standard EMAS. For design purposes, assume the aircraft has all of its landing gear in full contact with the runway and is traveling within the confines of the runway and parallel to the runway centerline upon overrunning the runway end.

The airport sponsor, EMAS manufacturer, and the appropriate FAA Regional Airports Division/ADO should consult regarding the selection of the appropriate design entrance speed for the EMAS installation.

Note that current EMAS models are not as accurate for aircraft with a maximum take-off weight less than 25,000 pounds.

3

042

**h. Aircraft Evacuation.** The EMAS must be designed to enable safe ingress and egress as well as movement of ARFF equipment (not necessarily without damage to the EMAS) operating during an emergency. If the EMAS is to be built above existing grade, sloped areas sufficient to allow the entrance of ARFF vehicles from the front and sides must be provided. Provision for access from the back of the EMAS may be provided if desirable. Maximum slopes must be based on the EMAS material and performance characteristics of the airport's ARFF equipment.

**i. Maintenance Access.** The EMAS must be capable of supporting regular pedestrian traffic for the purposes of maintenance of the arresting material and co-located navigation aids without damage to the surface of the EMAS bed. An EMAS is not intended to support vehicular traffic for maintenance purposes.

**j. Undershoots.** The EMAS must not cause control problems for aircraft undershoots which touch down in the EMAS bed. Fulfillment of this requirement may be based exclusively on flight simulator tests. The tests will establish the minimum material strength and density that does not cause aircraft control problems during an undershoot. Materials whose density and strength exceeds these minimums will be deemed acceptable.

**k. Navigation Aids.** The EMAS must be constructed to accommodate approach lighting structures and other approved facilities within its boundaries. It must not cause visual or electronic interference with any air navigation aids. All navigation aids within the EMAS must be frangible as required by 14 CFR Part 139. To meet the intent of this regulation, approach light standards must be designed to fail at two points. The first point of frangibility must be three inches or less above the top of the EMAS bed. The second point of frangibility must be three inches or less above the expected residual depth of the EMAS bed after passage of the design aircraft. As a part of the EMAS design, the EMAS manufacturer must provide the expected residual depth to allow the determination of this second frangibility point.

**l. Drainage.** The EMAS must be designed to prevent water from accumulating on the surface of the EMAS bed, the runway or the runway safety area. The removal and disposal of water, which may hinder any activity necessary for the safe and efficient operation of the airport, must be in accordance with AC 150/5320-5, *Airport Drainage.*

The EMAS design must consider ice accumulation and/or snow removal limitations/requirementsd ictated by the project locale. Requirements/limitations must be addressed in the approved inspection and maintenance program discussed in paragraph 14 and Appendix 3.

**m. Jet Blast.** The EMAS must be designed and constructed so that it will not be damaged by expected jet blast.

**n. Repair.** The EMAS must be designed for repair to a usable condition within 45 days of an overrun by the design aircraft at the design entrance speed. Note that this is a design requirement only.

An EMAS bed damaged due to an incident (overrun/undershoot, etc.) must be repaired in a timely manner. The undamaged areas of the EMAS bed must be protected from further damage until the bed is repaired.

**9. MATERIAL QUALIFICATION.** The material comprising the EMAS must have the following requirements and characteristics:

**a. Material Strength and Deformation Requirements.** Materials must meet a force vs. deformation profile within limits having been shown to assure uniform crushing characteristics, and therefore, predictable response to an aircraft entering the arresting system.

**b. Material Characteristics.** The materials comprising the EMAS must:

(1) Be water-resistant to the extent that the presence of water does not affect system performance.

(2) Not attract vermin, birds, wildlife or other creatures.

(3) Be non-sparking.

(4) Be non-flammable.

(5) Not promote combustion.

(6) Not emit toxic or malodorous fumes in a fire environment after installation.

(7) Not support unintended plant growth with proper application of herbicides.

(8) Exhibit constant strength and density characteristics during all climatic conditions within a temperature range appropriate for the locale.

(9) Be resistant to deterioration due to:

(a) Salt.

4

043

(b) Approved aircraft and runway deicing fluids.

(c) Aircraft fuels, hydraulic fluids, and lubricating oils.

(d) UV resistant.

(e) Water.

(f) Freeze/thaw.

(g) Blowing sand and snow.

(h) Paint.

**10. Material Conformance Requirements.** An EMAS manufacturer must establish a material sampling and testing program to verify that all materials are in conformance with the initial approved material force versus deformation profile established under paragraph 9.a. Materials failing to meet these requirements must not be used.

The initial sampling and testing program must be submitted to and approved by the FAA, Office of Airport Safety and Standards for each design method found by the FAA to be an acceptable means of complying with this AC. Once approved, the program may be used for subsequent projects.

**11. DESIGN PROPOSAL SUBMITTAL.** The EMAS design must be prepared by the design engineer and the EMAS manufacturer for the airport sponsor. The airport sponsor must submit the EMAS design through the responsible FAA Airports Region/District Office, to the FAA, Office of Airport Safety and Standards, for review and approval. The EMAS design must be certified as meeting all the requirements of this AC and the submittal must include all design assumptions and data utilized in its development as well as proposed construction procedures and techniques. The EMAS design must be submitted at least 45 days prior to the bid opening date for the project.

**12. QUALITY ASSURANCE (QA) PROGRAM.** A construction quality assurance program must be implemented to ensure that installation/construction is in accordance with the approved EMAS design. The construction contractor and EMAS manufacturer prepare the construction QA program for the airport sponsor. The airport sponsor must submit the construction QA program to the responsible FAA Airports Region/District Office for approval 14 days prior to the project notice to proceed.

**13. MARKING.** An EMAS must be marked with yellow chevrons as an area unusable for landing, takeoff, and taxiing in accordance with AC 150/5340-1, *Standards for Airport Markings.* Paint application should be in accordance with the EMAS manufacturers' recommendations for the EMAS system.

**14. INSPECTION AND MAINTENANCE.** The EMAS manufacturer must prepare an inspection and maintenance program for the airport sponsor for each EMAS installation. The airport sponsor must submit the program to the responsible FAA Airports Region/District Office for approval prior to final project acceptance. The airport sponsor must implement the approved inspection and maintenance program. The program must include any necessary procedures for inspection, preventive maintenance and unscheduled repairs, particularly to weatherproofing layers. Procedures must be sufficiently detailed to allow maintenance/repair of the EMAS bed with the airport sponsor's staff. The program must include appropriate records to verify that all required inspections and maintenance have been performed by the airport sponsor and/or EMAS manufacturer. These records must be made available to the FAA upon request. Appendix 3, Inspection and Maintenance Program, outlines the basic requirements of an EMAS inspection and maintenance program.

Airport personnel must be notified that the EMAS is designed to fail under load and that precautions should be taken when activities require personnel to be on, or vehicles and personnel to be near, the EMAS.

**15. AIRCRAFT RESCUE AND FIRE FIGHTING (ARFF).**

a. **Access.** As required by paragraph 8 (h), an EMAS is designed to allow movement of typical ARFF equipment operating during an emergency. However, as the sides of the system are typically steeply sloped, and the system will be severely rutted after an aircraft arrestment, ARFF vehicles so equipped should be shifted into all-wheel-drive prior to entering and maneuvering upon an EMAS.

b. **Tactics.** Any fire present after the arrestment of an aircraft will be three-dimensional due to the rutting and breakup of the EMAS material. A dual-agent attack and/or other tactics appropriate to this type of fire should be employed.

**16. NOTIFICATION.** Upon installation of an EMAS, its length, width, and location must be included as a remark in the Airport/Facility Directory (AFD). To assure timely publication, the airport sponsor must

5

AC 150/5220-22A                                                    9/30/2005

forward the required information to the FAA Aeronautical Information Services (AIS) as soon as possible, but not later than the "cut-off" dates listed in the AFD, for publication on the desired effective date. (The AIS address and cut-off dates are listed on the inside front cover of the AFD.)  The airport sponsor must also notify the appropriate FAA Regional Airports Division/ADO.

The following is an example of a typical entry:

- "Engineered Materials Arresting System, 400'L x 150'W, located at departure end of runway 16."

When an EMAS is damaged due to an overrun or determined to be less than fully serviceable, a Notice to Airmen (NOTAM) must be issued to alert airport users of the reduced performance of the EMAS.

DAVID L. BENNETT
Director of Airport Safety and Standards

045

# APPENDIX 1. STANDARD EMAS AND TYPICAL SECTIONS.



FIGURE A1-1. STANDARD EMAS INSTALLATION PROVIDES A LEVEL OF SAFETY THAT IS GENERALLY EQUIVALENT TO A STANDARD RUNWAY SAFETY AREA (RSA).

046

AC 150/5220-22A
Appendix 1

9/30/2005



FIGURE A1-2. EMAS TYPICAL SECTION.

047

9/30/2005

AC 150/5220-22A
Appendix 2

## APPENDIX 2.  PLANNING CHARTS.



**FIGURE A2-1.**

048

AC 150/5220-22A
Appendix 2

9/30/2005





DC-10
GW = 455,000 lbs.
NO REVERSE THRUST & POOR BRAKING

FIGURE A2-2.

Notes:
1. Arrestor includes a 75 ft paved lead-in rigid ramp. A 35 ft setback can be used to improve performance for short safety areas.
2. Poor braking simulated using 0.25 braking friction coefficient.

A2-2

049

9/30/2005

AC 150/5220-22A
Appendix 2



PLANNING PURPOSES ONLY
NOT TO BE USED FOR DESIGN. SEE PARAGRAPH 6

B-737-400
GW = 150,000 lbs.
NO REVERSE THRUST & POOR BRAKING

FIGURE A2-3.

Notes:
1  Arrestor includes a 75 ft paved lead-in rigid ramp.  A 35 ft setback can be used to improve performance for short safety areas
2  Poor braking simulated using 0.25 braking friction coefficient.

A2-3

050

AC 150/5220-22A
Appendix 2

9/30/2005



B-767
GW = 266,000 lbs.
NO REVERSE THRUST & POOR BRAKING

PLANNING PURPOSES ONLY
NOT TO BE USED FOR DESIGN - SEE PARAGRAPH 6

FIGURE A2-4.

Notes
1. Arrestor includes a 75 ft paved lead-in rigid ramp.  A 35 ft setback can be used to improve performance for short safety areas
2. Poor braking simulated using 0.25 braking friction coefficient

A2-4



B-747
GW = 875,000 lbs.
NO REVERSE THRUST & POOR BRAKING

FIGURE A2-5.

Notes
1. Arrestor includes a 75 ft paved lead-in rigid ramp.  A 35 ft setback can be used to improve performance for short safety areas
2. Poor braking simulated using 0.25 braking friction coefficient.

PLANNING PURPOSES ONLY
NOT TO BE USED FOR DESIGN - SEE PARAGRAPH 6

052



CRJ-200
GW = 53,000 lbs.
NO REVERSE THRUST & POOR BRAKING

PLANNING PURPOSES ONLY
NOT TO BE USED FOR DESIGN. SEE PARAGRAPH 6

**FIGURE A2-6.**

Notes:
1. Arrestor includes a 75 ft paved lead-in rigid ramp. A 35 ft setback can be used to improve performance for short safety areas
2. Poor braking simulated using 0.25 braking friction coefficient.

A2-6

053

9/30/2005

AC 150/5220-22A
Appendix 2





**FIGURE A2-7.**

Case 2:08-cv-02695-GW-E   Document 15   Filed 05/06/08   Page 69 of 85   Page ID #:391

Page intentionally left blank.

9/30/2005                                                                                      AC 150/5220-22A
                                                                                                   Appendix 3

### APPENDIX 3.  INSPECTION AND MAINTENACE PROGRAM.

An inspection and maintenance program, prepared by the EMAS manufacturer, will be submitted to and approved by the FAA Regional/Airports District Office.  The Airport sponsor must implement the approved inspection and maintenance program.  As a minimum, a basic EMAS inspection and maintenance program must address the following areas:

1.  General information on the EMAS bed including

    - A description of the EMAS bed

    - Material description

    - Contact information for the EMAS manufacturer

2.  Inspection requirements including:

    - Type and frequency of required inspections

    - Training of personnel

    - Instructions on how to conduct each inspection

    - List of typical problems and possible solutions

    - Required documentation for inspections

    - Inspection forms

3.  Maintenance and repair procedures including:

    - List of approved materials and tools

    - Description of repair procedures for typical damage to an EMAS bed such as repairing depressions/holes, abrasion damage, replacing a damaged block, repairing coatings, caulking/joint repair, etc.

4.  Any unique requirements due to location such as snow removal requirements and methods.  Identify compatible deicing agents.  Specify snow removal equipment that is compatible with the EMAS bed and recommended clearing procedures and/or limitations.

5.  Warranty information

AC 150/5220-22A                                                    9/30/2005
Appendix 3

Page intentionally left blank.

A3-2

9/30/2005

AC 150/5220-22A
Appendix 4

## APPENDIX 4. RELATED READING MATERIAL.

This appendix contains a listing of documents with supplemental material relating to the subject of EMAS. These documents contain certain information on materials evaluated as well as design, construction, and testing procedures utilized to date. These publications may be obtained from the National Technical Information Service (NTIS), Springfield, VA 22151.

1. DOT/FAA/PM-87/27, *Soft Ground Arresting Systems*, Final Report, Sept. 1986–Aug. 1987, published Aug. 1987 by R.F. Cook, Universal Energy Systems, Inc., Dayton, OH.

2. 2. DOT/FAA/CT-93/4, *Soft Ground Arresting Systems for Commercial Aircraft*, Interim Report, Feb. 1993 by Robert Cook.

3. DOT/FAA/CT-93/80, *Soft Ground Arresting Systems for Airports*, Final Report, Dec. 1993 by Jim White, Satish K. Agrawal, and Robert Cook.

4. DOT/FAA/AOV 90-1, *Location of Commercial Aircraft Accidents/Incidents Relative to Runways*, July 1990.

5. UDR-TR-88-07, *Evaluation of a Foam Arrestor Bed for Aircraft Safety Overrun Areas*, 1988 by Cook, R.F., University of Dayton Research Institute, Dayton, OH.

A4-1

AC 150/5220-22A                                                    9/30/2005
Appendix 4

Page intentionally left blank.

A4-2

059

# EXHIBIT 30

# Los Angeles World Airports (LAWA)
## Traffic Comparison (TCOM)
## Los Angeles International Airport

| | December 2007 | | | Calendar YTD December | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | *% Change* | 2007 | 2006 | *% Change* |
| **Passenger Traffic Totals** | | | | | | |
| Domestic | 3,633,704 | 3,687,799 | -1.47% | 44,732,810 | 44,129,926 | 1.37% |
| International | 1,456,168 | 1,384,533 | 5.17% | 17,163,265 | 16,910,748 | 1.49% |
| Total | 5,089,872 | 5,072,332 | 0.35% | 61,896,075 | 61,040,674 | 1.40% |
| **Domestic Passengers** | | | | | | |
| Scheduled Carriers | 3,290,869 | 3,360,849 | -2.08% | 40,875,515 | 40,256,824 | 1.5% |
| Commuter Carriers | 339,270 | 323,534 | 4.86% | 3,830,943 | 3,840,656 | -0.3% |
| Charter Carriers | 3,565 | 3,416 | 4.36% | 26,352 | 32,446 | -18.8% |
| Totals | 3,633,704 | 3,687,799 | -1.47% | 44,732,810 | 44,129,926 | 1.37% |
| **International Passengers** | | | | | | |
| Tom Bradley Intl | 756,929 | 708,831 | 6.79% | 9,193,010 | 9,028,075 | 1.83% |
| Terminal 2 | 320,378 | 326,835 | -1.98% | 3,851,891 | 3,860,728 | -0.23% |
| Terminal 4 | 119,498 | 107,203 | 11.47% | 1,324,111 | 1,308,144 | 1.22% |
| Terminal 7 | 89,729 | 72,661 | 23.49% | 838,790 | 896,238 | -6.41% |
| Terminal 5 | 75,971 | 74,107 | 2.52% | 829,393 | 708,286 | 17.10% |
| All Other Terminals | 93,663 | 94,896 | -1.30% | 1,126,070 | 1,109,277 | 1.51% |
| Totals | 1,456,168 | 1,384,533 | 5.17% | 17,163,265 | 16,910,748 | 1.49% |
| **US Customs Arrivals** | | | | | | |
| Tom Bradley Intl | 401,864 | 385,683 | 4.20% | 5,246,231 | 5,081,738 | 3.24% |
| Terminal 2 | 115,145 | 124,300 | -7.37% | 1,416,674 | 1,498,516 | -5.46% |
| Terminal 4 | 86,998 | 69,051 | 25.99% | 844,712 | 817,436 | 3.34% |
| Terminal 7 | 47,383 | 41,093 | 15.31% | 462,558 | 493,901 | -6.35% |
| Terminal 5 | 41,684 | 28,956 | 43.96% | 459,411 | 355,915 | 29.08% |
| Totals | 693,074 | 649,083 | 6.78% | 8,429,586 | 8,247,506 | 2.21% |
| **Air Cargo (Tons)** | | | | | | |
| Mail | 7,181 | 6,983 | 2.82% | 76,093 | 78,871 | -3.52% |
| Freight | 160,826 | 171,853 | -6.42% | 2,001,434 | 2,024,089 | -1.12% |
| Total | 168,007 | 178,837 | -6.06% | 2,077,527 | 2,102,960 | -1.21% |
| **FAA Aircraft Movement** | | | | | | |
| Air Carrier | 38,773 | 39,565 | -2.00% | 467,193 | 463,341 | 0.83% |
| Air Taxi | 17,959 | 15,045 | 19.37% | 193,930 | 174,745 | 10.98% |
| General Aviation | 1,645 | 1,339 | 22.85% | 17,217 | 16,142 | 6.66% |
| Military | 160 | 149 | 7.38% | 2,614 | 2,614 | 0.00% |
| Total | 58,537 | 56,098 | 4.35% | 680,954 | 656,842 | 3.67% |

# EXHIBIT 31

# Los Angeles World Airports (LAWA)
# Traffic Comparison (TCOM)
# Van Nuys Airport

| | December 2007 | | | Calendar YTD December | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | *% Change* | 2007 | 2006 | *% Change* |
| **Passenger Traffic Totals** | | | | | | |
| Domestic | | 0 | 100.00% | | 99 | 0.00% |
| International | 0 | 0 | 0.00% | 0 | 0 | 0.00% |
| Total | 0 | 0 | 0.00% | 0 | 99 | -100.00% |
| **Domestic Passengers** | | | | | | |
| Scheduled Carriers | 0 | 0 | 0.00% | 0 | 0 | 0.0% |
| Commuter Carriers | 0 | 0 | 0.00% | 0 | 0 | 0.0% |
| Charter Carriers | 0 | 0 | 0.00% | 0 | 99 | -100.0% |
| Totals | 0 | 0 | 0.00% | 0 | 99 | -100.00% |
| **International Passengers** | | | | | | |
| All Other Terminals | 0 | 0 | 0.00% | 0 | 0 | 0.00% |
| Totals | 0 | 0 | 0.00% | 0 | 0 | 0.00% |
| **US Customs Arrivals** | | | | | | |
| Totals | 0 | 0 | 0.00% | 0 | 0 | 0.00% |
| **Air Cargo (Tons)** | | | | | | |
| Mail | 0 | 0 | 0.00% | 0 | 0 | 0.00% |
| Freight | 0 | 0 | 200.00% | 8 | 8 | 3.60% |
| Total | 0 | 0 | 200.00% | 8 | 8 | 3.60% |
| **FAA Aircraft Movement** | | | | | | |
| Air Carrier | 0 | 0 | 0.00% | 0 | 0 | 0.00% |
| Air Taxi | 1,157 | 1,273 | -9.11% | 15,931 | 16,157 | -1.40% |
| General Aviation | 27,052 | 27,415 | -1.32% | 358,255 | 378,026 | -5.23% |
| Military | 12 | 24 | -50.00% | 278 | 732 | -62.02% |
| Total | 28,221 | 28,712 | -1.71% | 374,464 | 394,915 | -5.18% |

# EXHIBIT 32



Los Angeles World Airports

| airlines & flights | parking | ground transportation | airport info & services | airport condition |

LAWA    LAX    ONT    VNY    PMD    HOME

search

news & airport facts
maps
inside the airport
information
quick department links

projects

**Statistics** > Based Aircraft > Total Operation History

## VAN NUYS AIRPORT
### *TOTAL OPERATIONS HISTORY*

Listed below is an account of the total flight operations conducted at the Van Nuys Airport.

| YEARS | TOTAL OPERATIONS | YEARS | TOTAL OPERATIONS |
|-------|------------------|-------|------------------|
| 1949 | 70,275* | 1979 | 600,953 |
| 1950 | 110,214 | 1980 | 540,560 |
| 1951 | 125,839 | 1981 | 558,918 |
| 1952 | 123,867 | 1982 | 507,758 |
| 1953 | 133,222 | 1983 | 494,273 |
| 1954 | 131,303 | 1984 | 575,271 |
| 1955 | 144,661 | 1985 | 492,382 |
| 1956 | 194,821 | 1986 | 477,689 |
| 1957 | 218,401 | 1987 | 476,627 |
| 1958 | 191,671 | 1988 | 468,779 |
| 1959 | 215,720 | 1989 | 507,003 |
| 1960 | 228,132 | 1990 | 528,110 |
| 1961 | 281,336 | 1991 | 509,620 |

WWW.LAWA.ORG/VNY - Van Nuys Base Aircraft

| Year | Count | Year | Count |
|------|-------|------|-------|
| 1962 | 320,993 | 1992 | 520,468 |
| 1963 | 341,684 | 1993 | 514,320 |
| 1964 | 386,063 | 1994 | 486,584 |
| 1965 | 439,563 | 1995 | 526,177 |
| 1966 | 534,331 | 1996 | 526,433 |
| 1967 | 496,564 | 1997 | 537,470 |
| 1968 | 567,973 | 1998 | 560,662 |
| 1969 | 526,230 | 1999 | 598,564 |
| 1970 | 575,784 | 2000 | 483,365 |
| 1971 | 562,030 | 2001 | 456,778 |
| 1972 | 574,415 | 2002 | 498,477 |
| 1973 | 581,341 | 2003 | 460,734 |
| 1974 | 586,680 | 2004 | 454,753 |
| 1975 | 588,680 | 2005 | 415,961 |
| 1976 | 618,694 | 2006 | 400,398 |
| 1977 | 592,863 | 2007 | 394,915 |
| 1978 | 601,230 | 2008 | — |

**contact us | comments | sitemap**

© 2008 Los Angeles World Airports. All rights reserved.

http://www.lawa.org/vny/HistoryBasedAircraft.cfm

5/3/2008

063

# EXHIBIT 33

WWW.LAWA.ORG/LAX - 10 Year Summary



search

news & airport facts
maps
FAQs
inside the airport
quick department links
projects
rules & regs

Statistic > Ten Year Summary > FAA Aircraft Movements

### TEN YEAR SUMMARY OF FAA AIRCRAFT MOVEMENTS

|      | Air Carrier | Air Taxi | Military | General Aviation | Total   |
|------|-------------|----------|----------|------------------|---------|
| 1993 | 408,043     | 212,592  | 14,784   | 47,027           | 682,446 |
| 1994 | 418,166     | 214,473  | 14,213   | 43,036           | 689,888 |
| 1995 | 472,134     | 230,997  | 3,178    | 26,330           | 732,639 |
| 1996 | 502,056     | 233,832  | 3,262    | 24,716           | 763,866 |
| 1997 | 524,035     | 227,479  | 3,572    | 26,406           | 781,492 |
| 1998 | 525,089     | 219,123  | 3,326    | 26,031           | 773,569 |
| 1999 | 542,082     | 215,886  | 2,646    | 18,536           | 779,150 |
| 2000 | 565,805     | 198,306  | 2,304    | 17,018           | 783,433 |
| 2001 | 524,014     | 193,892  | 2,052    | 16,156           | 738,433 |
| 2002 | 449,712     | 177,123  | 2,115    | 16,474           | 645,424 |
| 2003 | 433,370     | 171,199  | 2,561    | 15,248           | 622,378 |

back

contact us | comments | sitemap

5/3/2008

WWW.LAWA.ORG/LAX - 10 Year Summary

http://www.lawa.org/lax/tenYrSummary.cfm?process=2d

# EXHIBIT 34

# Los Angeles World Airports (LAWA)
## Traffic Comparison (TCOM)
## Los Angeles International Airport

| | December 2007 | | | Calendar YTD December | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | *% Change* | 2007 | 2006 | *% Change* |
| **Passenger Traffic Totals** | | | | | | |
| Domestic | 3,633,704 | 3,687,799 | -1.47% | 44,732,810 | 44,129,926 | 1.37% |
| International | 1,456,168 | 1,384,533 | 5.17% | 17,163,265 | 16,910,748 | 1.49% |
| Total | 5,089,872 | 5,072,332 | 0.35% | 61,896,075 | 61,040,674 | 1.40% |
| **Domestic Passengers** | | | | | | |
| Scheduled Carriers | 3,290,869 | 3,360,849 | -2.08% | 40,875,515 | 40,256,824 | 1.5% |
| Commuter Carriers | 339,270 | 323,534 | 4.86% | 3,830,943 | 3,840,656 | -0.3% |
| Charter Carriers | 3,565 | 3,416 | 4.36% | 26,352 | 32,446 | -18.8% |
| Totals | 3,633,704 | 3,687,799 | -1.47% | 44,732,810 | 44,129,926 | 1.37% |
| **International Passengers** | | | | | | |
| Tom Bradley Intl | 756,929 | 708,831 | 6.79% | 9,193,010 | 9,028,075 | 1.83% |
| Terminal 2 | 320,378 | 326,835 | -1.98% | 3,851,891 | 3,860,728 | -0.23% |
| Terminal 4 | 119,498 | 107,203 | 11.47% | 1,324,111 | 1,308,144 | 1.22% |
| Terminal 7 | 89,729 | 72,661 | 23.49% | 838,790 | 896,238 | -6.41% |
| Terminal 5 | 75,971 | 74,107 | 2.52% | 829,393 | 708,286 | 17.10% |
| All Other Terminals | 93,663 | 94,896 | -1.30% | 1,126,070 | 1,109,277 | 1.51% |
| Totals | 1,456,168 | 1,384,533 | 5.17% | 17,163,265 | 16,910,748 | 1.49% |
| **US Customs Arrivals** | | | | | | |
| Tom Bradley Intl | 401,864 | 385,683 | 4.20% | 5,246,231 | 5,081,738 | 3.24% |
| Terminal 2 | 115,145 | 124,300 | -7.37% | 1,416,674 | 1,498,516 | -5.46% |
| Terminal 4 | 86,998 | 69,051 | 25.99% | 844,712 | 817,436 | 3.34% |
| Terminal 7 | 47,383 | 41,093 | 15.31% | 462,558 | 493,901 | -6.35% |
| Terminal 5 | 41,684 | 28,956 | 43.96% | 459,411 | 355,915 | 29.08% |
| Totals | 693,074 | 649,083 | 6.78% | 8,429,586 | 8,247,506 | 2.21% |
| **Air Cargo (Tons)** | | | | | | |
| Mail | 7,181 | 6,983 | 2.82% | 76,093 | 78,871 | -3.52% |
| Freight | 160,826 | 171,853 | -6.42% | 2,001,434 | 2,024,089 | -1.12% |
| Total | 168,007 | 178,837 | -6.06% | 2,077,527 | 2,102,960 | -1.21% |
| **FAA Aircraft Movement** | | | | | | |
| Air Carrier | 38,773 | 39,565 | -2.00% | 467,193 | 463,341 | 0.83% |
| Air Taxi | 17,959 | 15,045 | 19.37% | 193,930 | 174,745 | 10.98% |
| General Aviation | 1,645 | 1,339 | 22.85% | 17,217 | 16,142 | 6.66% |
| Military | 160 | 149 | 7.38% | 2,614 | 2,614 | 0.00% |
| Total | 58,537 | 56,098 | 4.35% | 680,954 | 656,842 | 3.67% |