1  GREGORY G. KATSAS
   Acting Assistant Attorney General
2  THOMAS P. O'BRIEN
   United States Attorney
3  ARTHUR R. GOLDBERG, D.C. Bar No. 180661
   Assistant Branch Director
4  JOEL McELVAIN, D.C. Bar No. 448431
   Trial Attorney
5  U.S. Department of Justice
   Civil Division, Federal Programs Branch
6  20 Massachusetts Ave., NW
   Washington, DC 20001
7  Telephone:  (202) 514-2988
   Fax:        (202) 616-8202
8  Email:      Joel.McElvain@usdoj.gov

9  Attorneys for the Plaintiffs

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                     WESTERN DIVISION

13 UNITED STATES OF AMERICA, and          )
14 MARY E. PETERS, United States          )   No. CV 08-02695 GW (Ex)
   Secretary of Transportation,           )
15                                         )   **1.  Plaintiffs' Reply**
                   Plaintiffs,            )   **Memorandum in Support of**
16                                         )   **Application for Preliminary**
               v.                         )   **Injunction; and**
17                                         )
   CITY OF SANTA MONICA,                  )   **2. Declaration of Byron K.**
18                                         )   **Huffman**
                   Defendant.             )
19

20              **Plaintiffs' Reply Memorandum in Support**
                **of Application for Preliminary Injunction**
21

22         The Plaintiffs, the United States of America and Mary E. Peters, the United

23 States Secretary of Transportation, respectfully submit this reply memorandum in

24 support of their application for a preliminary injunction, and in response to this

25 Court's order directing the Defendant, the City of Santa Monica, California ("the

26 City") to show cause why a preliminary injunction should not issue.

27         As the Plaintiffs demonstrated in their initial memorandum, a preliminary

28 injunction is necessary to ensure that the City complies with an Interim Cease and

   Desist Order ("Order") issued by the Acting Director of the Office of Airport

Safety and Standards of the Federal Aviation Administration ("FAA").[1]  The Order directs the City to refrain from enforcing an ordinance that attempts to ban the operation of certain categories of aircraft at Santa Monica Airport ("SMO").  Although the FAA's Order is "effective under its own terms" under 49 U.S.C. § 46105, the City has indicated that it will not abide by the Order unless this Court enjoins it to do so.

This Court has already, correctly, entered a temporary restraining order directing the City to comply with the Order.  (Order Granting Temporary Restraining Order ("TRO"), Apr. 28, 2008, at 3-4.)  This Court should enter a preliminary injunction for the same reasons that it entered the temporary restraining order.  First, the Plaintiffs are not only likely, but are certain, to succeed on the only issue that is properly before this Court – namely, whether the City must abide by the terms of 49 U.S.C. § 46105(a), which requires compliance with the FAA's Order until it is amended, modified, or set aside either by the agency or by a court of appeals.  Second, no showing of irreparable harm is needed here, because in an enforcement action such as this one where Congress has authorized injunctive relief as part of the statutory scheme, irreparable harm from the denial of enforcement is presumed to occur.

In its response to this Court's show cause order, the City raises a series of arguments addressed to the substantive or procedural merits of the FAA's Order.  As this Court recognized in issuing the temporary restraining order, the merits of the Order are not before it.  The City is welcome to file a petition for review asking a court of appeals to consider its arguments as to the merits of the Order.  It may

_____

[1]  As explained below, after the issuance of the initial Order, the Acting Director has issued a Supplemental Interim Cease and Desist Order, which addresses comments submitted to the agency by the City in response to the initial Order and restates the grounds for the Order.

not, however, simply refuse to comply with the Order, force the Plaintiffs to seek injunctive relief from this Court, and thereby create a second vehicle for its attempt to defeat the FAA's regulatory efforts. This Court accordingly should enter a preliminary injunction directing the City to comply with the Order, absent relief from that Order by the agency or by an appropriate court of appeals.

## Background

This Court is already familiar with the factual and legal background that led to the Plaintiffs' filing of their complaint and application for a temporary restraining order. This memorandum addresses developments in this case subsequent to those addressed in the Plaintiffs' initial filings.

The Acting Director of the Office of Airport Safety and Standards of the FAA issued an Interim Cease and Desist Order to the City on April 23, 2008. On the same date that the Order was issued, the undersigned counsel spoke by telephone with counsel for the City. In that conversation, the City's counsel declined the Plaintiffs' request for voluntary compliance with the Order, absent relief from this Court. The City's counsel, however, agreed (both in that conversation and in a telephone conversation the next day) that the City would forswear enforcement of the ordinance until a hearing on the Plaintiffs' application for a temporary restraining order would be held.[2]

This Court held a hearing on April 28. After the hearing, this Court entered a temporary restraining order directing the City to comply with the Order, and further ordered the City to show cause why a preliminary injunction should not issue.

---

[2] In its response to the Order that it submitted to the FAA, the City asserted that the ordinance came into effect on April 24, and that the City only declined to enforce the ordinance beginning on April 25. The Plaintiffs understand this to be an inadvertent misstatement, rather than a deliberate effort to avoid representations made to the government in this matter.

1
2
3
4
5
6

The Interim Cease and Desist Order, by its own terms, afforded the City the opportunity to submit a response to the FAA, whereby it could present any reasons it believed that the Order should not remain in effect.  The City submitted a response to the FAA on May 5; in that response, the City indicated that it intends to file (at some unspecified time after May 9) a petition for review in a court of appeals seeking relief from the Order under 49 U.S.C. § 46110.

7
8
9
10
11
12

The FAA has considered the arguments raised by the City in its administrative response.  The Acting Director issued a Supplemental Interim Cease and Desist Order on May 12, in which he addressed the City's comments and restated the reasons that, in his judgment, the City may not enforce its ordinance during the pendency of the FAA's administrative proceedings.  (Declaration of Byron K. Huffman, attached hereto.)

**Argument**

13
14
15
16
17
18
19
20
21

The City is placing itself squarely in violation of a valid and effective Order of the FAA by refusing to comply with the Interim Cease and Desist Order.  Pursuant to 49 U.S.C. § 46105, the City may not do so; the Order is effective under its own terms until such time as it is modified or set aside by the Secretary (or her designee) or the Court of Appeals.  Because the City refuses to comply voluntarily with its clear obligation to obey the Order, the Plaintiffs are entitled to a preliminary injunction.

22
23
24
25
26
27
28

As a general matter, preliminary injunctive relief may issue when the moving party demonstrates either "a combination of probable success on the merits and the possibility of irreparable harm," or "that serious questions are raised and the balance of hardships tips in its favor."  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  However, in statutory enforcement actions brought by the federal government, such as the present case, where an injunction is authorized by the statute, the requirement of showing an irreparable injury is

considered satisfied once a violation of federal law has been established.  "In statutory enforcement actions, . . . the passage of the statute is itself an implied finding by Congress that violations will harm the public . . . [and] further inquiry into irreparable injury is unnecessary."  *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992).  In other words, "[w]hen the government is seeking compliance pursuant to a statutory enforcement scheme, irreparable injury from a denial of enforcement is presumed."  *Navel Orange Admin. Comm. v. Exeter Orange Co.*, 722 F.2d 449, 453 (9th Cir. 1983).

        As this Court correctly recognized when it issued its temporary restraining order (TRO at 3), this rule, that the federal government need not show irreparable injury to gain injunctive relief, applies fully to enforcement actions under the Federal Aviation Act pursuant to 49 U.S.C. §§ 46106, 46107, and 47111.  *See Civil Aeronautics Bd. v. Carefree Travel, Inc.*, 513 F.2d 375, 385 (2d Cir. 1975).  Accordingly, the Plaintiffs need only show a likelihood that they will succeed on the merits of their claim for enforcement of the Order.

        In its response to this Court's show cause order, the City raises a series of arguments that are apparently directed to the questions of irreparable harm, or of the balance of hardships.  The City fails entirely, however, to address this Court's (correct) holding that the federal government need not make a showing on these questions to gain the injunctive relief that Congress has authorized.  In any event, the Plaintiffs easily satisfy even the traditional test for injunctive relief.

I.      *The Plaintiffs Are Likely to Succeed on the Merits*

        In this case, it is not only likely that the Plaintiffs will succeed on their claim, it is certain.  The Acting Director's Interim Cease and Desist Order (as restated in the Supplemental Interim Cease and Desist Order) instructs the City to cease and desist all efforts to enforce its ordinance.  The City insists that it will refuse to comply with the Order, absent direction from this Court that it must do

so. The City, however, may not determine on its own initiative whether it will obey this Order. The Plaintiffs are accordingly entitled to relief from this Court enjoining the City to comply with the Order.

Pursuant to 49 U.S.C. § 46105(a), the Interim Cease and Desist Order "remains in effect under its own terms or until superseded." Neither the Secretary (nor any designee of the Secretary) nor a Court of Appeals has superseded the Order. The Order thus is valid and binding. The City's statement of its intent to enforce its ordinance violates the Order, and thus violates the terms of Section 46105, which require compliance with the Order while it is in effect. The City is free to file a petition for review with the court of appeals, which would have "exclusive jurisdiction" to review the Order, or to award any "interim relief" from the Order's terms. 49 U.S.C. § 46110(c). No provision of law, however, permits the City to violate the Order absent such relief either from the FAA or the Court of Appeals. And no provision of law permits the City to justify violations of the Order by questioning the Order's merits in this Court. *See Federal Maritime Comm'n v. South Carolina Ports Auth.*, 535 U.S. 743, 762 (2002) (discussing foreclosure of district court review of merits in action to enforce FMC order); *see also United States v. Daylight Dairy Prods.*, 822 F.2d 1, 2 (1st Cir. 1987) (Breyer, J.) (discussing foreclosure of district court review of merits in action to enforce order under the Agriculture Marketing Agreement Act).

The City acknowledges that the court of appeals would hold exclusive jurisdiction to consider any challenges to the validity of the Order. It argues, however (at page 7 of its response), that the appellate court's exclusive jurisdiction would apply only if a petition had been filed with that court. As no such petition has yet been filed, the City argues, this Court is free to look underneath the Order

- 6 -

and to rule on its merits.[3]  As this Court recognized when it issued the temporary restraining order (TRO at 2-3), this conclusion does not follow.  The fact that a court of appeals has not yet been given the opportunity to exercise its exclusive jurisdiction over review of the Order does not mean that any other court would be empowered to do so.  To the contrary, in the context of the Hobbs Act – which, like the Federal Aviation Act, provides for exclusive jurisdiction in the court of appeals for review of certain administrative orders – it is well understood that district courts may not intrude on that exclusive jurisdiction, even where no appellate petition for review has been filed, and even where the time for filing such a petition has expired.  *See, e.g., Electromedical Prods., Int'l v. Kessler*, 949 F. Supp. 30, 32 (D.D.C. 1997).[4]

At bottom, the City argues (at page 8 of its response) that it is "high-handed" for the FAA to seek to enforce the Order while precluding the City from questioning that Order.  But the City is in no sense precluded from raising its arguments against the validity of the Order.  It was afforded the opportunity to

---

[3]  As discussed above, the City has notified the FAA of its intent to file a petition for review of the Order in a court of appeals at an unspecified date after May 9.  Given the nature of the City's arguments in this Court, the Plaintiffs understand the City to concede that, at least once such a petition is filed, this Court could not consider the merits of the FAA's Order, and could only enforce that Order while it remains in effect.

[4]  The City also suggests (at page 4 of its response) that the Order is not "proper or valid," citing to *Air California v. Dep't of Transp.*, 654 F.2d 616 (9th Cir. 1981).  That case, however, concerned the court of appeals' dismissal of a petition for review of a non-final order of the FAA.  In this case, the Interim Cease and Desist Order has a direct and immediate effect on the City, and the FAA demands immediate compliance with the Order.  The Order therefore is a final order for purposes of establishing the court of appeals' jurisdiction to review it, even though there will be continued administrative dealings between the City and the FAA on related matters.  *See generally Mace v. Skinner*, 34 F.3d 854, 857 (9th Cir. 1994).

respond to the FAA, and it has exercised that opportunity.  It also may, at any time, file a petition for review with the court of appeals, as both the Plaintiffs and this Court (see TRO at 2), have repeatedly informed it.  The City has not yet exercised that right, but no action either by the Plaintiffs or this Court has prevented it from doing so.

The only question before this Court is whether the City is in violation of the Interim Cease and Desist Order.  The City is free to seek any appropriate relief from the court of appeals; it may not, however, unilaterally decide to violate the Order, nor may it seek to justify such a violation before this Court by disputing the Order's merits.  Because there is no dispute that the City is so in violation, the Plaintiffs are not only likely, but are certain, to succeed on their claim for enforcement of the Interim Cease and Desist Order.

II.    *There is a Clear Possibility of Irreparable Harm*

As noted above, the Plaintiffs need not demonstrate the danger of irreparable harm to gain the relief sought here, the enforcement of a valid order issued under federal law.  In any event, there is a clear danger of irreparable harm to the national aviation system if the City's ordinance were to be permitted to go into effect.

The ordinance would prohibit the operations of Category C and Category D aircraft at SMO.  As noted both in the Interim Cease and Desist Order and the Supplemental Interim Cease and Desist Order, there currently are approximately 9,000 aircraft operations of C and D aircraft at that airport per year.  The ban thus would likely affect approximately 20,000 to 30,000 passengers annually.  These aircraft would be diverted to other airports in the region, including LAX.  These other airports, however, have their own limitations on the capacity that they can absorb.  The ban would create congestion and delays, and interfere with safe and efficient use of the air space in the Los Angeles area.  In addition, the effect of the ordinance, if other airport operators were to follow suit, would multiply the impact

1    of local efforts to interfere with the uniform operations of the federal aviation
2    system.

3         The City attempts to justify this interference with the federal aviation system
4    by claiming a safety need for a ban on Category C and D aircraft.  Its arguments on
5    this score, however, fail to show any basis to conclude that these aircraft pose a
6    greater safety hazard than do Category A or B planes.  As the City correctly
7    acknowledges (at page 20 of its memorandum), all of the overruns to date at SMO
8    have involved only Category A or B aircraft.  Although the City has submitted a
9    declaration that purports to list overruns at other airports, it fails to acknowledge
10   that several of the incidents in its list involved A or B aircraft.  The City's list
11   demonstrates the wisdom of the adage that "the plural of 'anecdotes' is not 'data'";
12   a complete review of the data on overruns shows that, nationally, C and D aircraft
13   are *less* likely to overrun runways than are A and B aircraft.  (See Supplemental
14   Interim Cease and Desist Order at 8, attached to Huffman Declaration.)  The City's
15   purported distinction between these categories of aircraft, therefore, simply lacks a
16   factual basis.[5]

17        The ordinance's interference with regional and national aviation operations
18   presents a possibility of irreparable injury to the federal government's interest in
19   ensuring safe and efficient use of air space.  The balance of equities lies in favor of
20   enforcing the Interim Cease and Desist Order, which seeks only to preserve the

---

24        [5]  This Court has correctly recognized that the Plaintiffs do not ask it to
     approve or disapprove of the substance of the Order.  (TRO at 3.)  The Plaintiffs
25   pause only to note that, for the same reason that the City fails in its (legally
     irrelevant) claim that the balance of equities lies in its favor, the City also is likely
26   to be ultimately held in violation of its various obligations under the Federal
27   Aviation Act, for example, its obligation under 49 U.S.C. § 47107(a) as a federal
     grant recipient to make its airport available for use on reasonable conditions and
28   without unjust discrimination.

status quo in which Category C and Category D aircraft have operated without incident for over twenty years.

## Conclusion

For the foregoing reasons, the Plaintiffs respectfully request that the Court enter a preliminary injunction that will enjoin the Defendant, the City of Santa Monica, California ("the City"):

1.  To comply with the Supplemental Interim Cease and Desist Order issued by the Acting Director of the Office of Airport Safety and Standards of the Federal Aviation Administration ("FAA") on May 12, 2008;

2.  To cease and desist from the enforcement of Santa Monica, Cal., Mun. Code § 10.04.06.220 (2008) during the pendency of the FAA's administrative proceedings with respect to the validity of that ordinance; and

3.  To permit Category C and Category D aircraft to operate at SMO during that same time period to the extent that such aircraft are permitted to do so under federal law.

Dated: May 12, 2008                    Respectfully submitted,

                                       GREGORY G. KATSAS
                                       Acting Assistant Attorney General

                                       THOMAS P. O'BRIEN
                                       United States Attorney

                                       ARTHUR R. GOLDBERG
                                       Assistant Branch Director


                                           /s/ Joel McElvain
                                       JOEL McELVAIN
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       20 Massachusetts Ave., NW, Room 7130
                                       Washington, D.C. 20001
                                       Telephone:   (202) 514-2988
                                       Fax:         (202) 616-8202
                                       Email:       Joel.McElvain@usdoj.gov

                                       *Attorneys for the Plaintiffs*

GREGORY G. KATSAS
Acting Assistant Attorney General
THOMAS P. O'BRIEN
United States Attorney
ARTHUR R. GOLDBERG
Assistant Branch Director
JOEL McELVAIN, D.C. Bar No. 448431
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 514-2988
Fax:          (202) 616-8202
Email:        Joel.McElvain@usdoj.gov

Attorneys for the Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and MARY E. PETERS, United States Secretary of Transportation, | No. CV 08-02695 GW (Ex) |
| Plaintiffs, | |
| v. | **Declaration of Byron K. Huffman** |
| CITY OF SANTA MONICA, | |
| Defendant. | |

1. I, Byron K. Huffman, Acting Director of the FAA Office of Airport Safety and Standards at

   the Federal Aviation Administration, hereby declare as follows pursuant to the provisions of

   28 U.S.C. § 1746.

2. I have been employed with the Federal Aviation Administration ("FAA") since September

   2001. I have been acting Director since May 5, 2008. Prior to serving as Acting Director, I

have been the Manager of the Airports Division in the FAA Alaskan Region with offices in Anchorage, Alaska for 6 1/2 years.

3. On May 12, 2008, I issued a Supplemental Cease and Desist Order, ordering the City of Santa Monica (City) to immediately suspend enforcement of its Ordinance, (effective April 24, 2008), banning Category C and D aircraft operations from Santa Monica Municipal Airport (SMO). A true copy of the executed Interim Cease and Desist Order is attached hereto as Exhibit 1.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Byron K. Huffman
Acting Director
FAA Office of Airport
Safety and Standards

Executed on the 12 day of May, 2008, at Washington, D.C.

# UNITED STATES DEPARTMENT OF TRANSPORTATION
# FEDERAL AVIATION ADMINISTRATION
# WASHINGTON, DC

|  |  |
|---|---|
| ———————————————— ) | |
| **IN THE MATTER OF COMPLIANCE** ) | **FAA Docket No. 16-02-08** |
| **WITH FEDERAL OBLIGATIONS** ) | |
| **BY THE CITY OF SANTA MONICA,** ) | |
| **CALIFORNIA** ) | |
| ———————————————— ) | |

## SUPPLEMENTAL INTERIM CEASE AND DESIST ORDER

On April 23, 2008, the Federal Aviation Administration (FAA) issued an interim cease and desist order that directed the City of Santa Monica (the City) not to enforce a March 25, 2008 Ordinance (Ordinance), that purported to ban operations of Category C and D aircraft at Santa Monica Airport (SMO). That order advised the City of its right to file a response within 10 days. The City filed a response on May 5, 2008. This supplemental order addresses the points made by the City in opposition to the order. Following careful review and consideration of the data and documents submitted by the City, this supplemental order also restates the bases for the issuance of an interim cease and desist order.

This matter is before the FAA based on a Notice of Investigation (NOI) dated October 8, 2002, initiated by the Director of the Office of Airport Safety and Standards, and supplemented by his March 26, 2008 Order to Show Cause. The NOI and Order to Show Cause were issued in accordance with the FAA Rules of Practice for Federally Assisted Airport Enforcement Proceedings, 14 Code of Federal Regulations (C.F.R.) Part 16. The FAA's investigation seeks to determine the legality of the City's Ordinance banning Category C and D aircraft operations at SMO.

The City's ban on Category C and D jet aircraft was scheduled to take effect and be enforced against operators on April 24, 2008. On April 23, however, the City Attorney agreed to a request by the Department of Justice to refrain from enforcing the Ordinance pending the April 28, 2008 hearing in United States District Court on the FAA's request for a temporary restraining order (TRO). After the hearing the Court entered an Order granting the TRO, which prohibits enforcement of the Ordinance, and scheduled a preliminary injunction hearing on May 15, 2008.[1]

The Ordinance's stated purpose purports to be one of safety: to protect the people living adjacent to the airport and flying in aircraft using the airport. The Ordinance also claims to comport with a 1984 agreement between the City and the FAA[2]. The City claims the Ordinance conforms to the City's

---

[1] United States v. City of Santa Monica, Case No. CV 08-2695.
[2] The 1984 Agreement is a settlement agreement between the City and the FAA. For additional explanation, see page 5 infra.

obligation under the agreement to serve category A and B aircraft at SMO, and the City asserts the right to prohibit or limit any other type, kind or class of aeronautical use of SMO.  The categories of aircraft are based on wingspan and approach speed.[3]

On March 26, 2008, the FAA issued an Order to Show Cause under 14 C.F.R Part 16.  The Order directed the City to show cause within ten days as to why the FAA should not supplement the existing Part 16 investigation (begun in 2002 when a similar Ordinance was proposed[4]) with the facts pertaining to the adopted Ordinance.  The Order to Show Cause also expressly determined the investigation and issuance of the initial determination had to be expedited pursuant to 14 C.F.R. § 16.11 because the Ordinance would otherwise take effect April 24, 2008.

On April 7, 2008, the City filed its response to the Order to Show Cause.

By letter dated and delivered on April 21, 2008, by e-mail, facsimile and express mail to the City and its counsel, the FAA requested that, by close of business Tuesday April 22, 2008, the City withdraw its April 14, 2008 letter to the aeronautical users of SMO advising them of the ban, and assure the FAA and those users in writing that the City would refrain from enforcing the ban on Category C and D aircraft operations pending the outcome of the Part 16 administrative proceeding.  The FAA requested a copy of the City's withdrawal letter by close of business Tuesday April 22, 2008.  The FAA's April 21, 2008 letter was attached to the Interim Cease and Desist Order.

The FAA further advised the City that should it fail to comply with this request by close of business Tuesday April 22, 2008, the FAA would issue a cease and desist order requiring the City to hold the Ordinance in abeyance in order to preserve the status quo pending the conclusion of the FAA's investigation.   The City responded by letter dated April 22, 2008, copy attached, refusing to withdraw the April 14, 2008 letter to the aeronautical users and stating again the City's intention to enforce the Ordinance effective April 24, 2008.

As stated above, the FAA issued a cease and desist on April 23, 2008, ordering the City of Santa Monica to cease and desist immediately from enforcing the Ordinance until a final agency decision is issued by the FAA in this matter under 14 C.F.R. Part 16.  The Order afforded the City ten days to respond.  On April 23, 2008, the City Attorney advised the Department of Justice that the City would accede to the Department of Justice's request and would not enforce the Ordinance until a TRO hearing was held.  On April 28, 2008, the United States District Court granted the FAA's request for a TRO enforcing the cease and desist order.  As a result, the City's Ordinance has yet to be enforced.  The preliminary injunction hearing is scheduled for May 15, 2008.

---

[3] A Category A-1 aircraft, has an approach speed of less than 91 knots. A Category B-I aircraft has an approach speed of  91 knots but less than 121 knots. A Category C-I aircraft has an approach speed between 121 knots or more but less than 141 knots.  A Category D-1 aircraft has an approach speed of more than 141 knots but less than 166 knots.

[4] On October 8, 2002, the FAA issued a Notice of Investigation under Part 16 initiating an investigation into the legality of a Santa Monica Airport Commission recommendation that the City Council adopt an Aircraft Conformance Program (ACP) that, like the present 2008 Ordinance, would restrict aircraft operations at SMO up to Category B-II aircraft, thus excluding Category C and D jet aircraft.  The City responded to the NOI on November 2, 2002, and did not adopt an Ordinance but entered into discussions with the FAA that continued until recently in 2008 when it adopted the new but substantially similar Ordinance.

On May 5, 2008, the City responded to the cease and desist order within the 10 day period provided for a response. In its response, the City again objected to the cease and desist order and demanded that the FAA withdraw the cease and desist order by May 9, 2008. The City avers that it will file a petition for review in an appropriate court of appeals challenging the cease and desist order if it is not withdrawn by May 9, 2008.

All of the issues raised by the City are being addressed in the on-going investigation, and will be decided in the FAA's forthcoming initial determination. The FAA is issuing this Supplemental Interim Cease and Desist Order pursuant to 14 C.F.R. §§ 16.11,16.31(d) and 16.109(a), and consistent with the provisions of our previous order, which afforded the City with notice and an opportunity to comment on the terms of that order. We have carefully reviewed and considered the City's May 5 response in opposition to the interim cease and desist order. Based upon that review, we conclude that the City has not articulated any basis, consistent with law and the public interest for allowing the Ordinance to take effect during the pendency of the FAA's administrative proceeding. The City therefore may not enforce its ban on operations by Category C and D operators until a final agency decision is issued on the legality of the City's ban.

We reiterate our previous finding that although we have not yet issued the initial Director's determination, we can and do make the preliminary finding that the City's ban on operation of these aircraft is likely unlawful. Accordingly, it is our view that the Ordinance cannot be enforced, since doing so will foreclose operations by aircraft with a present right to utilize SMO. The City's ban on these operations cannot be allowed while the Part 16 administrative proceeding addressing its legality is ongoing.

Enforcement of the Ordinance before the FAA's final agency decision is issued can only be interpreted as an attempt to divest Category C and D operators of their right to use SMO and the FAA of its jurisdiction over its administrative process to which the City, as a Federally obligated airport, must adhere. Notwithstanding the City's arguments in its Response to the Cease and Desist Order, SMO is an important general aviation reliever for Los Angeles International Airport (LAX) in a regional airspace and airport system that is already strained in terms of available airports. Furthermore, Category C and D aircraft operations have been landing and taking-off safely from SMO for over twenty years. There is no emergency requiring a ban, and the City has identified no safety or other basis for a change in the status quo that would bar these operations.

Airport design standards for facilities such as runways are based on the operational and physical characteristics of the aircraft that use the airport. FAA airport design standards are used so that all airport elements meet the requirements for the most demanding aircraft that is expected to have 500 or more annual itinerant operations at the airport. As stated in the Advisory Circular for Airport Design, AC 150/5300-13, "The use of the standards and recommendations contained in this publication for the design of airports supports this public charge [i.e. to develop and maintain a national system of safe, delay-free, and cost-effective airports]. These standards and recommendations, however, do not limit or regulate the operations of aircraft." AC 150/5300-13, page 1.

We reiterate that it is not inherently unsafe for an aircraft of a larger design category to utilize an airport that has been designed to accommodate a lesser design category if the aircraft meets the FAA approved operational requirements for using that airport. This is the case at SMO for Category C & D aircraft.

3

The FAA strictly regulates the safe operation of aircraft from certification (e.g. 14 C.F.R. Part 25) to the manner in which the aircraft is operated (e.g. 14 C.F.R. Part 135). Both types of regulations cover runway length requirements. Moreover, pilot certification, and the operation of a particular aircraft/flight, including the amount of required runway for a take off and landing, are all regulated by the FAA. Category C and D operations at SMO comply with all of these requirements.

There are also a number of separate reasons why the City's Ordinance is likely an unlawful ban. All of these have been communicated previously to the City and are discussed briefly below. The upcoming Director's Determination will fully address the merits of the case as noticed in the 2002 NOI, and as supplemented in the 2008 Order to Show Cause.

<u>Federal Grant Assurance Obligations</u>

We adhere to our prior determination that the City's Ordinance appears facially to violate Federal grant assurances that the City has committed to be bound by. Title 49 of the United States Code, § 47101, et seq., provides for Federal financial assistance for the development of public-use airports like SMO under the Airport Improvement Program ("AIP") established by the Airport and Airway Improvement Act of 1982, as amended. Section 47107 and the grant contract, set forth assurances to which an airport sponsor agrees as a condition to receiving Federal financial assistance. Upon acceptance of an AIP grant, the assurances become a binding obligation between the airport sponsor and the Federal government.

Between 1985 and 1994, the Airport received a total of $9.7 million in Federal airport development assistance. Because the City's AIP grants have not been used for purchasing land, most of the corresponding AIP grant assurance obligations are effective for 20 years. Since 1994, the City has not received new grants and the City's last grant amendment was in 2003. The City's grant assurance obligations therefore remain in effect.

Assurance 22, Economic Nondiscrimination, of the prescribed sponsor assurances implements the provisions of 49 U.S.C. § 47107(a) (1) through (6), and requires, in pertinent part, that the sponsor of a Federally obligated airport

>   will make its airport available as an airport for public use on reasonable terms, and without unjust discrimination, to all types, kinds, and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

The owner of any airport developed with Federal grant assistance is required to operate the airport for the use and benefit of the public and to make it available to all types, kinds, and classes of aeronautical activity on fair and reasonable terms, and without unjust discrimination. As such, it may not deny reasonable access to aeronautical users.

Title 49 USC § 40103(e) states that "[a] person does not have an exclusive right to use an air navigation facility on which Government money has been expended."

49 USC § 47107(a)(4) provides, in pertinent part, that "a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport."

4

Grant Assurance 23, *Exclusive Rights*, of the prescribed sponsor assurances requires and subsumes the statute's pertinent parts, so that the sponsor of a federally obligated airport

> will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public...It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities....

An exclusive right is defined as a power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right. An exclusive right can be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means. Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights, is an exclusive right that is forbidden by the Grant Assurance. That is precisely the type of right that the City's Ordinance attempts to assert to the detriment of Category C and D operations.

The City's Ordinance therefore raises serious concerns under each of these statutory and grant assurance provisions since, if effective, the Ordinance would bar categories of operators currently serving SMO, and in doing so would favor other categories of operators. Consistent with the City's obligations discussed above there can be no basis for allowing the City to begin enforcing its unilateral ban while the legality of that ban is under question and is subject to ongoing administrative investigation.

The 1984 Settlement Agreement

As we explained in the prior cease and desist order, this is not the first time the City has attempted to limit operations at SMO. In June 1981, the Santa Monica City Council enacted a resolution calling for closure of SMO.[5] That action resulted in extensive litigation against the City by airport associations and the FAA. The litigation resulted in a negotiated settlement memorialized on January 31, 1984, referred to as the 1984 Santa Monica Airport Agreement (1984 Agreement). The agreement was executed by the City and the FAA and resolved all "existing litigation and/or administrative complaints pending between the parties."

The 1984 agreement restates the City's Federal obligations, including those set forth in Assurance 22, to permit reasonable access to aeronautical users. In Section 8 of the agreement, the City committed to "operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever, or its capacity in terms of runway length and width, taxiway system, and runway weight bearing strength." Section 9 requires the City to maintain continuously the one designated runway (3/21), which is 5,000 feet long and 150 feet wide. The agreement also provides in Section 2 that SMO "is to be open and available to and for public use as an airport on fair and reasonable terms and without unjust discrimination, and without granting any exclusive rights prohibited by law" and recognizes that "exclusive authority is vested in the FAA for the regulation of all aspects of

---

[5] See also, *City of Santa Monica Airport Assn v City of Santa Monica*, 481 F. Supp 92 (C.D. Cal. 1979), aff'd 659 F.2d 100 (9th Cir 1981) (City jet ban held unconstitutional). Discussed infra at page 9.

air safety, the management and control of the safe and efficient use of the navigable airspace, and movement of aircraft through that airspace" in connection with SMO.

The City, ostensibly for safety reasons – an area within the agreed- to "exclusive authority" of the FAA – is poised to restrict access of two categories of users that are currently permitted to utilize SMO without restrictions.  Again, it would be imprudent to allow that action, which appears to be directly contrary to the Federal grant assurance obligations specifically agreed to by the City as set forth in the 1984 Agreement, to take place before the underlying legality of the City's Ordinance has been determined by the FAA.

<u>Surplus Property Act Restrictions</u>

As we also noted in our previous Order, deeds and other conveyance instruments issued under the Surplus Property Act (SPA), 49 U.S.C. § 47151, such as the 1948 SPA Instrument of Transfer that transferred SMO to the City, contain restrictive covenants similar to AIP grant assurance obligations.  These covenants ensure continued reasonable access to aeronautical users without unjust discrimination.  The SPA obligations run in perpetuity unless released by the FAA. The SPA deed and other instruments of transfer also provide the FAA with the right to revert the airport to the Federal government for violation of the deed and instrument covenants.

The United States executed an "Instrument of Transfer" dated August 10, 1948" (*1948 Instrument of Transfer*)[6] in which the Federal government surrendered its leasehold interest in the Santa Monica Airport, and transferred it together with U.S. airfield improvements back to the City.  The *1948 Instrument of Transfer* remised, released and forever quitclaimed the subject premises to the City subject to reservations, restrictions and conditions specified in the transfer document.

Two of the restrictions listed in the 1948 *Instrument of Transfer* executed by the Federal government and the City of Santa Monica, are directly applicable here. The first provides:

> the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, *on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right* for use of the airport….

The second relevant restriction in the 1948 *Instrument of Transfer* independently re-states the exclusive rights prohibition:

> no exclusive right for use of the airport at which the property transferred by this instrument is located shall be vested (directly or indirectly) in any person or persons to the exclusion of others in the same class, the terms *"exclusive right"* being defined to mean
>
> …any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft."

---

[6] 2001 Title Report sets out the 1948 Instrument of Transfer as a quit claim deed.

On the tenth of August, 1948, the City confirmed its acceptance of the *Instrument of Transfer* from the U.S Government by passing Resolution No. 183.  The City's acquiescence to the terms, conditions and restrictions is demonstrated by this City resolution accepting the 1948 *Instrument of Transfer;* the 1948 *Instrument of Transfer* was recorded in the County of Los Angeles on August 23, 1948 as Document No. 1746.

The City nonetheless argues that it is not subject to obligations under the Surplus Property Act.  This is contrary to the previous history of the City seeking, and the FAA's awarding of, partial releases from its Surplus Property Act obligations.  During the period from 1952-1956 and into the 1970s, several parcels of land were released from the Federal obligations contained in the 1948 *Instrument of Transfer.*

Pursuant to 49 U.S.C § 47151 only the Secretary may ensure compliance with an instrument conveying an interest in surplus property.  Hence, the FAA has the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non-federal public agencies pursuant to the SPA.

Additionally, FAA is granted the authority to release airport premises from surplus property terms and obligations.  This authority is conditioned on a finding that the release is necessary to protect or advance the interests of the United States in civil aviation.  See 49 USC § 47153 and 14 C.F.R. § 155.3

Accordingly, the City's Ordinance also raises legal concerns under the Surplus Property Act since the ban on operations by Category C and D aircraft is in all likelihood contrary to the obligations contained in the 1948 *Instrument of Transfer*.  Again, there is no basis, given this, to allow the Ordinance to take effect and disrupt the ongoing operations of Category C and D aircraft while the legality of the Ordinance is finally determined by the FAA.

<u>The City Has Provided No Basis That Would Support Allowing the Ordinance to Take Effect</u>

In response to the FAA's prior Cease and Desist Order, the City's May 5 filing offers various arguments as to why the City believes the Ordinance does not run afoul of any of the provisions discussed above. These arguments, as specifically discussed below, largely reiterate prior arguments advanced by the City.  Principally the City contends that the Ordinance ban on Category C and D aircraft is based on the City's assumptions that Category A and B aircraft operations are somehow safer at SMO than are Category C and D aircraft operations. The City claims that growing numbers of Category C and D aircraft have begun using SMO since 1984, and that this exacerbates the safety risks at SMO. The City therefore assumes that because category C and D aircraft may have faster approach speeds than Category A and B aircraft, they have a higher safety risk and thus cannot operate at SMO. However, this assumption is flawed. The approach speeds of many jets, like C-I and C-II, may at certain weights be slower than some B-II aircraft.

As the FAA has previously explained, however, it is incorrect to categorically assume that operations of Category C and D aircraft at SMO are less safe than operations of Category A and B aircraft.  Airport design standards do not determine whether a given aircraft can safely land or take off at a given airport; this is the function of the aircraft certification and aircraft operating rules.  The aircraft certification and operating rules take into account the aircraft design features and characteristics (for example, aircraft

weight, configuration, engine thrust, stopping capability, speeds, and procedures) and the operating environment (for example, airport elevation, runway surface condition (dry or wet), runway length and slope, and atmospheric conditions such as wind and temperature) to determine the conditions under which takeoff and landing operations can be conducted.  Aircraft approach categories only categorize aircraft in terms of their approach speed at the maximum certificated landing weight.  These categories are not intended to be, and should not be used as, a sole criterion for determining whether or not a takeoff or landing can be safely conducted, nor for evaluating the relative safety risk of different aircraft for takeoff or landing.

The vast majority of existing turbojet aircraft, including those that operate at SMO, were certified in accordance with 14 CFR Part 25, *Airworthiness Standards: Transport Category Airplanes*. These certification standards apply to airplanes ranging from business jets to large airliners.  These standards include requirements that determine the minimum safe distances required for the aircraft to take off and land under the conditions, airplane weights, and configurations within the operating envelope defined for the aircraft.

For takeoff, the current Part 25 certification rules require that an aircraft must be able to safely continue or reject a takeoff if an engine fails at the most critical point in the takeoff.  For both takeoff and landing, the probability of the failure of any system needed to show compliance with the certification requirements must be inversely related to the severity of the failure.  Failures that could result in a catastrophic outcome must be extremely improbable.

The rules under which a given aircraft is operated (i.e., 14 CFR Parts 91, 121, 125, 135) relate the minimum safe takeoff and landing distances determined under Part 25 to the specific operation and airport for each takeoff.  The combination of the aircraft certification rules and the operating rules provide the requirements and parameters under which takeoff and landing operations can be safely conducted.

Under the rules discussed above, operations by Category C & D aircraft at SMO are completely permissible. The FAA has concluded that the City has not demonstrated at this stage of the proceeding any basis supporting its contrary contention that growing numbers of Category C and D aircraft decrease safety at SMO.  There is simply no evidence that C and D aircraft are any less safe than A and B aircraft. In fact, the performance range of many B, C or even D aircraft overlap to such an extent that restricting C and D aircraft would be unjustly discriminatory to the operators of those aircraft.

Moreover, not only do accident rates indicate that jets, including those in Category C and D, have lower accident rates than propeller driven aircraft, larger jet aircraft have even lower accident rates than smaller jet aircraft types. There, again, is no data to support a premise that jets have a higher overrun rate than other aircraft types, or that large jets are more prone to an overrun than smaller aircraft, or that C or D jets have a higher overrun rate than B aircraft.  In fact, the overrun accident history at SMO could not support banning any type of B, C or D jets.  According to NTSB data from 1981 to 2007, a period of twenty-six years, there were 6 accidents, including two fatalities at SMO.  All six accidents involved aircraft that were small piston propeller driven A-I or B-I aircraft, and not those prohibited by the Ordinance.[7]

---

[7] See NTSB database at ntsb.gov

8

In 1979, the U.S. District Court found an earlier Santa Monica Ordinance imposing a total ban on jet landings to violate the Equal Protection and the Commerce clauses of the U.S. Constitution. *Santa Monica Airport Association v. City of Santa Monica*, 481 F. Supp. 927 (D.C C.D CA, 1979), aff'd 659 F.2d 100 (9th Cir 1981). The district court rejected the City's safety justification for the Ordinance, finding: "as to safety, the evidence is utterly convincing that modern, small, business or executive type jets of the type that would be able to fly out of this airport with the jet ban lifted, are at least as safe, if not much safer, than the types of piston-engine fixed wing aircraft which are now allowed to use the airport." *Id.* Since jet operations at SMO include category C and D operations, the City's Ordinance is again attempting to ban the types of operations that were at issue in the 1979 proceeding. This history reinforces the harmful precedent that would be established if the City is permitted to enforce the 2008 ordinance pending the Part 16 proceeding.

The City also attempts to justify the Ordinance as meeting FAA requirements for Runway Safety Areas ("RSAs"). RSAs enhance safety in the event of an undershoot, overrun, or excursion from the side of the runway. All airports certificated by the FAA for commercial service under 49 U.S.C. § 44706, as implemented by 14 C.F.R. Part 139 are required to build standard runway safety areas to the extent practicable by 2015. 49 U.S.C § 44706 note (2005). The RSA standard is part of FAA's airport design standards; it is not an operating requirement or condition for federally funded general aviation airports like SMO. No FAA aircraft operating rule requires a standard RSA.

There is no basis in Federal law for Federally funded airports to restrict access on this basis. Moreover, at commercial service airports the RSA standard only has to be met "to the extent practicable". Even if Santa Monica were a commercial service airport, and it is not, standard RSAs would not be practicable at SMO because there is little leveled property at both ends of the runways. Accordingly, Santa Monica has no independent proprietary authority to restrict access based upon Federal RSA standards. In any event, assuming arguendo that an airport proprietor has authority to exceed minimum airport design standards such as those relating to RSAs, that authority clearly may not be exercised in a manner that violates its obligations under its Federal grant assurances and Surplus Property Act obligations to allow access on fair and reasonable terms without unjust discrimination. For similar reasons, SMO lacks authority to interpret FAA's Airport Reference Code ("ARC") designation to restrict access in violation of the obligations noted above.[8]

RSAs also are not considered during aircraft certification, nor do they enter into the determination of the minimum runway length required under airplane operating rules. Airplanes must be able to safely operate regardless of the presence or absence of an RSA. FAA-approved Airplane Flight Manual (AFM) limitations and performance information, developed in accordance with the airplane certification requirements, are used to show compliance with the requirements applicable to that operation. When those requirements are met, there is no aircraft performance regulatory basis for prohibiting operations.

---

[8] The standards and recommendations in the FAA Airport Design Circular, FAA AC 150/5300-13, dated 9/29/89, are recommended by the FAA for use in the design of civil airports. For airport projects receiving Federal grant-in-aid assistance for a project, the use of these standards is mandatory. At certificated airports, the standards and recommendations may be used to satisfy 14 CFR Part 139, subpart D. AC, paragraph 3. SMO is neither a recipient of Federal funding for an airport development project nor certificated under Part 139. Where such standards are mandatory, FAA approval may be sought to modify design standards other than dimensional standards for runway safety areas to meet local conditions. AC paragraph 6.

In any event, these arguments, and any others offered by the City, will continue to be considered in the context of the ongoing FAA proceeding. But, at this stage, and based on all the arguments the City has made thus far, there is absolutely no demonstrated basis for the City's attempt to ban category C and D aircraft that have been safely operating for over twenty years at SMO.

Contrary to the City's argument in its Response to the Interim Cease and Desist Order, this case is not about FAA "aggressively" attacking the City. It is about the City taking action that would ban operators currently using SMO and doing so on a basis that appears facially unlawful. Even more importantly, the City's Ordinance would take this step while an investigation into the legality of the Ordinance is ongoing. It is therefore the City's disruption of the status quo without apparent legal authority that has prompted this order and our prior order.

The FAA has presented the City with numerous alternatives to the City's Ordinance, including the FAA proposal presented to the City on March 7, 2008, which includes a pilot awareness program to be developed in conjunction with FAA, installation of a 70-knot Engineered Materials Arresting System (EMAS) on the departure end of runway 21, and the implementation of a voluntary program of property acquisition, initially limited to approximately 15-20 homes in the most critical areas in the RSA and Runway Protection Zone (RPZ) for both runways at SMO. The FAA also offered the possibility of Federal funding to assist the City to implement these alternatives. The City has consistently rejected each of these proposals. Any of these alterations could have addressed the City's concerns without unlawfully curtailing operations by C and D operators.

As to the agency's alleged misconduct, the City's bases for this claim are legally and procedurally incorrect. The initiation of the investigation of the City's proposed action (2002 Ordinance) was well within the authority of the Rule. See 14 C.F.R. §16.101. Part 16 actions like this one initiated by the FAA, as opposed to by third party complaint, do not have any time prescribed period for issuance of a Director's Determination. See 14 C.F.R. §16.31(a). As previously explained, the Order to Show Cause provided the City 10 days to respond, the time period for responding to a motion under 14 C.F.R. § 16.19(c). The City was provided 30 days to respond to the 2002 NOI and would have been provided additional time to respond to the 2008 Order to Show Cause had the City agreed to delay enforcement of the ordinance which had been due to become effective within less than 30 days following issuance of the Order to Show Cause. The Order to Show Cause provided that the proceedings would be expedited. As to the City's Freedom of Information Act request the FAA provided a partial response and release of documents to the City and is working to complete the same. Additionally, once the Director's Determination is issued, the FAA will provide the City with any documents comprising the index of administrative record not in the possession of the City.

The City's argument that the ban on Category C and D aircraft imposes no harm on aircraft operations because operations may still be conducted at SMO with Category A and B aircraft is frivolous. The argument completely disregards the City's Federal obligation to provide reasonable access to aeronautical users. Under section 47107(a)(1) and assurance 22 the reasonable access requirement applies to aircraft access, not to operators who elect, consistent with the City's ban, to utilize other aircraft. The ban on Category C and D aircraft is unlawful because it precludes those aircraft from operations at SMO. Harm will also result from having a federally-obligated airport proprietor appear to have unbridled discretion to violate its grant obligations and usurp the agency's jurisdiction over safety of aircraft operations.

10

The City has failed to demonstrate any safety rationale or proprietary authority for its proposed ban on Category C and D aircraft. It correctly acknowledges that there have been no overruns of Category C or D aircraft at SMO. Although the City has submitted a declaration by Robert Trimborn that lists overruns that have occurred at other airports, its fails to note that several of the overruns in its list -- those of a Cessna 340, a Cessna 560, and a Falcon 900 -- were each of Category B aircraft, not C or D. Furthermore, the City purports to justify its ban on operations of Category C and D aircraft by speculating as to the damage that would occur in the (exceedingly unlikely) event of an overrun at SMO by such aircraft. As some Category B aircraft (such as, for example, the Falcon 900) weigh more than twice as much as some Category C aircraft (such as, for example, the Learjet), there is no basis for the City's speculation on this score.

Again, the City cannot deny access to Category C and D aircraft since the FAA regulations permit Category C and D aircraft that meet relevant FAA airworthiness standards and aircraft operating requirements to land and takeoff at SMO. See, e.g., *Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir.2007) ("[T]he FAA preempts the entire field of aviation safety through implied field preemption. The FAA and regulations promulgated pursuant to it establish complete and thorough safety standards for air travel, which are not subject to supplementation by ... state laws.") The FAA Part 16 case cited by the City, *Pacific Coast Flyers Inc. v County of San Diego*, is distinguishable. The case involved the temporary displacement of aircraft during construction of an airport improvement project. In no respect can the case be relied upon as supporting SMO's permanent ban.

The City fails to cite any court decision upholding the authority of an airport proprietor to ban certain aircraft operations because of local aviation safety concerns. That is because no court has ever interpreted the scope of the proprietor exception, codified at 49 U.S.C. 41713(b)(3), to support such an argument. Courts that have addressed the airport proprietor exception have recognized that local proprietors play an "extremely limited" role in the regulation of aviation. *American Airlines, Inc. v. DOT*, 202 F.3d 788, 806 (5th Cir. 2000). See also *British Airways Board v. Port Authority of New York and New Jersey*, 564 F.2d 1002, 1010 (2d Cir. 1977) ("[A]irport proprietors have an 'extremely limited role' in the system of aviation regulation").

The City cites assurance 22(i), which provides that an airport may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or to serve the civil aviation needs of the public. But 22(i) reflects only the limited proprietary authority discussed above. See, for example, *Ashton v. City of Concord*, Docket No. 16-02-01 (August 22, 2003), affirmed in Final Agency Decision, February 27, 2004, petition dismissed *Ashton v. FAA*, 181 Fed. Appx. 2, (D.C. Cir, 2006), where FAA found that an airport sponsor properly exercised its limited proprietary rights in declining to enter into an aeronautical business agreement.[9]

Assurance 22(i) is the exception to the rule, which is that the prohibition on denial of access and unjust discrimination under Grant Assurance 22(a). Furthermore, the 10th Circuit Court of Appeals' decision in

---

[9] See also *AOPA v. Pompano Beach*, Docket No. 16-04-01, (December 15, 2005) "Airport owners may impose reasonable rules or regulations to restrict or deny use of the airport for purposes deemed to be incompatible with safety under the local conditions peculiar to that airport. However, as noted in the Order, this authority is not unbridled. The airport may propose an access restriction based on safety and efficiency, but when such a restriction triggers a complaint, such as this complaint, the FAA Airports Office will review the supporting justification and make the final determination regarding the reasonableness of an access restriction. Restrictions based on safety and/or efficiency require supporting justification from the appropriate Flight Standards and/or Air Traffic Offices."

*Arapahoe County Public Airport Authority v FAA,* 242 F3d 1213 (C.A. 10, 2001), rejected the Authority's argument that its scheduled passenger service ban is per se an exercise of its proprietary power because grant assurance 22(i) permits the Authority to make that determination without articulating a viable purpose for the restriction. *Arapahoe* at 1222-1224.

The City's reliance on the FAA's final agency decision in *Millard Refrigerated Services v Omaha Airport Authority,* FAA Docket No. 13-93-19 (8/4/95), a 25 year old FAA administrative decision, is also misplaced. *Millard* is factually distinguishable because the airport authority there was compelled to choose which airport design standards to meet when the FAA issued newly effective standards. The airport authority was proposing airport improvements and seeking federal funding and therefore compliance was mandatory. Unlike the City of Santa Monica, the authority in *Millard* thoroughly studied and evaluated the actions required to meet the standards for small and large airplane design category airports before concluding that it was only feasible to meet the standards for former. Its decision was primarily based upon existing physical constraints of the airport and substantial difference in costs ($156,000 vs $3,550,000). Unlike the ban at issue here, the change in design category of *Millard* only affected three based operators, who were offered assistance in relocating to another airport. Finally, the airport did not take action to limit access until required to do so by the FAA. The FAA determined that, in part due to frost conditions, the airport's pavement stength was not designed to support regular use by large airplanes. FAA's subsequent warning that the authority's federal grant obligations required it to limit use of its runway to aircraft weighing less than 12,500 pounds MGTW prompted the airport to adopt a ban.

The City's Tenth Amendment argument is also inapposite. This argument, like the argument that the ban causes no harm, improperly disregards SMO's status as a federally obligated airport. The Supreme Court in *NY v. US,* 505 US 144, 145 (1992) continues to rely on a key holding from *South Dakota v. Dole,* 483 U.S. 203, 210 (1987): "Congress may attach conditions on the receipt of Federal funds." The Tenth Amendment does not restrict the range of conditions Congress can impose on the receipt of Federal funds when the conditions bear some relationship to the purpose of the Federal spending. In any event, as previously discussed, the area of national air transport and air safety is a recognized Federal concern.

Santa Monica has also failed to articulate any irreparable harm it will suffer if the Ordinance, which purports to ban operation by aircraft that have safely operated at SMO for over twenty years, is not allowed to take effect. In fact, public interest concerns dictate that the Ordinance should not take effect. The City's Ordinance, as explained above, is likely unlawful in a number of respects. Allowing an Ordinance (that may subsequently be determined to be unlawful) to subvert present operations of Category C and D airplanes is harmful on its own and because of its effects on the national air system. Santa Monica is an important general aviation reliever airport for Los Angeles International Airport (LAX). According to the City's own estimates the ban would affect over 9,000 Category C and D aircraft operations or approximately 7% of total operations at SMO. Disruption of over 9000 annual operations is a significant number for the Los Angeles region and nationally as well. For example, the FAA uses 500 annual operations as a standard for funding runways. The exclusion of 9,000 operations may also impact the travel of approximately 20,000-30,000 passengers annually.

The ban would also affect interstate travel because the Category C and D aircraft are used for a substantial portion of non-stop interstate flights. This would result in a significant burden on interstate commerce.

By banning 9,000 or more operations from SMO, and forcing those operations to use other airports, the ban affects Federal air traffic and airspace management in the greater Los Angeles region. Several other airports in the region, Los Angeles International Airport ("LAX"), Van Nuys (VNY), and Burbank (BUR), are already at or near capacity.[10]  LAX is at capacity and the others are working to petition the FAA to institute noise access restrictions that could affect the very aircraft that the City seeks to displace at SMO. The LAX Master Plan Final EIS states that "all of the general aviation airports are constrained from large scale expansion and there is a concern to avoid displacing general aviation operations from those busy facilities into other commercial airports in the region." Diverting general aviation operations to LAX is inconsistent with SMO's reliever status obligation: to relieve general aviation operations from LAX. Given capacity constraints, and the petition of other airports in the region to restrict access, it is simply incorrect for the City to claim that other airports could absorb, without consequence, the effects of the City's unilateral decision to ban 9,000 annual operations of category C & D operations at SMO.

Allowing one City to ban categories of aircraft in violation of its Federal obligations could also encourage other local governments to follow suit thus creating a patchwork of local laws affecting aviation which is the province of the Federal government. The ban undermines the FAA's role to ensure the safe and efficient use of airspace pursuant to 49 U.S.C. § 40103(b)(1). Permitting the City to enforce its ban during the pendency of Part 16 administrative proceedings will detract from FAA's statutory role to enforce airport grant assurances and other Federal obligations and plenary jurisdiction over aircraft operations and safety in movement areas. It would also be harmful in undermining the congressional policies underlying the airport grant compliance and improvement programs.


Legal Authority.

Pursuant to 49 U.S.C § 40113(a) FAA is authorized to issue orders to carry out Part A of Subtitle VII of 49 U.S.C., including section 40103(e) prohibiting the granting of exclusive rights. That section provides explicit authority for the Administrator of the FAA to "take action the . . . Administrator . . . considers necessary to carry out this part . . . ." including the authority for " issuing orders."

Pursuant to 49 U.S.C § 47122(a) the FAA may issue orders to carry out Subchapter I on Airport Improvement, sections 47101 – 47142. This subchapter includes the grant assurances requiring reasonable access and prohibiting unjust discrimination to aeronautical users.

---

[10] The primary role of SMO and other general aviation airports in the region is to act as relievers for the commercial airports like LAX.  General aviation jet operation numbers drop as delays increase at LAX because general aviation jet operations move to reliever airfields like SMO that do not experience such delays.  The role of commercial airports like LAX is not to accept general aviation from SMO, it is the other way around.  Single engine piston operations may have dropped at VNY over the last 20 years, however, multi-engine and jet powered aircraft operations have grown.  Van Nuys will be petitioning FAA to consider noise restrictions on the growth of jet aircraft at Van Nuys.  Therefore, SMO can't assume LAX and Van Nuys can accept SMO's displaced Category C and D aircraft anymore than Van Nuys can assume it can displace aircraft to SMO.

13

Pursuant to 49 U.S.C. § 46110(a),  FAA final orders issued under Part A or Part B of Subtitle VII of 49 U.S.C. may be appealed to the United States Court of Appeals.

Under 14 C.F.R § 16.33(d) if the Director's Initial Determination finds the respondent in noncompliance and proposes the issuance of a compliance order, the initial determination will include notice and opportunity for a hearing under Subpart F, if such an opportunity is provided by the FAA.  Section 16.109(a) of the regulation provides authority for the issuance of proposed orders of compliance including a cease and desist order in initial determinations.  Under 14 C.F.R.§ 16.11 the Director of the Office of Airport Safety and Standards may issue orders and take such other actions as are necessary to fulfill the purposes of  Part 16.  Said purposes include the adjudication of proceedings instituted by the FAA to determine compliance with the prohibition on exclusive rights, the grant assurances, and Surplus Property Act obligations. See 14 C.F.R. §§ 16.1(a) (1),(5), (8). Section 16.11(a) expressly cites the explicit authority of the agency in 49 U.S.C.  §§ 40113 and 47122 to take action that it considers necessary to carry the applicable statutes.[11]

The City's May 5 response nevertheless questions the FAA's authority to order a party to desist from apparent unlawful action pending final agency determination on the legality of that action.  In effect, the City argues that unlawful aircraft bans must be tolerated until such time that an administrative proceeding has been finally concluded.  That is not, and cannot be, the law. Notwithstanding the City's arguments, the FAA does have the authority to issue interim cease and desist orders pursuant to the general authority of 49 U.S.C. §§ 40113 and 47122 coupled with that provided under 14 C.F.R. 16.11, 16.31(d) and 16.109(a).  The regulatory scheme outlined in the City's Response that ends with a final cease and desist order in a final agency decision is the normal Part 16 process but it is not the only possible process under the statutes and regulation.  It certainly is not a basis that can support the City's aircraft ban.

Section 40113(a) and 47122 authority exists to provide broad authority that is completely applicable in situations such as this, where a city is purporting to ban classes of aircraft under an untested and likely unlawful ordinance while refusing to wait until the administrative process has run its course.  The broad authority of sections 40113 and 47122 give the Department and FAA the authority to take action that the agency considers necessary to carry out the applicable part or subchapter, including issuing orders in extraordinary circumstances, such as those presented in this case.  Further, section 16.11 of the regulation expressly cites the explicit authority of the agency in 49 U.S.C. §§ 40113 and 47122 to take action that it considers necessary to carry the applicable statutes.[12]

The FAA has provided the City notice and an opportunity to be heard pursuant to section 16.11.  The City received (and responded to) our earlier letter of April 21 and to the initial order imposing the cease and desist order for a limited time period.  At base, the City argues that existing procedures hamstring the agency so that it must countenance unlawful activities until such time that an agency proceeding has been ultimately concluded.  That is not the case. The interim cease and desist order, together with this Supplemental Order, ensures orderly continuation of the status quo during the existing administrative process and until a final decision is issued with appeal rights to the United Court of Appeals pursuant to 49 U.S.C. § 46110.

---

[11] In 14 C.F.R § 16.11(a) section 47122 is miscited as 47121
[12] See footnote 8.

The FAA has therefore concluded that there is ample authority for the Agency to require the City to cease and desist from any enforcement of the Ordinance. No local government has previously ever taken the unprecedented action the City now contemplates. In the context of this proceeding, where the City is poised to begin enforcing a local ordinance with criminal penalties that may very well be unlawful for a host of reasons, allowing the Ordinance to take effect at this juncture in the administrative proceeding cannot be countenanced. There is no basis here for the City to alter the status quo, deprive operators of their existing right to use SMO, and subject other airports and the air navigation system to the disruption that will ensue while the City tests its various arguments in defense of its Ordinance in the ongoing administrative proceeding.

Under the statutory and regulatory scheme, an initial Director's Determination with a finding of non-compliance and providing the opportunity for a hearing, may propose issuance of a compliance order. However because the Ordinance would become effective before the Director's Determination will issue, and given the immediate and severely disruptive nature of the Ordinance the FAA has determined to leave in place the Cease and Desist Order previously imposed in our April 23 Order.

Good cause exists for issuance of an interim cease and desist order. As we have discussed above, SMO is an important general aviation reliever for LAX in a regional airspace and airport system that is already strained in terms of available airports. Furthermore, Category C and D aircraft operations have been landing and taking-off safely from SMO for over twenty years. No emergency has been shown requiring an immediate ban, and there is no urgent or compelling basis for a change in the status quo that would bar these operations. Furthermore, while we have not yet issued an initial determination we continue to believe that the City's ban on operation of these aircraft is likely unlawful. Accordingly, it is our view that the Ordinance cannot be allowed to go into effect.


IT IS ORDERED:

That the City of Santa Monica, California continue to cease and desist from enforcing its Ordinance banning Category C and D aircraft operations from Santa Monica Municipal Airport until a final agency decision is issued in this matter pursuant to 14 C.F.R. §§ 16.33 or 16.241(c).

That the City of Santa Monica shall continue to notify all aeronautical users of the Santa Monica Municipal Airport, including operators of Category C and D aircraft, that the Ordinance's ban on C and D aircraft is not in effect.


Byron K. Huffman                                               Date: 5/12/08
Acting Director
Office of Airport Safety and Standards

15

## CERTIFICATE OF SERVICE

I hereby certify that, on May 12, 2008, I caused the foregoing documents to be filed with the Court through its electronic case filing system.  The electronic filing of these documents constitutes service on the following:

Martin T. Tachiki, Esquire
Deputy City Attorney
1685 Main Street, Room 310
Santa Monica, California 90401


    /s/ Joel McElvain
JOEL McELVAIN
*Attorney*